```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                             SHERMAN DIVISION

 3   UNITED STATES OF AMERICA,           §
                                         §
 4                    Plaintiff,         §    Case No.
                                         §    4:20-cr-00382-SDJ-KPJ-
 5        vs.                            §    103, 104
                                         §
 6   MAAZ AZIZ and SAAD AZIZ, et al,     §    VOLUME II
                                         §    Pages 171 - 393
 7                    Defendants.        §

 8                     TRANSCRIPT OF DETENTION HEARING
                      BEFORE THE HONORABLE SEAN D. JORDAN
 9                      UNITED STATES DISTRICT JUDGE

10                  Monday, October 25, 2021; 1:35 p.m.
                              Plano, Texas
11

12   APPEARANCES OF COUNSEL:
     (Continued on page 172.)
13
     FOR THE UNITED STATES:
14
       Ernest Gonzalez
15     Colleen Elizabeth Bloss
       U.S. ATTORNEY'S OFFICE - Plano
16     101 East Park Boulevard, Suite 500
       Plano, Texas 75074
17
     FOR THE DEFENDANT MAAZ AZIZ:
18
       Lucas C. Wohlford
19     Robert M. Castle, III
       DUANE MORRIS, LLP - Dallas
20     100 Crescent Court, Suite 1200
       Dallas, Texas 75201
21

22     ***********************************************

23                    GAYLE WEAR, RPR, CRR
                    Federal Official Court Reporter
24                        7940 Preston Road
                         Plano, Texas 75024
25                        214.872.4867
```

```
 1   APPEARANCES OF COUNSEL:
     (Continued from page 171.)
 2
     FOR THE DEFENDANT SAAD AZIZ:
 3
     Ryan Jonathan Meyer
 4   Rachel Maloney Riley
     KATTEN MUCHIN ROSENMAN LLP - Dallas
 5   2121 N. Pearl Street, # 1100
     Dallas, Texas 75201
 6
     ALSO PRESENT:  Brent Andrus, AUSA
 7                  Patrick Madrigal, IT - AUSA

 8                      *   *   *

 9                   I N D E X
     GOVERNMENT'S WITNESSES                        PAGE
10
     CHRISTOPHER B. DOERING
11
         Redirect examination by Mr. Gonzalez     192
12       Recross-examination by Mr. Castle        207
         Recross-examination by Mr. Meyer         247
13
     MIKAELA KEENE
14
         Direct examination by Ms. Bloss          254
15       Cross-examination by Mr. Wohlford        318
         Cross-examination by Mr. Meyer           357
16       Redirect examination by Ms. Bloss        380

17   ***

18   PROFFER BY RACHEL RILEY                      388

19
                     E X H I B I T S
20
     GOVERNMENT'S            OFFERED          ADMITTED
21
     5                                         258
22   8                                         271
     9                                         276
23   10                                        283
     11                                        290
24   12                       309              309
     13 (Demonstrative)                        315
25                        *   *   *
```

```
 1   October 25, 2021                              1:35 p.m.

 2                         ---o0o---

 3                    P R O C E E D I N G S

 4                         ---o0o---

 5          THE COURT:  Good afternoon.  You can be seated.

 6          All right.  We're here on cause number 4:20-cr-382,

 7   United States of America versus Maaz Aziz and Saad Aziz,

 8   defendants 103 and 104 in this case.  We're here to complete

 9   the detention hearing that we started a week ago.  And where

10   we had left off in that hearing was the government had

11   finished with its first witness, Agent Doering.

12          And, Mr. Gonzalez, I think you had one more witness

13   you were going to present; is that correct?

14          MR. GONZALEZ:  I believe we were at the point where

15   I was going to redirect the agent with a few more questions,

16   just a few questions.  And then we do have one more witness

17   after that.

18          THE COURT:  All right.  We can have the agent take

19   the stand again.  Go ahead.

20          And before we do that, actually, I will go ahead

21   and have counsel make their appearances.

22          Mr. Gonzalez, who else do you have with you?

23          MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

24   government.  The government's ready to proceed.  I have Miss

25   Colleen Bloss assisting me; Patrick Madrigal from the U.S.
```

1    Attorney's office; Brent Andrus from the U.S. Attorney's

2    office; Mikaela Keene from the FBI, as an analyst; and

3    Special Agent Chris Doering.

4              THE COURT:  All right, thanks.

5              And let's go ahead and have defendants make their

6    appearances.

7              MR. WOHLFORD:  Good afternoon, Your Honor.  Luke

8    Wohlford and Rob Castle on behalf of defendant Maaz Aziz.

9              MR. MEYER:  Ryan Meyer and Rachel Riley for

10   defendant Saad Aziz, Your Honor.

11             THE COURT:  All right.  Thank you.

12             MR. WOHLFORD:  And, Your Honor, if I may, just

13   before we get started, address a housekeeping matter, and I

14   hope we can just get it out of the way now.  I think it's

15   going to relate to evidentiary objections.  And I think it

16   would be most efficient to handle it up front, if you don't

17   mind.

18             THE COURT:  Go ahead.  What's the issue?

19             MR. WOHLFORD:  Yeah.  So, Your Honor, as you know,

20   ordered, after the hearing last Friday, that all supplemental

21   briefing and any additional exhibits be submitted, filed, and

22   served by last Wednesday, October 20th.

23             The government filed a supplemental brief on

24   October 20th, but did not serve it on defense counsel.  The

25   government then filed an untimely second supplemental brief

1    and several new exhibits on Friday, October 22nd, but again,

2    they didn't serve it on defense counsel.

3         Only yesterday morning, the government served the

4    second supplemental brief and the exhibits that it had filed

5    with that supplemental brief.  But the form in which it was

6    served, I couldn't access them.  After --

7         THE COURT:  It looks like we're having a little

8    trouble with your microphone.  You may be a little close to

9    it.  I tell people to be close to the microphone.  You may

10   actually be too close.

11        MR. WOHLFORD:  My apologies, Your Honor.  So when

12   finally, after some email exchanges I finally got the

13   documents, the second supplemental brief and the second

14   supplemental exhibits, all of which were untimely filed, last

15   night around 5:00.

16        Then this morning, the government e-mailed us a new

17   document that they said they intended to present today; that

18   was at 11:24 a.m.  And then just before the hearing, the

19   government provided us with another demonstrative exhibit

20   that I understand they intend to present to the Court today.

21        And just for the record, Your Honor, we

22   obviously -- we would respectfully move to strike the

23   late-filed second supplemental brief and the exhibits.  We

24   would -- and we would object to the presentation or reliance

25   on -- by the government on any of the exhibits that were

1    untimely filed and certainly untimely served.

2           To get us this kind of voluminous information at

3    5:00, or after 5:00 last night, is troubling and is

4    consistent with what seems to keep happening here.  And so

5    for those reasons, Your Honor, we would object and we move to

6    strike the late-filed supplemental briefing.

7           THE COURT:  All right.  Mr. Gonzalez, what's the

8    government's response?  It sounds like your colleagues on the

9    other side said they got your briefing late, and your

10   exhibits -- additional exhibits late.

11          MR. GONZALEZ:  Well, there's been two filings, Your

12   Honor, a supplemental brief and a second supplemental brief.

13   The first supplemental brief we did file on the 20th.  We

14   have an email that we sent it to the Court as well as to the

15   defense counsel, and I can submit that to the Court for the

16   Court's review.

17          Ms. Sanford, the next day on the 21st, acknowledged

18   that that had been filed.  So we thought everything was fine;

19   that we had filed it with the Court; that we had sent a copy

20   to defense counsel; and we had no reason to believe that they

21   hadn't received it.

22          Secondly, the documents that are in that

23   supplemental brief are the documents that were already

24   presented during our hearing on the 15th.  It's those same

25   documents that were given and provided to defense counsel,

1    other than adding I believe one particular document to the

2    documents that had already been provided.

3         But there was a brief that was submitted.  Like I

4    indicated, I've got an email here where Ms. Kaufman, who is

5    my legal assistant, at 8:55 p.m. sent it both to the Court as

6    well as defense counsel.  And like I said, I can provide that

7    to the Court.  And then some acknowledgement the following

8    day by Ms. Sanford, the courtroom deputy for Your Honor,

9    indicating that it was received and that everything was good.

10        So we had no reason to believe that they had not

11   received it, that they did not have it in their possession,

12   and that they could not review it.

13        The second supplemental briefing were documents

14   that we provided to defense counsel, were items that we

15   ourselves received on the 21st.  We have a continuing

16   obligation of discovery.  So when we get items that are

17   coming in, as they're coming in, we're trying to make them

18   available to the defendants and defense counsel as quickly as

19   possible.

20        So that documents that are contained -- that were

21   contained in that second supplemental brief are documents

22   that we received on the 21st.  Had we received those

23   documents, we then tried to get those documents to defense --

24   the defense counsel and the defendants.  But unfortunately,

25   that particular supplemental got kicked back because it

1    contained information, personal information, and it got

2    kicked back to us.

3           So then the following day when we realized that it

4    had been kicked back to us because it was not allowed to be

5    filed, we then contacted defense counsel, tried to find out

6    whether those documents had been received.  We, until Sunday,

7    had not -- were not aware that they had not received any of

8    the filings, including the filing of the 20th.  But like I

9    said, we've produced the documents as they're coming in.  The

10   documents that were provided today, we received them today.

11          So it's a continuing obligation on our part to

12   deliver discovery.  We're trying to comply with that.  We are

13   sending those documents to them.  Unfortunately, with regards

14   to the filing on the 20th and the filing on the 21st, we had

15   no notice that they -- had any idea that they had not

16   received it and had not been able to review it.

17          THE COURT:  All right.  Just taking first the

18   filing on the 20th, I'm assuming that when you're filing,

19   it's coming onto our CM/ECF system -- this is your first

20   filing on the 20th.  That was filed in CM/ECF; is that

21   correct?

22          MR. GONZALEZ:  Well, it's under seal, so we filed

23   it under seal.  So we have to serve both the Court and the

24   defendant.

25          THE COURT:  And you -- and there was an error in

1    that transmission, is that --

2         MR. GONZALEZ:  We didn't -- we didn't realize it

3    until they notified us.  We thought it was fine because of

4    the fact that we had interchange or communicated with

5    Ms. Sanford, and she had indicated to us everything was good.

6    So we thought everything was correct.

7         MS. BLOSS:  And, Your Honor, just to -- just to add

8    on to that.  Opposing counsel filed opposition briefing and

9    they sent us an email stating that they were filing

10   opposition briefing that was in response to Ms. Kaufman's

11   service of those documents.  So if at any point they were

12   unable to open those documents, didn't see the filing, then

13   the time to tell the government was the time that they

14   received that email.

15        So we had no reason to believe that they hadn't

16   received those documents or attachments.  And, in fact, they

17   had received the bulk of the attachments on the 15th when we

18   presented them to the Court and to opposing counsel, a hard

19   copy.

20        THE COURT:  So as Mr. Gonzalez said, was there one

21   additional exhibit with your submission on the 20th that had

22   not been presented at our first detention hearing?

23        MS. BLOSS:  Correct.  That would be the inventory

24   log that wasn't presented in hard-copy format.  But again,

25   that was attached to the original supplemental filing, or the

1    first supplemental filing that we did on the 20th.  And to

2    the extent they did not receive it, we certainly made every

3    attempt to serve it on them.  And they were included on the

4    email to the Court stating that that filing had been made.

5              THE COURT:  Mr. Wohlford?

6              MR. WOHLFORD:  Sure.  Briefly, Your Honor, with

7    respect to this first filing, I can attest to the Court I did

8    not receive notice of that filing.  I'm not sure what

9    Ms. Bloss is discussing about our filing something in

10   opposition.  Yeah, we filed a supplemental motion in

11   opposition to the government's emergency motion for a stay,

12   in accordance with Your Honor's order, but we didn't file

13   that on top of something that they had filed or in response

14   to something that they had filed.

15             THE COURT:  Right.  The only filings I think I have

16   from defendants are your two supplemental ones that were

17   filed on Wednesday.  And the arguments that were made there

18   concerning timeliness, I think were to the exhibits and other

19   materials that we saw at the hearing.  Is that accurate?

20             MR. WOHLFORD:  Yes.  Certainly, Your Honor.  And so

21   with the first supplemental brief, I'll acknowledge there

22   must have been something lost in the ether of the internet or

23   something.  You know, I don't dispute that Mr. Gonzalez has

24   an email that they attempted to send to us.  But I can

25   represent to the Court that I certainly did not receive an

1  email on Wednesday with the first supplemental brief.  So

2  there is that issue.

3         The second supplemental brief, I think our position

4  is that's untimely, that is not in accordance with Your

5  Honor's order.  The exhibits submitted with it were not in

6  accordance with Your Honor's order.  Even if there was some

7  argument that, well, we didn't have them until Thursday,

8  October 21st, the fact that we initially didn't get them in a

9  form that we could actually access them until 5:00 on Sunday,

10  when they were apparently filed and submitted to the Court on

11  Friday, it's incredibly troubling.

12         And so, again, we think that untimely filing and

13  service of that brief and those exhibits warrants the

14  striking of that brief and warrants a, you know, refusal to

15  allow the government to rely on those late-disclosed

16  exhibits, not to mention the exhibit that was provided to us

17  at 11:24 this morning and the exhibit that was provided us as

18  we walked into the courthouse today.

19         You know, this is feeling a lot like a detention

20  hearing by ambush, and it feels more so all the time, and we

21  think that that violates very basic notions of fair notice.

22         And with respect to this, while this is just a, you

23  know, continuing duty to disclose, I think Mr. Meyer can

24  speak to whether or not all of the documents that were

25  attached to that second supplemental exhibit, whether -- you

1    know, we have some evidence to suggest that at least one of

2    those documents was provided to the government on September

3    27th, not on October 21st.  But even so, it's incredibly

4    troubling that what we keep seeing is new evidence and the

5    government relying on new evidence in support of a motion for

6    detention that was filed a month ago.

7          What was the basis for detention initially when it

8    was sought, if it's now just going to be relying on all this

9    new evidence that we only get the night before a hearing.

10          So Your Honor, we think this is a basic fairness

11   and due process issue here.  And for the record, we would

12   object to the use of any of those late-disclosed exhibits,

13   and we move to strike the government's untimely filed briefs.

14          THE COURT:  All right.  Maybe before I turn back to

15   the government, does Mr. Meyer want to make a comment on

16   the -- on this material you believe was available to the

17   government earlier but not produced?

18          MR. MEYER:  Yes, Your Honor.  And I do not know how

19   to use the document camera, so I have paper copies.  But this

20   is Exhibit 14 to the government's Friday brief.  And I don't

21   actually know what the ECF number of that filing is, but it's

22   the government's second supplemental, which again it's

23   Exhibit 14.  It's a PPP form.

24          THE COURT:  Um-hum.  All right.  If you have a

25   paper copy, Mr. Gonzalez.  I'm pulling it up directly from

1    CM/ECF here, so I can see the document myself.  And I'm sure

2    the government has their copy.  So if you want to reference

3    that.  In other words, you don't need to worry about using

4    the projector on this one.

5              MR. MEYER:  Yes, Your Honor.

6              THE COURT:  This is a Paycheck Protection Program

7    loan?

8              MR. MEYER:  Yes, Your Honor.  So the document

9    that's on the document -- so Exhibit 14, that's correct, Your

10   Honor, it's the paycheck protection loan form, PPP loan form,

11   for SCS Supply Chain.  And this document on the document

12   screen -- I have provided a copy to Mr. Gonzalez -- does not

13   have a Bates number because the discovery we received

14   Thursday morning from the government is not Bates labeled.

15             But this is a subpoena return that was included in

16   one of those sub folders and clearly lists the PPP loan

17   documents were provided to the government on what appears to

18   be September 27.  And I don't have -- I did not have time to

19   correspond or double check the rest of the materials, but it

20   would appear, at least Exhibit 14 or some version of Exhibit

21   14, had been provided to the government over a month ago.

22             THE COURT:  All right.  So we can hear from either

23   Mr. Gonzalez or Ms. Bloss on your colleagues' contentions

24   that some of these materials should have been produced

25   earlier, were available earlier.  And then one thing you

1    might elaborate on, Mr. Gonzalez -- we can do this as we get

2    into particular exhibits, but you've mentioned broadly the

3    notion of your continuing duty to supplement, and some of

4    these are just coming in.  Maybe you can elaborate a little

5    bit on, you know, why they're coming in at these times, and

6    then also the contention that maybe, at least this document,

7    was actually obtained earlier.

8            MR. GONZALEZ:  I will address the issue of the

9    supplemental brief on the 21st.  The issue with that one, my

10   understanding, was that a password was given to defense

11   counsel to be able to access it, and there was some either

12   miscommunication or inability to use the appropriate password

13   to gain access to that particular filing and that's why it

14   wasn't accessible to them until the 21st.  But it was

15   provided on the 21st, as soon as we obtained the documents.

16           In regards to our continuing obligation to

17   disclose, we realize and we accept that responsibility, and

18   that's what we've been attempting to do, is to disclose when

19   these documents are being provided to us.  Some of these

20   subpoena requests for bank documents have been or were made

21   some time ago.

22           And we can't control when the banks are delivering

23   those documents to us.  They're coming in staggered.  And

24   there are so many.  There are 65 bank accounts and other

25   financial accounts that we're looking into, and they're

1    coming in.  As soon as they're coming in and we believe them

2    to be relevant to the issues here before the Court, we're

3    trying to make them available.

4            On the issue of this particular document that

5    they've brought to light, if we can approach the bench.

6            THE COURT:  Yes.

7            *(Sidebar discussion begins.)*

8            THE COURT:  I just ask all of you to try to speak

9    up somewhat so we can pick you up on this mic so that Gayle

10   can hear you and she can put it on the transcript.

11           So, Mr. Gonzalez, as to this document, this is

12   the --

13           MR. GONZALEZ:  The PPP.

14           THE COURT:  -- PPP form, yes.

15           MR. GONZALEZ:  So our attention to that particular

16   document came by way of a SARs.  We're not allowed to use a

17   SAR as evidence.  So when we see something in the SARs

18   report, we then have to follow up and ask for it in a

19   different format where we can introduce it in court.  So

20   that's what happened.

21           We did have it provided to us, but it came in a

22   SARs report, and we're not allowed -- that's not -- under DOJ

23   policy, we're not allowed to use SARs report as evidence.  So

24   that's what happened.  We saw it in the SARs report.  We

25   wanted to get it in a different format that was admissible

1    for this proceeding, so then we followed up and asked for

2    that document to be sent to us again.

3           MS. BLOSS:  And I don't think it's an issue of

4    admissibility.  We have to do the subpoena for production as

5    well, or we're supposed to.  So SARs are supposed to be kind

6    of confidential --

7           THE COURT:  Right.

8           MS. BLOSS:  -- methods of receiving information.

9           THE COURT:  All right.  Go ahead.

10          MR. MEYER:  I was just going to say, Your Honor, to

11   be clear, this is a broad subpoena return covering over a

12   year period.  The one that was produced on the 21st they

13   provided us on Friday.  I believe it was on Friday.

14          MR. WOHLFORD:  No, it was on Sunday.

15          MR. MEYER:  Oh, for Regions, that's true.  No.  The

16   Regions Bank accounts by themselves was on Friday.

17          MR. WOHLFORD:  Oh, yeah.  Okay, yeah.

18          MR. MEYER:  So Regions Bank, it's the same, it's a

19   number of these same accounts, right.  So it just looks like

20   what they got on Friday was an update to the subpoena, which

21   I understand.  I completely understand that.  My point is it

22   appears that what they got on September was the exact request

23   for production.  This is not just a SARs by itself, it

24   appears.

25          MR. GONZALEZ:  But we have to ask -- we have to

1    have the documentation showing that that particular document

2    came by way of a separate subpoena request, not through a

3    SARs report.

4         MR. MEYER:  No, I understand that.  It looks like

5    it did come through a separate subpoena, is my point, in

6    September.

7         MS. BLOSS:  Right.  But, Your Honor, if I could

8    just step back for a second because this entire argument

9    seems to be predicated on a misstatement of law, which is

10   that Rule 16 requires government production in respect to the

11   government's case in chief, which is why it's an ongoing

12   obligation, right.  It's not a Rule 16 production with

13   respect to specific instance of detention.

14        And so as we are receiving information, as we're

15   getting it produced to us, we are turning around and

16   producing it to them because that right for defense counsel

17   applies to the government's chase in chief in what materials

18   we are going to use, under Rule 16.

19        THE COURT:  Right.

20        MR. WOHLFORD:  What we're talking about today, with

21   the untimeliness and the untimeliness of the disclosure,

22   deals with Your Honor's order of October 15th and Your

23   Honor's order that any supplemental briefing and exhibits be

24   filed and served on October 20th.

25        And I do want to correct one thing that was said.

1    That second supplemental brief was not provided to defense

2    counsel on October 21st, it was provided for the first time

3    yesterday morning.  And for me at least, the documents

4    attached to it were in a format that I could not access.  I

5    was not able to access them until the government's assistant

6    provided those documents around 5:00 last night.

7            So the notion that the second supplemental brief

8    was provided on October 21st is just incorrect.  We received

9    it last night -- or yesterday morning, for the first time.

10   And for me at least, I couldn't access them until 5:00.

11           MR. GONZALEZ:  Because the password was incorrect.

12           MS. BLOSS:  Correct.  And, Your Honor, can I add to

13   that, which is that I asked for those documents to be

14   produced on the 21st when we received them.  And it was my

15   understanding those documents were, in fact, produced on the

16   21st.  So any discussion about service with respect to the

17   briefing deadline doesn't take into account the production on

18   the 21st.

19           MR. GONZALEZ:  And, Your Honor, here is the

20   document that I was referring to, which shows that we sent

21   this new one for the 20th where we sent it to the Court and

22   we sent it to defense counsel.  And then --

23           MR. MEYER:  We're not disputing it, Your Honor.

24   We're saying we never got it.

25           MR. GONZALEZ:  And here is Ms. Sanford's response

1    saying the Court had received it, that everything is good.

2    So as of that point, we're thinking that everything's fine,

3    we've complied with the Court's order, we haven't failed to

4    comply with the Court's order.  We're thinking they're having

5    it and they're reviewing it.  We haven't heard back from

6    them.

7              At 11:00 that night -- I think we filed ours at

8    8:00.  At 11:00, they filed their response, too, as well,

9    their supplemental brief.  So we're thinking they're -- it's

10   in response to our supplemental brief, so we have no reason

11   to believe anything's wrong.

12             THE COURT:  Well, I'll tell you what.  Just if

13   we've gotten through the central part here, I think, just so

14   our record is more clear --

15             MS. BLOSS:  Correct.

16             THE COURT:  -- I'll have you all move back --

17             MR. MEYER:  Yes, Your Honor.

18             THE COURT:  -- and then we can continue.  But just

19   I think here it's always difficult to get a good --

20             MR. MEYER:  I understand.

21             THE COURT:  -- record, so if you all can return.

22             MR. MEYER:  Yes, Your Honor.

23             *(Sidebar discussion concludes.)*

24             THE COURT:  All right, counsel.  I have the various

25   submissions, and here's -- so broadly speaking, and the

1    points have been made when we were up here at the bench, that

2    obviously the government's discovery obligations are

3    generally directed to their case in chief.  Counsel for

4    defendants have pointed out the Court did enter an order that

5    said, you know, the government needed to file its supplement,

6    it needed to produce the materials that it had used in the

7    detention hearing.  And my thought on that was that whatever

8    materials hadn't been produced that the government was using

9    at that hearing, should be provided to defense counsel,

10   certainly that or ideally before the deadline for the

11   supplemental briefs.

12           We now have additional documents that the

13   government has asserted have come in after those deadlines

14   that are part of this second filing before the Court.

15           So the issue I have is that for purposes of

16   detention, of a detention hearing, I need to be able to

17   consider whatever information is relevant while at the same

18   time, we needed to have the defendants be able to have the

19   opportunity, from a due process perspective, to respond

20   meaningfully and have time to process that information.

21           So what I -- the way that I'm going to proceed

22   today is we'll take this exhibit by exhibit.  And I think I

23   need to consider the information, but what I'm going to do is

24   work with defense counsel to accommodate any need they may

25   have for more time to look at material or more time to be

1    able to submit something additional to the Court.  I'll take

2    it under consideration the motion to strike, but the issue

3    with that, counsel, is that if it is relevant and important

4    to a decision as significant as detention, I think striking

5    it is problematic.

6           But at the same time, I'm very sensitive to defense

7    counsels' concern that they haven't had sufficient time to be

8    able to consider these documents, confer with their clients

9    about these documents, and so I want to make sure that we

10   make that accommodation.  But I think what we'll do is take

11   it exhibit by exhibit and we'll make the accommodations

12   needed for defense counsel.

13          We are going to conclude this hearing today.  And

14   we will get a decision out.  So one way or the other, the

15   record will wind up being closed.  But why don't we do this.

16   When we're proceeding and an exhibit comes up that is a new

17   exhibit, we may have a bench conference or I may just confer

18   with counsel at that point about, you know, what

19   accommodation we may need to make for the defendants.

20          MR. WOHLFORD:  Understood, Your Honor.  Thank you.

21          THE COURT:  All right, counsel.

22          So, Mr. Gonzalez, you can go ahead and proceed with

23   redirect of Agent Doering.

24          Agent Doering, I'll remind you that since we

25   continued this hearing, you remain under oath.

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  You can proceed when you're ready,

 3    Mr. Gonzalez.

 4              MR. GONZALEZ:  Thank you, Your Honor.

 5                   CHRISTOPHER B. DOERING,

 6       first having been previously sworn, testifies as follows:

 7                     REDIRECT EXAMINATION

 8    BY MR. GONZALEZ:

 9    Q.    Agent Doering, I'll try to move this along as quickly

10    as possible.  Defense counsel, in his cross-examination of

11    you, asked you about the debriefing process that we had gone

12    through with some of the other co-defendants, and then some

13    terminology was used to the extent of threatened or coerced

14    individuals into debriefing.

15              Did that ever occur?  Did we threaten anyone or

16    coerce anyone into debriefing with us?

17    A.    No, sir.

18    Q.    Was it a quid pro quo, you debrief and we release?  Or

19    was it different than that?

20    A.    It was different.

21    Q.    How was it that these debriefs -- these other debriefs

22    came about?

23    A.    We gave them the option to debrief and come in to allow

24    us to consider flight risk and how their potential

25    cooperation would move forward.
```

1   Q.    So, initially, when those individuals are being

2   contacted, the government's position was that they should be

3   detained and they would have the opportunity to convince us

4   that it wasn't as we saw it, that they would be worthy of

5   some sort of bond.

6   A.    Correct.

7   Q.    And so at that time, when we're having these

8   conversations, they're represented by their attorneys;

9   correct?

10  A.    Correct.

11  Q.    And their attorneys are guaranteeing that their

12  constitutional rights are not being violated.

13  A.    Correct.

14  Q.    And after conferring with their attorneys, then they

15  agree to do a debrief or not to do a debrief.  Some did.

16  Some didn't.  Some went to detention hearings.  Some waived

17  detention hearings.  And there were some that debriefed and

18  still didn't get out; correct?

19  A.    Correct.

20  Q.    And none of that was done under coercion, a cloud of

21  coercion or a cloud of threat:  Do this or you won't get

22  this.  None of that; correct?

23  A.    Correct.

24  Q.    Now, there was also some discussion about you using the

25  word "flight risk" as opposed to the word "serious flight

1    risk."

2         Do you consider these defendants to be a serious

3    flight risk?

4    A.    Yes.

5    Q.    And you've talked about the different things that you

6    use to make that analysis, so I won't rehash that.

7         Now let me move really quickly to the Aziz -- the

8    Aziz brothers here before the Court, and SCS.  Do the two

9    defendants here before the Court run and operate that parent

10   company of SCS?

11   A.    They do.

12   Q.    And, in fact, in their pretrial services report they

13   both indicated ownership.  Saad Aziz states -- specifically

14   says he owned and operated SCS for five years; is that

15   correct?

16   A.    Correct.

17   Q.    And then Maaz Aziz states he owned and operated along

18   with his brother, co-defendant Saad Aziz, SCS chain -- Supply

19   Chain; the brothers owned the business from 2016 until August

20   21st, 2021, when his warehouse was raided by law enforcement.

21   A.    Correct.

22   Q.    So both of these individuals had claimed ownership of

23   SCS.

24   A.    Yes.

25   Q.    You've testified that SCS has a subsidiary in Canada.

1    A.    Correct.

2    Q.    So simply because Maaz Aziz's name is not a name as a

3    director in Canada, doesn't mean that he doesn't have an

4    interest in that business in Canada, or Dubai, or in any of

5    these other places.

6    A.    Correct.

7    Q.    And they run their business activities together.  They

8    have financial documents and businesses together; correct?

9    A.    Correct.

10   Q.    You're familiar with the land that was in Frisco,

11   Texas?

12   A.    Yes, sir.

13   Q.    Was that land that was invested with money from SCS,

14   which was in the name of both defendants?

15   A.    Correct.

16   Q.    And do they have mutual accounts that they are

17   signatories to?

18   A.    Accounts that are closed and open, yes.

19   Q.    Okay.  Now, in deciding whether to do a debrief with

20   someone and deciding to reach a conclusion as to whether the

21   individuals are a flight risk, do you look at the information

22   that they provide the pretrial services report officer?

23   A.    Yes.

24   Q.    And what they said and what they failed to report.

25   A.    Correct.

1    Q.    Okay.  And in that report with the pretrial services

2    officer, it didn't include or it didn't list the properties

3    in Frisco, did it?

4    A.    No.

5    Q.    It didn't include and it didn't list the properties in

6    Pakistan.

7    A.    No.

8    Q.    It didn't include the properties in Dubai, at the

9    airport.

10   A.    No, it didn't list any properties in Dubai.

11   Q.    Okay.  So some of these items would be important to the

12   issue of flight.

13   A.    Yes.

14   Q.    These items weren't in the pretrial services report,

15   didn't come up at the initial detention hearing; so it wasn't

16   available for the magistrate judge to consider, was it?

17   A.    No, sir.

18   Q.    It doesn't list foreign bank accounts; right?

19   A.    No.

20   Q.    So all these things are important for a rational

21   decision as to whether they pose a risk of flight.

22         Now, foreign-owned businesses.  Important --

23   A.    Yes.

24   Q.    -- is that correct?  Dubai?  None of those are listed.

25   A.    No, sir.  No, they are not.

1    Q.    Same thing with foreign travel.  You know, there's been

2    some questions back and forth about foreign travel, whether

3    they travel to Canada for pleasure, whether they travel to

4    Mexico for pleasure.  But if you look at what Maaz Aziz said

5    in regards to his travels to certain countries and that he

6    reported to pretrial services, he stated:  The defendant

7    reported he does have a United States passport which is

8    currently in possession of his attorney.  The defendant

9    reported he travels outside the United States, includes trips

10   to Canada, United Arab Emirates, and Colombia for business.

11          That was not for vacation.  There's been some back

12   and forth as to whether he traveled to Canada for vacation.

13   But clearly when being interviewed by pretrial services, and

14   we assume that they're being honest, he indicated that it was

15   for business.

16   A.    Yes, he did.

17   Q.    And what's been introduced to this Court already is

18   multiple trips to Canada, multiple trips to Dubai and abroad;

19   correct?  Colombia, as well.

20   A.    There's multiple -- travel to multiple locations, yes.

21   Q.    All right.  So another thing that wasn't reported in

22   the pretrial services report was other businesses owned by

23   family members or individuals that are closely associated or

24   related to the defendant.

25          Have you come to find out that Saad Aziz's wife,

1    Duua Aziz, owns businesses that are closely related to SCS?

2    A.   One business, yes.

3    Q.   Okay.  Well, actually, there are several.  Are you

4    familiar with Gizmo Galaxy?

5    A.   Yes, sir.

6    Q.   And Gizmobile?

7    A.   I'm aware of Gizmobile.  I believe that --

8    Q.   (Overlapping speech.)

9    A.   -- Maaz Aziz.

10              (Court reporter clarification.)

11              THE WITNESS:  I believe Gizmobile to be owned by

12   Maaz Aziz.

13   BY MR. GONZALEZ:

14   Q.   But that wasn't divulged in the pretrial services

15   report.  The defendants -- one of the defendants' wives owns

16   businesses that are associated with SCS.

17   A.   I did not see that.

18   Q.   Now, you also testified -- and maybe you missed this

19   question or didn't understand the question.  I think defense

20   counsel was asking you about his substantial links to the

21   community here in the United States, and indicated that he

22   has a large number of family members here in the United

23   States.  But he also has a large number of family members in

24   Pakistan; correct?

25   A.   Yes.

1   Q.    Do you recall in the first detention hearing in front

2   of Judge Nowak that Duua Aziz testified that the defendants

3   have somewhere near ten cousins that still live in Pakistan?

4   A.    Yes.

5   Q.    Would that be a substantial number of family members

6   that still live in a foreign country?

7   A.    Yes.

8   Q.    That's not in the pretrial services report either;

9   correct?

10  A.    Correct.

11  Q.    Now, there was also some testimony on your part about

12  that traveling with a fake COVID document.  Do you recall

13  that?

14  A.    Yes.

15  Q.    And how anybody -- that's so rudimentary that anybody

16  could fake that particular document; right?

17  A.    Correct.

18  Q.    And while that may be true, doesn't it also indicate

19  the willingness on their part to use a fake document to get

20  something they want?  In that case, it was travel.

21  A.    Yes.

22  Q.    And when it comes to motivation or incentive to flee, I

23  think you testified to this, but 20 years of imprisonment or

24  facing 20 years of imprisonment is a huge incentive to flee.

25  A.    Yes, sir.

1    Q.    And I think there was some going back and forth about

2    being able to get a passport.

3    A.    Correct.

4    Q.    Do you recall that?

5    A.    Correct.

6    Q.    And you said that you had done some research into that.

7    Have you been able to determine whether someone can go to an

8    embassy and obtain another passport, a replacement passport?

9    A.    Yes.  They can be -- a replacement passport can be

10   obtained at --

11   Q.    They provide --

12   A.    -- a consulate.

13   Q.    -- certain documentation, and a replacement passport

14   can be obtained.

15   A.    Correct, yes, with some supporting documentation.

16   Q.    Now, in regards to fugitives fleeing, you are familiar

17   with the fact that a fugitive doesn't necessarily have to

18   travel with -- or travel legally or with legal documentation;

19   they can do it illegally.

20   A.    Yes.

21   Q.    We have people crossing into the United States every

22   day illegally; correct?

23   A.    Correct.

24   Q.    Can it not work the other way?

25   A.    Correct.

1   Q.    Where people go into Mexico fleeing, or go into Canada

2   fleeing?

3   A.    Yes.

4   Q.    And it doesn't require a passport for legal

5   documentation?

6   A.    Yes.  They can walk across or find their way across the

7   border.

8   Q.    Can people contract a private airplane with someone

9   that's willing to take a fugitive outside of this country?

10  A.    Yes.

11  Q.    That happens.

12  A.    Yes.

13  Q.    So a passport is not necessary, correct, to travel?

14  A.    Correct.

15  Q.    And there was some question, and I think Judge Jordan

16  asked you, if there was any information about fake passports.

17  A.    Yes, sir.

18  Q.    And, in fact, in this very investigation there were

19  fake passports seized.

20  A.    Fake passport cards, yes.

21  Q.    Okay.  They could be used to travel.

22  A.    Correct.

23  Q.    Okay.  And that was a part of the investigation that

24  happened in Houston where that individual was purchasing

25  phones or buying phones with false identities --

1    A.    Yes.

2    Q.    -- correct?  And when they went to search his

3    residence, they found not only credit cards, Social

4    Securities, IDs, but also those fake immigration cards.

5    A.    Correct.  They were manufacturing identities along with

6    passport cards.

7    Q.    So that can be done.

8    A.    Yes, sir.

9    Q.    And you're familiar with the fact that some of these

10   other countries, less-developed countries where their

11   securities are not as pronounced here as they are in the

12   United States, face -- fake passports are created all the

13   time.

14   A.    Yes.

15   Q.    Now, having understood that the two defendants here are

16   working as one group as the owners of SCS; right?

17   A.    Correct.

18   Q.    Because that's what they're doing, they're working as

19   one person.  To try to separate them, to say, well, he's the

20   one -- he's the director, but he's not the director, but the

21   reality of it is that they're working together to get things

22   done.

23   A.    Correct.

24   Q.    They're receiving -- both receiving the benefits of

25   what they're doing; correct?

1    A.    Correct.

2    Q.    That's where they're getting their pay from.  That's

3    what they're living off of --

4    A.    Yes.

5    Q.    -- or were at that time?

6    A.    Yes.

7    Q.    So when you say that Maaz Aziz was in possession of a

8    firearm and that someone that worked for him was in

9    possession of a firearm, they took a firearm to do a

10   transaction, this is a conspiracy charge.

11   A.    Yes.

12   Q.    The events or the overt acts taken by one

13   co-conspirator can be used against the other co-conspirator,

14   in this case, the brother who wasn't present and didn't

15   possess the gun, but they're doing it for that purpose of

16   doing the illegal activity.  It's a partnership in crime;

17   correct?

18   A.    Correct.

19   Q.    Now, and I think at some point probably towards the end

20   of your testimony, the defense attorneys -- well, strike

21   that.

22          At the end of your testimony or close to the end of

23   your testimony, I asked you if you had formed a basis for

24   your belief that the defendants posed a serious risk of

25   flight.  Do you recall that?

1    A.    I do.

2    Q.    And I will ask you again:  Do you still maintain that

3    opinion that these defendants pose a serious risk of flight?

4    A.    Yes.

5    Q.    Why?

6    A.    You look at the foreign connections.  You have an SCS

7    Canada company that's owned by SCS, or there's an ownership

8    stake.  You have Dubai contacts, a Dubai business over there.

9    You have a Pakistan properties.  You have a bank account in

10   Pakistan.  You have foreign contacts in Dubai.  You have

11   operations in other countries or contacts in other countries.

12   So -- you have travel for business to other countries.

13          So you combine the foreign contacts, the foreign

14   travel, the foreign businesses, the network that is

15   established to continue this illegal activity, to include SCS

16   Canada -- it's a functioning business -- you combine all of

17   that along with the weight of the evidence and the fact that

18   many of these things were not reported to pretrial, you have

19   a serious flight risk.

20   Q.    Okay.  Let me just summarize that.  Owners of the

21   foreign companies?

22   A.    Yes.

23   Q.    Ties to foreign companies and individuals?

24   A.    Yes.

25   Q.    Family members living in foreign countries?

```
 1    A.     Yes.

 2    Q.     Foreign travel?

 3    A.     Yes.

 4    Q.     Foreign finances and bank accounts?

 5    A.     Correct.

 6    Q.     Their continued use of accounts while incarcerated.

 7    A.     Yes.

 8    Q.     Do you have any evidence of that, that they have

 9    continued to use bank accounts while incarcerated?

10    A.     The Regions Bank account, yes.

11    Q.     Moving money around.

12    A.     Yes.

13    Q.     Okay.  Shared financial investments and bank accounts.

14    A.     Yes.

15    Q.     Ownership of closely related businesses owned by family

16    members.

17    A.     Yes.

18    Q.     Incentive to avoid 20 years of jail time.

19    A.     Correct.

20    Q.     Knowing and working with people who produce fake

21    documents.

22    A.     Yes.

23    Q.     Willingness to produce and travel with fake documents.

24    A.     I'm sorry?

25    Q.     Willingness to produce and travel with fake documents.
```

1    A.     Yes.

2    Q.     Family members assisting in fugitives -- with

3    fugitives.

4    A.     Yes.

5    Q.     Lack of candor with the Court in regards to all of

6    these things.  None of this was reported to Judge Nowak or

7    pretrial services.  This was --

8    A.     Yes.

9    Q.     -- significant things to calculate as to whether these

10   individuals should have been released but was not provided.

11   A.     Correct.

12   Q.     So do you believe your -- the opinion that you had at

13   the beginning of all this that there was serious risk of

14   flight has only gotten stronger?

15   A.     Yes.

16   Q.     And, lastly, I believe that defense counsel told you

17   that it wasn't until -- or pointed out to you that it wasn't

18   until the last two minutes of your long testimony that you

19   finally said the word "flight."  Do you recall that?

20   A.     Yes.

21   Q.     Wasn't the whole presentation of your PowerPoint in

22   order for the Court to see that there is -- there is flight,

23   by showing the magnitude of the operation, by showing the

24   foreign contacts, by showing the individuals that they were

25   involved with, by showing that they were operating different

1    businesses, by showing the money that's involved, the money

2    that's being generated?  Prior to using the word "flight,"

3    was that also indicative of someone having access to the

4    resources and ability to flee?

5    A.    Correct.

6              MR. GONZALEZ:  That's all I have.  I will pass.

7              THE COURT:  All right.  Thank you, Mr. Gonzalez.

8              Given that we have returned today, if defense

9    counsel have any additional examination for this witness, you

10   can go forward.

11             MR. CASTLE:  Thank you, Your Honor.

12             THE COURT:  So Mr. Castle; right?

13             MR. CASTLE:  Yes, Your Honor.

14             THE COURT:  All right.  You can proceed.  Just make

15   sure you speak into the microphone but not too close.

16             MR. CASTLE:  Can you hear me okay?

17             THE COURT:  Is it on?

18             THE COURTROOM DEPUTY:  It's not on.

19             THE COURT:  I don't think it's on.  Make sure that

20   light's on.  Now you are.

21             MR. CASTLE:  Is that better?

22             THE COURT:  Yes.

23                          RECROSS-EXAMINATION

24   BY MR. CASTLE:

25   Q.    Agent Doering, I'll be brief.  How are you?

1    A.    Mr. Castle.

2    Q.    Earlier, Mr. Gonzalez began his redirect of you asking

3    about coerce and cooperation; correct?

4    A.    Correct.

5    Q.    You would agree that the statement was if Maaz Aziz

6    comes in, proffers, admits wrongdoing, then we'll withdraw

7    the motion to detain.

8    A.    I believe that the statement was he can come in and

9    we'll evaluate, or something to that effect of, after the

10   debriefing to figure out where things are at.

11   Q.    And there was no discussion, if he didn't proffer and

12   admit, of waiving the motion to detain; correct?

13   A.    Say that again.

14   Q.    There was no discussion of waiving the motion to detain

15   if he did not come in and proffer and plead guilty; correct?

16   A.    Well, I don't believe there's anything about pleading

17   guilty.

18   Q.    But it was made clear that the proffer, he needed to

19   come in and accept responsibility, not minimize his role --

20   A.    Correct.

21   Q.    -- and then the government would withdraw the motion to

22   detain; correct?

23   A.    Along with allowing us to evaluate him as a flight risk

24   and his honesty.  Go ahead.

25   Q.    Are you finished?

1    A.    I am.  Sorry.

2    Q.    I'm curious.  Are all of the principals of Dawn

3    Wireless detained currently?

4    A.    No.

5    Q.    Are all of the principles of RJ Telecom currently

6    detained?

7    A.    No.

8    Q.    Are any of them still detained?

9    A.    No. Of those -- so I can be clear, Dawn Wireless and RJ

10   Telecom --

11   Q.    Correct.

12   A.    -- is that what you're talking about?  Correct.

13   Q.    So the principal owners have all been released;

14   correct?

15   A.    Correct.

16   Q.    And the government withdrew its motion to detain?

17   A.    Correct.

18   Q.    And it was only after they agreed to cooperate;

19   correct?

20   A.    That was after we were given a debrief -- an

21   opportunity to debrief and consider flight risk, honesty,

22   cooperation.

23   Q.    Is it safe to assume, agent, without leading too far

24   astray here, that each one of those principals is now facing

25   a guaranteed prison sentence?

1    A.    They are facing extensive time as well.

2    Q.    Wouldn't you agree that makes them more of a flight

3    risk now that prison is absolutely certain?

4    A.    I think when we have a chance to evaluate, that allows

5    us to determine if there's any chance to mitigate flight

6    risk.  We get to talk to them.  We get to understand a little

7    better about their family situation.  And we also get a

8    chance to ask them questions and engage their honesty and

9    determine how they're going to move forward.

10   Q.    And, again, you recall from the first hearing when I

11   asked generally that cooperation doesn't mean you're not a

12   flight risk; correct?

13   A.    Even when defendants are cooperating, they can flee.

14   Q.    And you've had experience with a cooperating witness

15   flee; correct?

16   A.    Yes.

17   Q.    Do you recall during the first hearing, the lots, the

18   real estate property, the real property, the lots in Frisco?

19   We call them the lots.  Do you understand what I mean by

20   that?

21   A.    I do.  The Frisco properties.

22   Q.    Do you recall that this came up at the end of that

23   hearing before Judge Nowak?

24   A.    I do.

25   Q.    So Mr. Gonzalez said this didn't come up at the first

1   hearing.  That's not true, is it?

2   A.    It didn't come up in the pretrial report.

3   Q.    He said it didn't come up in the first detention

4   hearing.  You would agree it did come up; correct?

5   A.    At the very end.

6   Q.    And my partner, Luke Wohlford, do you recall him

7   testifying?

8   A.    He did.

9           MR. GONZALEZ:  Objection.  I don't recall any

10  attorney testifying.  If Mr. Wohlford said something, it

11  wasn't evidence, so it's not in the record as evidence.

12          THE COURT:  Well, I'm going to overrule the

13  objection and allow the question.  If you need to revisit it,

14  you can, Mr. Gonzalez.

15  BY MR. CASTLE:

16  Q.    Agent Doering, Mr. Wohlford explained that in light of

17  the allegation of a financial crime, money laundering, the

18  information and assets was delivered through counsel;

19  correct?

20  A.    It was.  I believe he held up a piece of paper with the

21  assets.

22  Q.    And do you recall that he explained that -- when asked

23  for other assets, he mentioned that the may -- the Aziz

24  brothers may or may not be owners of real property in Frisco?

25  A.    Yes.

1    Q.    And he said we are uncertain because the lots were in

2    the process of being transferred or sold prior to their

3    indictment; correct?

4    A.    I can't recall that.

5    Q.    So we'll rely on the record.  Then you have no reason

6    to disagree with that statement either, do you?

7    A.    Correct.

8    Q.    You mentioned that Mr. Aziz has a large number of

9    family members in Pakistan?

10   A.    Based off of Duua Aziz.

11   Q.    And you said it was ten cousins?

12   A.    Yes, sir.

13   Q.    How many cousins do you have, agent?

14   A.    Extensive amount of cousins.

15   Q.    Do you talk to every single one of them?

16   A.    I know them all and talk to them all.  Yes.

17   Q.    Routinely?

18   A.    Not routinely.  But if I were to contact them, we would

19   talk and they would be willing to help.

20   Q.    And if you were hiding from the government, would they

21   be willing to expose themselves to harm for you to hide with

22   them?

23           MR. GONZALEZ:  Objection, Your Honor.  Relevance.

24           MR. CASTLE:  Your Honor, they opened the door on

25   ten cousins that Mr. Aziz hasn't spoken to in years, like it

1    was some nefarious omission, but it's not.

2              MR. GONZALEZ:  The agent isn't the fugitive.  The

3    agent isn't the individual being accused.  The agent isn't

4    the one who is facing a 20-year sentence; the defendants are.

5    So it's improper to ask this agent if his family members

6    would give him comfort as a fugitive.

7              THE COURT:  All right.  I'll overrule the

8    objection.  But, Mr. Castle --

9              MR. CASTLE:  I'll make --

10             THE COURT:  -- you may want to wrap this up.

11             MR. CASTLE:  Yep.

12   BY MR. CASTLE:

13   Q.    Agent Doering, you would agree that you have no

14   evidence he has any communication whatsoever with anyone in

15   Pakistan; correct?

16   A.    I don't have any evidence that he does or does not.

17   Q.    Okay.  So again, it would be speculation of a

18   relationship with the cousins; correct?

19   A.    People communicate with their cousins all the time.

20   Q.    Okay.  You mentioned foreign bank accounts in Pakistan.

21   A.    Correct.

22   Q.    Maaz Aziz -- you have no evidence and presented no

23   evidence or testimony that Maaz Aziz has any bank account in

24   Pakistan; correct?

25   A.    I don't have evidence that he has a bank account, but

```
 1   Saad has a bank account.  And he has access -- I would
 2   believe he would have access to that account like he has to
 3   SCS Canada as an owner, or SCS Supply as an owner.
 4   Q.    We'll come back to those companies.
 5            MR. CASTLE:  I would move to strike everything
 6   after I have no evidence.
 7   BY MR. CASTLE:
 8   Q.    That was your belief.  That was your statement;
 9   correct?
10   A.    I believe.
11   Q.    That he would have access?
12   A.    Yes.
13   Q.    You don't know.  You're guessing; right?
14   A.    Based off of the prior -- based off of their
15   relationship to date.
16   Q.    You don't know that, though, do you, agent?
17   A.    That's my belief based off their records so far.
18   Q.    You would agree belief is not knowledge; correct?
19   A.    It's what I'm basing it off of today.
20   Q.    That's not my question.  My question is a little
21   different.
22            You would agree that a belief is not necessarily a
23   fact; correct?
24   A.    It's my opinion today.
25   Q.    An opinion is not necessarily a fact.
```

1    A.    It's my belief today.

2          MR. CASTLE:  This isn't even logical at this point,

3    Your Honor.  If you would ask him to respond to my question.

4    BY MR. CASTLE:

5    Q.    Do you agree that a belief is not a fact?

6    A.    It's not a fact.

7    Q.    Thank you.  In terms of real property in Pakistan, that

8    doesn't apply to Maaz Aziz; correct?

9    A.    There is property listed in that notebook that doesn't

10   have a name on it.  I don't know that that's his property or

11   not his property.

12   Q.    So you have no knowledge of him owning any property in

13   Pakistan; correct?

14   A.    No evidence today.

15   Q.    And in terms of close family members owning a business,

16   you have no knowledge of Maaz Aziz's wife owning a business

17   with him; correct?

18   A.    No.

19   Q.    In terms of we talked about going to an embassy for a

20   replacement passport.  You said they could do so with certain

21   documentation.  What documentation?

22   A.    I'm no expert when it comes to the Pakistani consulate

23   process.  But internet research, it appears a national

24   identity card, copies of a passport, other supporting

25   documentation.  But it can be done based off the internet

1    research.

2    Q.    Can we now have copies of a expired passport?

3    A.    I can't answer that.

4    Q.    So you would agree, like last hearing, you are not an

5    expert, have no special knowledge, offer no experience with

6    the Pakistani passport process, policies, or procedures;

7    correct?

8    A.    No, but Saad and Maaz Aziz would have experience with

9    that.

10   Q.    How would they have experience with that, finding a

11   replacement passport?  What's that based on?

12   A.    With the passport process in general.

13   Q.    My question though, agent, is you don't know that they

14   could actually go get a passport today; correct?

15   A.    I don't know that.

16   Q.    So, again, a belief --

17   A.    A belief.

18   Q.    -- or speculation?

19          You mentioned that they were associated with people

20   who can create forged identities, from questions with

21   Mr. Gonzalez; correct?

22   A.    Correct.

23   Q.    And earlier, last time you testified that your

24   investigation had uncovered people who created false

25   identities; correct?

1    A.    Correct.

2    Q.    And if I read your testimony correctly on your direct

3    from Mr. Gonzalez from the last hearing, it said you've

4    identified two people; correct?

5    A.    Correct.

6    Q.    And that was Mr. Sims and Mr. Trent?

7    A.    Correct.

8    Q.    And I'll spare the Court and everyone the time of going

9    through it all.  You don't know that they've ever met,

10   spoken, talked, communicated, or know how to get in touch

11   with each other; correct?

12   A.    Correct.  But through the conspiracy, through their

13   activities, through Maaz Aziz's street activities, they would

14   have associations with individuals that could know identity

15   traffickers.

16   Q.    Like Rayquan Green.

17   A.    Like Ryeshawn Green or individuals like him.

18   Q.    And you also testified the last time you have no

19   evidence he's ever met, spoken to, communicated with, knows

20   how to reach --

21   A.    No.

22   Q.    -- Ryeshawn Green.

23   A.    Through the conspiracy, through the association,

24   through the street trafficking, connections they could, my

25   belief, find someone through those channels easier than an

1    ordinary person to obtain those underlying fraudulent

2    documents.

3    Q.    Could possibly, maybe, if they got lucky.  You have no

4    idea though; correct?

5    A.    Better access than an ordinary person.

6    Q.    Agent, wouldn't you have better access than the

7    ordinary person?

8              MR. GONZALEZ:  Objection.  Argumentative.

9              THE COURT:  Sustained.

10             MR. CASTLE:  I'll withdraw it, Your Honor.  My

11   apologies.

12   MR. CASTLE:

13   Q.    You have no knowledge that they have -- or evidence

14   they would know who to contact to create a false passport;

15   correct?

16   A.    I don't have direct knowledge of that.

17   Q.    And you mentioned some people in Houston today, for the

18   first time, making false passport cards; correct?

19   A.    Yes.  That's another arm, if you will, of the

20   investigation.

21   Q.    Do you have any evidence that -- linking Maaz Aziz to

22   those people who are still unnamed?

23   A.    No evidence that he knows them, but evidence that

24   passport cards can be created fraudulently.

25   Q.    But you have no access that he knows how to go from

1    point A to point C without going through point B, which is

2    knowing who to ask.  You would agree with that; correct?

3    A.    The individuals to ask are the street traffickers.

4    Q.    The street traffickers like Ryeshawn Green who he's

5    never spoken to.

6    A.    And other individuals.  I don't know every individual

7    that SCS has obtained financed phones from, at this point in

8    the investigation.

9              MR. CASTLE:  Almost done here.

10             (Counsel confer.)

11   BY MR. CASTLE:

12   Q.    Do you recall Mr. Gonzalez asked you recently that, you

13   know, the faked COVID pass -- COVID test result shows a

14   willingness to travel on false documents?

15   A.    Correct.

16   Q.    And we've agreed in the past, just to make sure we're

17   still consistent, that changing a signature or a name on a

18   PDF is a far cry -- a far more rudimentary than forging an

19   American passport; correct?

20   A.    Correct.  It's more -- it's rudimentary -- more

21   rudimentary.

22   Q.    And do you recall in the first hearing we mentioned the

23   same thing about a willingness to --

24   A.    Yes.

25   Q.    -- travel?  And I asked you during that hearing, a

1     willingness without ability is indicative of nothing, and you

2     agreed.  Do you recall that?

3     A.    I do.

4     Q.    And do you still agree with that?

5     A.    With the -- without the ability to travel?

6     Q.    The willingness to travel without the ability to get a

7     fake passport doesn't really indicate much of anything, does

8     it?

9     A.    You need the ability to do that, and I believe they

10     could have that ability in this case.

11     Q.    But here we go back to verbs like "could."  You don't

12     know they have the ability, do you?  We're here on evidence

13     today, not belief.

14     A.    They do have -- they deal in street trafficking, which

15     this conspiracy has shown a broad network of individuals that

16     obtain financed phones, devices, through identity theft.

17            Identity theft is created by identity

18     manufacturers.  Access to those individuals or individuals

19     that know them could lead you to passports, passport cards --

20     Q.    Could --

21     A.    -- underlying identity sets --

22     Q.    Oh, I'm sorry.  Pardon me.

23     A.    -- underlying identity sets to obtain those passports.

24     Q.    And so far, we've heard three names from the street

25     trafficking identity manufacturers:  Mr. Sims, Mr. Trent, and

1    Mr. Green; correct?

2              MR. GONZALEZ:  Objection.  Asked and answered.

3              MR. CASTLE:  I'm just confirming that's it, if we

4    have this new Houston angle who are unnamed people.

5              THE WITNESS:  Those are the ones we've talked

6    about, but there's Houston -- there is a Houston cell as

7    well.

8    BY MR. CASTLE:

9    Q.    So outside of Mr. Sims and Mr. Trent, who are the

10   people in Houston?

11   A.    It's -- give me one second -- it's Cesar -- it's a very

12   long last name, I can't -- Nepomuceno, I believe is what it

13   is, and Reyes, are two individuals that are indicted out of

14   the Houston cell that are -- were involved with identity

15   sets, manufacturing identity sets.

16   Q.    So out of those five people, you have no evidence or no

17   knowledge that Maaz Aziz can communicate with them; correct?

18   A.    Not that Maaz Aziz knows them, no.

19   Q.    Or that Maaz Aziz knows how to contact them?

20   A.    No.

21             THE COURT:  Mr. Castle, if you pause for a moment,

22   I just want to ask the agent a question on those two

23   individuals in Houston.

24             Were those the individuals in Houston you

25   referenced earlier with regard to the passport cards?

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  All right.  I wanted to make sure.

 3                    You can proceed, Mr. Castle.

 4                    MR. CASTLE:  All right.  Thank you, Your Honor.

 5                    THE WITNESS:  "Nepomuceno" is the last name of

 6      that -- yeah.

 7      BY MR. CASTLE:

 8      Q.    I'm not certain, sir --

 9      A.    Nepomuceno is one of the indicted individuals.

10      Q.    Okay.  And do you recall that during the last hearing

11      you testified that they could potentially provide a means by

12      which they could possibly get to a passport?

13      A.    Who?

14      Q.    You.

15      A.    No.  Who could?

16      Q.    Maaz Aziz?

17      A.    That they could potentially...

18      Q.    I'm reading here -- could potentially provide means by

19      which they could possibly get a passport.

20      A.    I'm sorry.  Just ask one more time.

21      Q.    You testified previously that the same -- about the

22      street crimes could potentially provide means by which they

23      possibly could get a forged passport; correct?

24      A.    A passport or identity sets?

25      Q.    You said identity sets.  It said potentially to a
```

1    passport --

2    A.    To a passport, correct.  Yes.  Now I recall.

3    Q.    And at the last hearing, from questioning from me and

4    the Court, you testified you weren't aware of any passports

5    at that time; is that correct?

6    A.    That's correct.

7    Q.    So did the Houston angle come up in the last ten days?

8    A.    It did not.  It's just -- it's a large investigation.

9    It's one of the -- it wasn't my primary investigation.  We

10   had a Houston DPS agent run that, and that just slipped

11   through the cracks.

12   Q.    So your prior testimony then was inaccurate.

13   A.    It was accurate at the time.

14   Q.    It was inaccurate at the time, but --

15   A.    Based on the information --

16            (Court reporter clarification.)

17   BY MR. CASTLE:

18   Q.    It was inaccurate at the time, but it was not

19   intentionally inaccurate.

20   A.    It was not intentionally inaccurate.

21   Q.    So it was inaccurate, though, correct, because you had

22   that information previously?

23   A.    I had the information.  It just -- I didn't recall it

24   at the time preparing for the hearing.

25   Q.    Mr. Gonzalez asked you about family members who harbor

1   fugitives; correct?

2   A.    Correct.

3   Q.    We went through this last time; correct?

4   A.    We did.

5   Q.    And just to confirm nothing else has changed, the only

6   two people who are accused of wrongdoing in that are in

7   prison; correct?

8   A.    Correct.

9   Q.    Ms. Aziz, Maaz's wife, was never accused of any

10  wrongdoing; correct?

11  A.    No.

12  Q.    She wasn't ever accused of being uncooperative, was

13  she?

14  A.    No.

15  Q.    And she was never contacted or communicated with;

16  correct?

17  A.    Not as -- not to my knowledge, no.

18  Q.    So when you say they have family members who are

19  willing to harbor fugitives, those two people are in prison

20  now; correct?

21  A.    They're in jail.

22  Q.    And there's no evidence anyone else was involved with

23  that; correct?

24  A.    Not at this time.

25  Q.    When we were here last time, I asked you about the

1    Anker vacuums and you learned they weren't stolen.  When did

2    you learn the Anker vacuums weren't stolen?

3    A.    It was -- had to have been October 12th, 14th,

4    somewhere in that time frame.

5    Q.    And last time you testified, the statement was, you

6    said, I can't predict the future based off what we have

7    today.  Do you recall testifying to that?

8    A.    I think I was -- I can't predict the future.  I can

9    only go based -- I can only base it off of today -- base my

10   opinion off today.

11   Q.    Yeah.  I can't predict the future based off what we

12   have today.  I can pull the quote up if you would like to see

13   it.

14   A.    If that's what it is.  I think what I was trying to say

15   is I can't predict the future.  I can only base my opinion or

16   base what I have off today.

17   Q.    Okay.  And your -- a lot of the testimony you've

18   offered is based on opinion, belief, speculation, what might

19   happen; correct?

20   A.    Correct, based off the investigation.

21   Q.    And you recall Mr. Gonzalez saying that since the

22   meeting prior to indictment, they now are facing 20 years in

23   prison; correct?

24   A.    Correct.

25   Q.    And do you recall, during the first hearing before

1    Judge Nowak, that we pointed out the claims you've charged

2    them with, they'll get 65 years if the sentences are stacked.

3              Do you recall that?

4    A.    I do.

5    Q.    And so you can agree 65 years is far more than 20;

6    correct?

7    A.    It is.

8    Q.    And did you explain to them and advise them about the

9    65 years; correct?

10   A.    We did.

11   Q.    And they never fled, did they?

12   A.    Not then.

13   Q.    So the 65 years didn't scare them, but now 20 is.  Is

14   that your testimony?

15   A.    I think it's significant time.  Now that there's been

16   the weight of evidence presentation, I think that plays into

17   it.  There is more facts before them.  They've heard what

18   those facts are.  So the strength of the evidence along with

19   the sentence go hand in hand, it amplifies it.

20   Q.    And you would agree that the weight of the evidence

21   comes into play after the serious risk of flight's been

22   determined; correct?

23   A.    I do, but it's part of the risk of flight.

24   Q.    And they were told that they're going to be charged

25   with all seven counts in the indictment prior to indictment;

1  correct?

2  A.    Correct.

3  Q.    You told them they were going to be indicted prior to

4  indictment; correct?

5  A.    They were.

6  Q.    And they had their passports and they had their money,

7  and they didn't flee, did they?

8  A.    They had their passports and they did not flee.

9  Q.    And they had access to the same accounts they have

10  access to now; correct?

11  A.    Correct.

12  Q.    And they didn't flee, did they?

13  A.    Not at that time.

14  Q.    And now because, as Mr. Gonzalez says, they're facing

15  20 years, when we told them it was 65 years, now they're

16  going to be scared.  Is that your position?

17  A.    20 years, 65 years, it's a long time.

18  Q.    Oh, I think we can agree on that.

19        MR. CASTLE:  Pardon me.  Strike that.  Sorry, Your

20  Honor.

21  BY MR. CASTLE:

22  Q.    Other than the statement in pretrial services -- and

23  just as a background question, you weren't in the pretrial

24  services interview, were you?

25  A.    No.

1    Q.    So you don't know what was said or what was not said;

2    correct?

3    A.    Just the report.

4    Q.    And do you have any evidence, other than what was said

5    in the pretrial statement, that Maaz Aziz is an owner of SCS

6    Supply?

7    A.    Just his statement.

8    Q.    Are you aware of -- are you aware or have you ever

9    heard of witnesses getting nervous talking to pretrial

10   services?

11   A.    I'm sure it happens.

12   Q.    Have you ever heard of pretrial services making a

13   mistake in a report?

14   A.    I'm sure it happens.

15   Q.    In fact, you have evidence that shows the opposite,

16   that Maaz Aziz does not own SCS Supply; correct?

17   A.    What's that evidence?

18   Q.    Don't you have the books and records of SCS?

19   A.    I do.  I also have the fact that he was a joint

20   signatory on two different SCS accounts.  I have SCS Canada,

21   a document where there is a profit-sharing draw down, and

22   then bank records through Regions where it actually shows a

23   wire transfer to him with the memo SCS-CA, which would

24   indicate a payment from SCS Canada.

25          So while he is not documented on paper, that

1    doesn't mean that there's still not ownership arrangement

2    between the two brothers.

3    Q.    You saw the handwritten note.  That's the same one last

4    time we talked about?

5    A.    There's that handwritten note.  And then if you

6    go to --

7    Q.    I just want to stick with the handwritten note, agent,

8    right now, if you don't mind.

9    A.    I'm sorry?

10   Q.    I just want to stay on the handwritten note.

11   A.    That's fine.

12   Q.    And that was the one where you said you have no context

13   for what this means, and you assumed and believed what it

14   meant; correct?

15   A.    That's based off of those records, I formed an opinion.

16   Q.    And you couldn't read parts of that either; correct?

17   A.    There was a couple of lines, but I was able to read

18   other parts of it.

19   Q.    A part, but you couldn't read the entire document.

20   A.    Not the entire.

21   Q.    And you talked to no one about it; correct?

22   A.    I talked --

23   Q.    You talked to no one about it; correct?  About the

24   document, what it means?

25   A.    With who?

1   Q.    Any of your myriad of co-conspirators, alleged

2   co-conspirators, cooperating co-defendants?

3   A.    No.

4   Q.    So the entirety of that testimony is what you believe

5   that document means.  You have no knowledge whatsoever what

6   that document means; correct?

7   A.    We have that document, what it says, and it refers to

8   SCS Canada with amounts to both Maaz and Saad, which

9   correspond to financial statements obtained through the

10  search warrant.

11  Q.    And you have no knowledge or context of what that

12  handwritten document means; correct?

13  A.    Only what it says, and the other records.

14  Q.    But you're guessing as to what --

15          MR. GONZALEZ:  Asked and answered, Your Honor.

16          THE COURT:  I'm going to sustain that.  I think --

17  I think this had been covered.

18  BY MR. CASTLE:

19  Q.    You mentioned travel earlier, that Maaz Aziz traveled

20  to Canada for business?

21  A.    Yes.

22  Q.    Do you know what business that was?

23  A.    I believe it was for the opening of SCS Canada.

24  Q.    Do you believe or do you know?

25  A.    I know he had traveled.  I know when it was

1    incorporated.  And then you have his statement to probation

2    saying it was for business.

3    Q.    And is it your testimony that every trip that's listed

4    on that list of flights is business travel to Canada?

5    A.    I have his statements of what was business, and then I

6    have those supporting documents that support that statement.

7    Q.    And I'm asking you is the Customs list of flights you

8    previously provided, is it your position that every flight to

9    Canada was for business purposes?

10   A.    I can't make that assertion that every flight is for

11   business, or that it wasn't for business, or that it wasn't

12   for both.

13   Q.    And when you said Mr. Aziz said that he went to Dubai

14   for business travel, there was the GITEX conference; correct?

15   A.    Correct.

16   Q.    And there's nothing illegal about attending to a

17   conference; correct?

18   A.    It's a business where you can make foreign contacts,

19   foreign business ventures.  That's what that business is for,

20   or that expo was for.

21   Q.    And it's a conference; right?

22   A.    Expo.  Yeah.

23   Q.    And there's nothing illegal about attending an expo, is

24   there?

25   A.    It's for -- it's business travel.

232

1    Q.    And we've been through this ad nauseam in the past.

2    I'm just going to summarize.  You have no evidence of Maaz

3    Aziz having personal ties to anyone in Dubai; correct?

4    A.    No.

5    Q.    I'm not correct?  Or correct, you have no evidence?

6    A.    I don't know of any individuals he personally knows in

7    Dubai.

8    Q.    So you're talking about the deep ties he has to Dubai.

9    You can't name a single person with whom he has deep ties --

10   A.    He has business -- SCS has business ties to Dubai.

11   Q.    Right.  So SCS has business ties.  But you can't show

12   that Maaz Aziz has any ties; correct?

13   A.    I can show that the business has ties; that they opened

14   up a DAFZA branch there in Dubai; and that they also have a

15   Dubai-based shop that is tied to SCS, and Maaz Aziz is an

16   owner of SCS.

17   Q.    And you have no evidence, though, he has any personal

18   contacts in Dubai; correct?

19   A.    He is in charge -- he is a head of sales.  He is an

20   owner of SCS as is his brother, Saad.  I would allege that

21   they have business contacts in Dubai to run that shop and to

22   run that DAFZA business.

23   Q.    Can you name one person in Dubai with whom he has --

24   you have evidence of him having communications?

25   A.    I can't name one person.

1   Q.    So you have no evidence, other than a belief as to his

2   ownership in SCS, as to what may or may not be there ties --

3   with these close ties in Dubai.

4   A.    Correct.  They have business ties in Dubai.

5   With business come people.

6   Q.    And you can't name a single person he has a tie to.

7   A.    I can't name a single person, but I don't know that he

8   doesn't have those contacts as well.

9   Q.    And in Pakistan, you can't name -- identify a single

10  person with whom he has had contact within the last two

11  years, can you?

12  A.    I don't know who he's had contact with.

13  Q.    But my point is you can't identify one person; correct?

14  A.    Just that he has family and there's property over

15  there.

16  Q.    In your prior testimony you mentioned, what, 1,074

17  pallets?

18  A.    Yes, sir.

19  Q.    And you had been through I believe 751 pallets as of

20  that date; is that correct?

21  A.    It was something to that, yes.

22  Q.    And if I understood your testimony correctly --

23          MR. GONZALEZ:  Your Honor, goes beyond the scope of

24  redirect, and this has already been asked and answered.

25          MR. CASTLE:  Your Honor, he opened the door to the

1    weight of the evidence.  He's saying the weight of the

2    evidence, all the evidence.  And, Your Honor, I would say

3    that would open the door.

4            THE COURT:  Overrule the objection.  You can ask

5    the question.

6            MR. CASTLE:  I'll be very, very brief, Your Honor.

7    BY MR. CASTLE:

8    Q.    You mentioned that 751 pallets had been confirmed as

9    stolen, obtained fraudulently, or whatnot; correct?

10   A.    Correct.

11   Q.    And the remaining pallets you were still going through;

12   correct?

13   A.    Correct.

14   Q.    Where are the Anker vacuum pallets of a thousand

15   seventy-four?

16   A.    They are outside of the 751.

17   Q.    So part of the remaining 323?

18   A.    Correct.

19   Q.    Okay.  And we know those were obtained legally;

20   correct?

21   A.    Those were obtained from a company.

22   Q.    And you recall the flight list you provided and you

23   obtained from Customs; correct?

24   A.    Correct.

25   Q.    And there were multiple columns, airport codes, and

1   there was a column that had either OBD or NBD.

2   A.    Correct.

3   Q.    And what do you recall or what is your understanding

4   what NBD means?

5   A.    Just looking at that category and trying to match

6   flights up, inbound and outgoing bounds, it appeared that the

7   NBD would appear not onboard.

8   Q.    Okay.  And OBD was onboard?

9   A.    On board.  That's my understanding, but --

10  Q.    And you would agree that the travel you provided -- I'm

11  just trying to move along quickly here -- contained multiple

12  flights for the category NBD, which means not onboard;

13  correct?

14  A.    I would have to look at it again.

15              MR. CASTLE:  Your Honor, may I speak with

16  Mr. Gonzalez for one second?

17              (Counsel confer.)

18  BY MR. CASTLE:

19  Q.    Can you see that okay?

20  A.    Yes, sir.

21  Q.    You would agree that there is at least -- we can count

22  them all together -- one, two, three, four --

23              THE COURT:  You may want to speak into the

24  microphone.

25  BY MR. CASTLE:

1    Q.    If we count them all together, would you agree that

2    there is one, two, three, four, five, six, seven, eight,

3    nine, ten, eleven, twelve, thirteen NBDs --

4    A.    Okay.

5    Q.    -- on this chart; correct?

6    A.    That's what the chart says, yes.

7    Q.    A significant number of the alleged flights or

8    international travel that was testified to, he wasn't even

9    onboard the plane; correct?

10   A.    There is also a significant number of flights that he

11   did board.

12               MR. CASTLE:  In fact, that's nonresponsive.

13               THE COURT:  Sustained.

14               THE WITNESS:  I'm sorry.

15   BY MR. CASTLE:

16   Q.    You would agree there's a significant number of flights

17   where he was not onboard; correct?

18   A.    Correct.

19   Q.    What does -- on the bottom of this page, what do REQ

20   mean?  What does REQ mean?

21   A.    I can't see what you're looking at.

22   Q.    Oh, I'm sorry.

23   A.    I don't know the answer to that.

24   Q.    So he may or may not have been on those flights, too;

25   correct?

1    A.    I can't answer that.

2    Q.    So you don't know.

3          And then you would agree that the first record here

4    is 2002?

5    A.    Yes.

6    Q.    And then you have an outbound flight in 2007 to

7    Toronto.  Do you see that?

8    A.    Yes.

9    Q.    Do you know how old Maaz Aziz was in 2007?

10   A.    He would have been 14.

11   Q.    So you'd agree that's not for business; correct?

12   A.    It could be to visit the family that's up there that

13   has SCS Canada.

14   Q.    But SCS Canada wasn't formed until '19.

15   A.    He has family up there, though.

16   Q.    Did they live there in 2019?

17   A.    Jawaad Farooq, the cousin?

18   Q.    Yeah.  Do you know when he moved to Canada?

19   A.    I don't know when he moved to Canada.

20   Q.    You don't know if he was there in 2007, or not;

21   correct?

22   A.    No.

23   Q.    You would agree this chart shows his international

24   travel from the time he was a teenager through today;

25   correct?

1   A.    Correct.

2   Q.    You would agree it's a little bit misleading, when you

3   talk about a 14-year-old, and put this out there and say this

4   is his whole travel, when most of it or big chunks of it are

5   irrelevant where he wasn't on the plane or was a child;

6   correct?

7   A.    No, I don't agree with that.  I think there's a

8   significant amount of travel that's still international and

9   he's of age and he was conducting this business.  If you

10  scroll up ... sorry, too far.

11          Down there in Bogota, in 2019, to Colombia, he

12  stated that was for business.  And about a few months after

13  that we started seeing incoming payments from the country of

14  Colombia.  So I would say that is for business, which is what

15  we're focused on.  And Toronto and Dubai.  So business

16  travel.

17  Q.    My point, agent, is, for example, like Bogota, in order

18  for this flight to be on this list, he would have had to use

19  a passport; correct?

20  A.    Correct.

21  Q.    And he apparently used his passport; correct?

22  A.    Correct.

23  Q.    Do you have any evidence he's ever traveled illegally

24  abroad without a passport?

25  A.    No.

1   Q.    Earlier, Mr. Gonzalez asked you something, you know,

2   people come into this country illegally every day.  Do you

3   recall that?

4   A.    Yes.

5   Q.    And you said why wouldn't the opposite be true?  You

6   heard that.

7   A.    Yes.

8   Q.    Wouldn't that be true for every single criminal

9   defendant in the country?

10  A.    If someone wants to leave and they're motivated to do

11  that, they could do that.

12  Q.    So you would agree that plan is really not that

13  indicative of Maaz Aziz, the defendant we're here on, being a

14  flight risk; right?

15  A.    I wouldn't say that every defendant has the foreign

16  ties, family in foreign countries, the businesses, the

17  network set up either.

18  Q.    Is it the government's position that a naturalized

19  citizen is always a flight risk because they were born in a

20  foreign country?

21  A.    It's the position here that there's a flight risk just

22  because of all of those factors I just stated which --

23  Q.    Right.  You would agree we've established most of those

24  don't apply to Maaz Aziz; correct?

25  A.    As far as ...

```
1   Q.    Foreign bank accounts, foreign property, having family

2   members own close businesses.  None of those apply; correct?

3   A.    He has the cousin in Canada that owns SCS Canada.

4   There's Dubai businesses, which through his SCS ownership and

5   position, he would have access to.  And has familial property

6   in Pakistan, which I think he would have access to.

7   Q.    And last time he was in Canada, you would agree, was

8   2019?

9   A.    At the time that SCS Canada was incorporated.

10  Q.    My question is simply that he hadn't been there since

11  2019; correct?

12  A.    Can you scroll up just for --

13        Correct.

14  Q.    And just to remind the Court, you haven't identified a

15  single person he can call in Dubai; correct?

16  A.    Correct.

17  Q.    You can't identify a single person he can call in

18  Pakistan; correct?

19  A.    Other than his family.

20  Q.    But you don't know what the relationship is with those

21  people, though; correct?

22  A.    I would assume that word, that "family" -- that you can

23  contact family.

24  Q.    But you don't know that, do you?

25  A.    I don't know that.
```

1    Q.    And when is the last time you see him in Pakistan?

2    A.    Might not necessarily see him in Pakistan if he

3    connects through Dubai.

4    Q.    Or Qatar, perhaps?

5    A.    Qatar?  I only see 2018.

6    Q.    And the only statement or the only evidence you have of

7    him owning SCS Supply is the statement reported by Pretrial

8    that may or may not be accurate; correct?

9    A.    The statement, joint signature accounts for SCS or for

10   SCS Supply Chain, for Smart Cellular, which was the name of

11   the business before that.  There are other factors that

12   provide weight to that statement.

13   Q.    You would agree someone other than an owner can have

14   signatory authority on an account; correct?

15   A.    They can.

16   Q.    But you would agree that's not dispositive of whether

17   he owns the company; correct?

18   A.    If you take that, along with cooperating defendant

19   statements that say they worked together; their roles in the

20   company; if you look at all of that -- the fact that he's not

21   listed on SCS Canada's Certificate of Incorporation, but yet

22   he's taking share drawdowns on Canada; he's getting wires

23   with the memo for SCS Canada, which are indicative of

24   ownership -- that lends credibility to the fact that him not

25   being listed on the Certificate of Incorporation doesn't

1    necessarily mean he's not an owner.

2    Q.    It doesn't lend credibility to the fact he's also an

3    owner; correct?  I mean, Maaz and he agree that those amounts

4    could be a loan.

5    A.    It could.  But when you look at this February 21

6    statement for SCS Canada, there is a bonus that lists Saad

7    and Maaz for 25,000 and it says a share draw, which I believe

8    would be a shareholder draw, which is indicative of

9    ownership.

10   Q.    But you don't know that; correct?

11   A.    I'm basing --

12   Q.    Just a belief.

13   A.    I'm basing that off of this evidence right here.

14          MR. CASTLE:  Your Honor, I'm almost done.  Just

15   give me one second to wrap up.

16   BY MR. CASTLE:

17   Q.    Do you recall the last hearing I mentioned to you that

18   you testified -- your testimony -- I asked if your testimony

19   was based on speculation.  You said yes, and based on my

20   beliefs; correct?

21   A.    Correct.

22   Q.    But as we sit here today, you can't testify or tell

23   this Court with any degree of certainty that it's more likely

24   than not that they're going to flee, can you?

25   A.    I can base that off of the evidence that I've talked

1    about so far, my opinion.

2    Q.    But --

3    A.    The totality of the case.

4    Q.    The weight of the evidence again?

5    A.    The weight of the evidence.  What we've talked about.

6    Q.    Okay.  So no ownership, no foreign ties, no people, no

7    relationship with document forgers, but that's your opinion.

8    A.    Can you say those three again?

9    Q.    Went through a laundry list.  I just wanted to be sure.

10            No foreign bank account for Maaz Aziz; correct?

11   A.    In his name that I know of.

12   Q.    Well, based on what you know today; correct?  We're in

13   a live hearing before this Court.  It's evidentiary.

14   A.    Correct.  But there are also other items that weren't

15   listed on the Probation --

16   Q.    I understand Maaz Aziz does not list --

17   A.    -- the two properties in --

18   Q.    Frisco?

19   A.    -- Frisco.  The Regions Bank account wasn't listed.  He

20   has a coin-based account, which is crypto, that wasn't listed

21   that I know of.  And you also look at SCS Canada.

22            (Counsel confer.)

23   BY MR. CASTLE:

24   Q.    So you said the crypto wasn't listed?

25   A.    Not that I know of.

1    Q.    Do you see $180,000 listed in bonds?

2    A.    I don't know why that would be listed under bonds.

3    Q.    Because, are you aware, that pretrial services

4    indicated that they thought crypto was like stocks and bonds

5    and other securities, despite IRS rulings and SEC rulings to

6    the contrary?  Are you aware of that?

7    A.    I'm not aware of that.

8    Q.    If I represent to you the $180,000 is the crypto, do

9    you have any reason to dispute that representation?

10   A.    Not if that's what you're saying.

11   Q.    And in terms of the lots not being disclosed, that's

12   not true, is it, agent?

13   A.    It wasn't disclosed to Probation.

14   Q.    Agent, are you aware -- we asked you earlier about

15   testimony or statements Mr. Wohlford made at the end --

16              (Court reporter clarification.)

17   BY MR. CASTLE:

18   Q.    -- Mr. Wohlford made at the end of the hearing.

19              MR. GONZALEZ:  Your Honor, that's not evidence.

20   What Mr. Wohlford said is not evidence.

21              THE COURT:  Sustained.  You may want to rephrase

22   that.

23   BY MR. CASTLE:

24   Q.    Do you recall Mr. Wohlford stating that that

25   information had been turned over to pretrial services and --

1          MR. GONZALEZ:  And I would object to that

2    statement.  There is no proof that anything was turned over.

3    Mr. Wohlford made a statement that he presented it, but he

4    could have called the pretrial services officer and he failed

5    to do that.  So there is no evidence before this Court that

6    Mr. Wohlford did any of this.

7          THE COURT:  I'm going to sustain that just to the

8    extent that I think your question is what Mr. Wohlford stated

9    at a hearing; correct?

10          MR. CASTLE:  Correct, Your Honor.

11          THE COURT:  All right.  As long as that's clear.

12    BY MR. CASTLE:

13    Q.   Did Mr. Wohlford present any statements to the Court,

14    and during the very first hearing before Judge Nowak,

15    regarding disclosure of the two lots?

16    A.   He did present a statement.

17    Q.   And do you have any reason to believe Mr. Wohlford was

18    lying?

19    A.   No.

20    Q.   Do you have any evidence Mr. Wohlford was lying?

21    A.   No.

22    Q.   Are you aware that Mr. Wohlford was proffering that

23    information as to what was communicated to pretrial services?

24    A.   Correct.

25    Q.   And the judge accepted that; correct?

1    A.    I believe she did.

2    Q.    And she admonished him:  Why didn't you mention this

3    earlier?  Do you recall that?

4    A.    Um-hum, yes.

5    Q.    And he said *I'll fall on my sword, Your Honor*.

6    A.    He did say that.

7    Q.    So the crypto was disclosed.  Lots were disclosed;

8    correct?

9    A.    At the end of the hearing.

10   Q.    That's still disclosure.  They were disclosed prior to

11   the hearing; right?

12   A.    Yes.

13   Q.    So no ties to any forger.  Remember last time I asked

14   you, are you basically saying this mere possibility that they

15   could get a passport or travel documents because they may

16   know somebody who knows somebody who makes 16 phone calls --

17        MR. GONZALEZ:  Objection.  Asked and answered

18   several times.

19        THE COURT:  I'm going to sustain that.  I think,

20   Mr. Castle, a lot of the questions you're going through now

21   are -- is material you've been through with this witness,

22   even again today.  And I feel like I understand the points

23   you're making.  But it feels like you're retreading where

24   you've been today and where you were at the last hearing.

25        MR. CASTLE:  Your Honor, my apologies.  I've heard

1    a lot of retreading and testimony today that caught me off

2    guard, so I felt the need to confirm which version was right.

3    So ...

4             THE COURT:  All right.  Thank you, Mr. Castle.

5             MR. CASTLE:  Pass the witness.

6             THE COURT:  All right.  Mr. Meyer, how long do you

7    think you have?  Because we are going to finish this today,

8    and I do want counsel on both sides to be mindful of let's

9    try to avoid retreading waters that we already went through

10   before.

11            MR. MEYER:  Yes, Your Honor.  I can assure you that

12   nobody is motivated to finish today as our clients are.

13            THE COURT:  You can proceed.

14            MR. MEYER:  Thank you, Your Honor.

15                          RECROSS-EXAMINATION

16   By MR. MEYER:

17   Q.    Agent Doering, not to -- to the Judge's point, not to

18   retread too much ground, I just want to make sure the record

19   is clear after your redirect today.  There is no evidence

20   that my client, Saad Aziz, has direct contact with Greg

21   Trent, who's one of the identity forgers that you've

22   mentioned.

23   A.    Correct.

24   Q.    Okay.  And is Mr. Trent currently detained or is

25   Mr. Trent released?

1    A.    Released.

2    Q.    Okay.  So Mr. Trent's an identity forger who the

3    government believes has forged numerous identities, and he's

4    currently on release.

5    A.    Correct.

6    Q.    Okay.  And Richard Sims, who is defendant 42, who is I

7    think one of the other identity forgers you've mentioned,

8    there's no evidence that my client, Saad Aziz, has direct

9    ties to him, is there?

10   A.    Correct.

11   Q.    And is Mr. Sims currently released or detained?

12   A.    Released.

13   Q.    And the two new individuals you mentioned today, who

14   I'm going to say are defendants 63 and 64, because I cannot

15   pronounce defendant 63's name, and 64 is Reyes -- was the

16   individuals in Houston.  There is no evidence that my client

17   has any direct involvement or contact with them; is that

18   correct?

19   A.    Correct.

20   Q.    And Mr. Trent and Mr. Sims, were they released after

21   they had an opportunity to debrief with the government?

22   A.    Yes.

23   Q.    And Mr. Obeidat, who is defendant 84, was arrested on

24   August 24th and released on August 31st.  Did he have an

25   opportunity to debrief with the government?

1   A.    He did.

2   Q.    And that's the individual the government that the

3   government did three controlled sales with; is that right?

4   A.    It is.

5   Q.    And at least two of those sales, according to the

6   Fourth Superseding Indictment, Mr. Obeidat was told to his

7   face that these were stolen products; is that right?

8   A.    They represented, yes.

9   Q.    Okay.  And nonetheless, the government met with him, he

10  was forthcoming; and, therefore, decided that he could -- he

11  could be released.

12  A.    Correct.

13  Q.    You mentioned earlier that it is possible for a client

14  to go to a embassy and get a replacement passport.  Do you

15  have any idea how long that process takes?

16  A.    I think from the website it said somewhere between

17  seven to ten weeks; expedited, maybe three weeks.

18  Q.    Okay.  Do you -- are you -- so you could do an expedite

19  in three weeks; is that right?

20  A.    Don't hold me -- it's somewhere in that time frame.

21  Q.    And that's based on the website of the Pakistani

22  Consulate.

23  A.    Correct.

24  Q.    Not direct contacts with the Pakistani citizenship

25  service, whatever that may be.

1   A.    No.

2   Q.    And when was the raids executed on my client's house

3   and business?

4   A.    August 24th.

5   Q.    And when did my client self-surrender?

6   A.    I believe it was September 23rd.

7   Q.    That's more than three weeks; is that right?

8   A.    Correct.

9   Q.    Are you aware of him requesting an expedited Pakistani

10  passport in those three weeks?

11  A.    No, sir.

12  Q.    And were you present when my client's house was raided

13  by the FBI, or were you at the warehouse?

14  A.    I was neither.

15  Q.    Okay.  You've been on -- have you conducted search

16  warrants before?

17  A.    Yes.

18  Q.    Is it normal for officers to bring firearms?

19  A.    Yes.

20  Q.    Were firearms brought to my client's house in the

21  morning of August 24th?

22  A.    You mean, like, on their person?

23  Q.    Yes.

24  A.    Yes.

25  Q.    Okay.  And are you aware that Mr. Aziz has two children

1  under the age of three?

2  A.    Yes.

3  Q.    So we've talked a lot about the seriousness of the

4  presentation that's been made to Mr. Aziz twice now.  Do you

5  think that he probably understood that it was pretty serious

6  when armed agents arrived and took his children out in the

7  morning?

8  A.    Yes.

9  Q.    But he did not flee at that time; is that right?

10  A.    Not at that time.

11  Q.    And in writing, my colleague, Mr. McCarthy, indicated

12  to you and to Mr. Gonzalez that Mr. Aziz wanted to

13  self-surrender on September 9th; is that correct?

14  A.    Correct.

15  Q.    And he met with the U.S. police to turn himself in that

16  same week?

17  A.    Correct.

18  Q.    And there were several more emails and letters,

19  including on September 13th, to Judge Nowak and Judge Johnson

20  indicated he wanted to self-surrender.

21  A.    Yes.

22  Q.    And I think you described this, at the first hearing in

23  front of Judge Nowak, that you couldn't recall someone in 15

24  years trying this hard to surrender; is that right?

25  A.    That was -- yes.

1   Q.     And at that time, you and Mr. Gonzalez had already met

2   with Saad Aziz on August 31st and told him that he was facing

3   charges; is that right?

4   A.     Correct.

5   Q.     So he understood by at least August 31st, if the armed

6   agents didn't put him on notice on August 24th, that charges

7   were coming.

8   A.     Yes.

9   Q.     But he stayed in the country.

10  A.     He did.

11  Q.     And Mr. Gonzalez again mentioned that there's a family

12  member assisting a fugitive.  And to be clear, from your

13  prior testimony, that is Saad Aziz's brother's wife's father.

14  A.     Correct.

15  Q.     Who is currently in federal prison for that crime; is

16  that right?

17  A.     Yes.

18  Q.     Just the last two points of clarification, agent.  This

19  is not a presumption case, is it?

20  A.     No.

21  Q.     And there's also no evidence that Saad Aziz had

22  anything to do -- or, sorry, Saad Aziz has any direct

23  involvement with the armed robberies that are alleged in this

24  case.

25  A.     Not direct, as in he didn't go in the store.

1  Q.    Okay.  He had no direct involvement with the armed

2  robberies.

3  A.    Correct.  He didn't go in the store.

4           MR. MEYER:  No further questions at this time, Your

5  Honor.

6           THE COURT:  All right.  Agent, you can step down.

7           We're going to take a break for about ten minutes.

8  We'll be back about 3:15.

9           (Recess taken.)

10           THE COURT:  All right.  We just finished with Agent

11  Doering.

12           Ms. Bloss, you can call the government's next

13  witness.

14           MS. BLOSS:  The government calls Mikaela Keene.

15           THE COURT:  All right.  Let's have -- what's the

16  name again?  Ms. Keene?

17           MS. BLOSS:  Keene.

18           THE COURT:  Okay.  Let's have her sworn.

19                (Witness sworn.)

20           THE COURT:  You can proceed when you're ready,

21  Ms. Bloss.

22                MIKAELA KEENE,

23     first having been duly sworn by the courtroom deputy,

24                testifies under oath as follows:

25  ***

254

```
 1                    DIRECT EXAMINATION
 2    BY MS. BLOSS:
 3    Q.    Why don't you go ahead and state your name for the
 4    record and spell it for us.
 5    A.    Okay.  My name is Mikaela Keene.  First name is
 6    M-I-K-A-E-L-A, last name, Keene, K-E-E-N-E.
 7    Q.    Where do you work?
 8    A.    At the FBI.
 9    Q.    What do you do there?
10    A.    I'm a forensic accountant on the violent crimes squad
11    in the Frisco office.
12    Q.    How long have you worked with the FBI?
13    A.    About ten months now.
14    Q.    And during all those ten months, were you a forensic
15    accountant for them?
16    A.    Yes.
17    Q.    Before that, where did you work?
18    A.    At worked at Elliott Davis; it's an accounting firm.
19    Q.    Doing the same sort of work?  Forensic accounting?
20    A.    I was an auditor.
21    Q.    Okay.  And in order to become an auditor and a forensic
22    accountant, do you have some sort of training or experience,
23    education?
24    A.    Yes.  So I have an undergrad in accounting and finance,
25    with a minor in economics.  I have a master's in accounting
```

1   with a concentration of forensic data analytics.  I'm also a

2   certified public accountant licensed with the State of

3   Tennessee, as well as a certified fraud examiner.

4   Q.    All right.  So you're the person crunching the numbers

5   on the financials; right?

6   A.    Yes.

7   Q.    You're not making the arrests; right?

8   A.    No.

9   Q.    And you're not the one going in and interviewing

10  co-defendants; right?

11  A.    Correct.

12  Q.    All right.  So did you do that in this case?  Did you

13  crunch the numbers here?

14  A.    Yes.

15  Q.    And I want to talk to you because you were specifically

16  asked to look at the numbers with respect to transactions

17  made by the Azizes as it related to the question of flight

18  risk; right?

19  A.    Correct.

20  Q.    That's what you're prepared to come in here and talk

21  about.

22  A.    Correct, yes.

23  Q.    All right.  So then let's look at the representations

24  that the Aziz brothers made to pretrial services and how it

25  matches up to your forensic analysis of their records.

1          MS. BLOSS:  Patrick, can we get -- can we get Saad

2     Aziz's PSR, page 3 to page 4, finances table?

3     BY MR. BLOSS:

4     Q.   All right.  So it's here at the bottom.  This is what

5     Saad Aziz told pretrial services his assets looked like;

6     right?

7     A.   Yes.

8          THE COURT:  Hold on for a second.

9          Go ahead, counsel.  I think if the green light's

10    on, your mic's on.

11         MR. WOHLFORD:  Okay.  Your Honor, I think that's

12    Maaz Aziz.  That's my misspelled name up there.  I'm pretty

13    sure this relates to Maaz.

14         MS. BLOSS:  All right.  Then let's get Saad's up

15    there.  So if we could blow up the finances section for Saad

16    Aziz's PSR.

17    BY MR. BLOSS:

18    Q.   Okay.  So this is what Saad Aziz disclosed to pretrial

19    services was his financial assets on September 23rd, 2021;

20    right?

21    A.   Yes.

22    Q.   Do you see anything on there that suggests property?

23    A.   No.

24    Q.   Not domestic?  Not foreign?

25    A.   No.

1   Q.    All right.  Let's look at Maaz Aziz's financial

2   disclosure to Pretrial on that same day.

3               MS. BLOSS:  Patrick, could we pull that up?  Page

4   3, bottom of the page.

5   BY MS. BLOSS:

6   Q.    All right.  Do you see anything on here?

7   A.    Beyond the residence, no.

8   Q.    No.  And when the list -- listing the residence, okay,

9   they were listing that as an asset and then they were listing

10  the mortgage; right?

11  A.    Correct.

12  Q.    You don't see any Frisco property on here; right?

13  A.    No.

14  Q.    You don't see any property in Pakistan?

15  A.    No.

16  Q.    Did your investigation find documents suggesting that

17  the Aziz brothers had properties in Frisco?

18  A.    Yes.

19              MS. BLOSS:  All right.  And do you have Exhibit 5

20  in front of you, Your Honor?  I believe we provided this to

21  the Court at the last hearing.  And at this time, the

22  government would move to enter that into evidence.

23              THE COURT:  Any objection?

24              MR. WOHLFORD:  Not sure what Exhibit 5 is.  Is

25  it -- the exhibits, just for the record, Your Honor, we

1    received were sort of jumbled and it was unclear what was

2    what.

3              So is it this full packet with these tabs on it?

4              MS. BLOSS:  That's correct.

5              MR. WOHLFORD:  Okay.  That's 5.

6              Well, I guess we'll reassert our prior objection.

7    I understand Your Honor has already allowed those in, but

8    just for the record, we would assert our prior objection.

9              THE COURT:  Mr. Meyer?

10             MR. MEYER:  We join in that objection, Your Honor.

11             THE COURT:  All right.  I'm going to overrule the

12   objections and admit Government Exhibit 5.

13                     (Government's Exhibit 5 was admitted.)

14   BY MS. BLOSS:

15   Q.   All right.  So let's look at the first page of tab 6

16   where it's talking about the property summary.

17             MS. BLOSS:  Mr. Madrigal, that's the property

18   summary section.

19   BY MR. BLOSS:

20   Q.   This is lot 6 in Frisco, Texas.  Do you see where it

21   says who owns this property?

22   A.   Yes.

23   Q.   Who owns it?

24   A.   Saad Aziz, a married person, and Maaz Aziz, a married

25   person.

1    Q.    So they own this jointly.

2    A.    Yes.

3    Q.    And what date did it give for this property being in

4    their ownership?

5    A.    12/31/2020.

6    Q.    So clearly before PSR disclosure; right?

7    A.    Yes.

8    Q.    All right.  If we can go to the net equity section,

9    that's page 10 of the lot 6 tab.  And it's on the screen

10   here.  If we could look at -- was this property valued?

11   A.    Yes.

12   Q.    Could you explain what this is?

13   A.    Yes.  So this takes the market value, so what it would

14   be worth if you were to try to sell it, and it gives the

15   value and then deducts any sort of liens or costs of that

16   sale.

17   Q.    Okay.  So what's it valued at here?

18   A.    It's valued at 1 million.

19   Q.    So this would be just pure profit --

20   A.    Yes.

21   Q.    -- for the Aziz brothers.

22   A.    Yes.

23        MS. BLOSS:  All right.  If we could scroll up,

24   Mr. Madrigal.

25   BY MR. BLOSS:

1    Q.    And when we look here, and it says there is a note

2    here.  It says *Per the BPO*?

3    A.    Yes.

4    Q.    What does that say?

5    A.    It says, *Per the BPO, the subject property is currently*

6    *listed for sale at $1,999,999 for 66 days up to the time of*

7    *reporting.*

8    Q.    So the Aziz brothers were attempting to sell this

9    property; right?

10   A.    Yes.

11   Q.    And they were attempting to sell this property at the

12   time that they are making no disclosures to pretrial

13   services?

14   A.    Yes.

15   Q.    Did you look at -- online and see what the status of

16   this property was?

17   A.    Yes.

18   Q.    Okay.  Can we turn to that portion?  That's page 12 of

19   the packet.

20          MS. BLOSS:  But it's the realtor.com page 2 for

21   you, Mr. Madrigal.

22   BY MR. BLOSS:

23   Q.    Is this what you found online?

24   A.    It is, yes.

25   Q.    What does it list the current status of that property

1    at?

2    A.    Um, it says *unavailable*.

3    Q.    Okay.  So it was taken off the market.

4    A.    Yes.

5    Q.    This is an asset that the Aziz brothers still possess.

6    A.    Correct.

7    Q.    Let's take a look at the second lot that wasn't

8    disclosed.  If we could turn to lot 7 tab in that packet.

9    And again, if we could look at the first page.

10          MS. BLOSS:  And for you, Mr. Madrigal, the property

11   summary report.

12   BY MR. BLOSS:

13   Q.    Who owns this property?

14   A.    Again Maaz Aziz, a married man, and Saad Aziz, a

15   married man.

16   Q.    Again joint ownership here; right?

17          And at what date did they own this property?

18   A.    12/31/2020.

19   Q.    If we could go look at the net equity work sheet;

20   that's page 10 of the packet.

21          What was the property valued at?

22   A.    It was valued at $1 million as well.

23   Q.    Okay.  And what is the total net equity for this

24   property?

25   A.    $376,678.

1    Q.    So that should be profit.

2    A.    Yes.

3    Q.    And again, this property, looking at the writing right

4    there, that was listed for sale or for a little over $1

5    million; right?

6    A.    Correct.

7    Q.    Did you also look into the status of this property?

8    A.    Yes.

9    Q.    Okay.  So you went online, you looked it up.

10   A.    Yes.

11   Q.    Okay.  Let's look at what you found.  If we could turn

12   to page 13 of the packet.

13          MS. BLOSS:  But it's the realtor.com page 3 for

14   you, Mr. Madrigal.

15   BY MR. BLOSS:

16   Q.    According to this listing, what happened to this

17   property?

18   A.    On October 8th of 2021, this property was sold.

19   Q.    So this is after the time for reporting to pretrial

20   services; right?

21   A.    Um-hum.

22   Q.    This is after the detention hearing in front of Judge

23   Nowak; right?

24   A.    Yes.

25   Q.    This is after the defendants are aware that the

1    government's investigating them for fraudulent activities.

2    A.    Yes.

3    Q.    And realtor.com, you want those postings to be

4    accurate; right?

5    A.    Correct.

6    Q.    Because people are determining whether or not to buy

7    properties or look at properties.  There's an economic

8    proposition there.

9    A.    Absolutely.

10   Q.    All right.  Let's take a look at some of the more --

11   more of the representations of the Aziz brothers made to

12   pretrial services.

13            So, again, can we pull up Saad Aziz's PSR and look

14   at his financial table?

15            What is the estimated net worth that Saad Aziz --

16   Saad Aziz reported to pretrial services?

17   A.    $403,476.

18   Q.    Okay.  So this is as of September 23rd, 2021.

19   A.    Correct.

20   Q.    Did you see any other documents where Saad Aziz had

21   reported his net worth?

22   A.    Yes.

23   Q.    What were those documents?

24   A.    It was a personal financial statement included in a

25   credit application.

1    Q.    So he's trying to get money when he's reporting his net

2    worth there.

3    A.    Correct.

4    Q.    Okay.  And was that vastly different from this report?

5    A.    Yes.

6    Q.    What did he report there?

7    A.    His net worth as of 12/31/2019, was listed at

8    $1,246,694.

9    Q.    Okay.  And so that's --

10           MR. MEYER:  Objection, Your Honor.  I believe

11   she's -- the witness is reading off of Exhibit 9 or 10, which

12   are the exhibits we discussed earlier that were attached to

13   the government's second supplemental briefing.

14           MS. BLOSS:  Well, let's take that issue up, then.

15   Your Honor, this is an exhibit that is attached to the second

16   supplemental briefing.  It is an exhibit that we received

17   after the October 20th deadline.

18           But I want to step back and reframe what we're

19   doing here in this hearing, if I could.

20           THE COURT:  Go ahead.

21           MS. BLOSS:  The only parties in this room who

22   legally had any obligation to disclose financial assets to

23   the courts were the Aziz brothers, Maaz and Saad Aziz, when

24   they had to disclose their financials to pretrial services.

25           This information should have been disclosed on

1    September 23rd, 2021, and it wasn't.  So the government had

2    to conduct an additional investigation, had to subpoena

3    records with respect to the Aziz brother's accounts.  And

4    those subpoena returns come back on a rolling basis.  Some

5    had been asked for previous, prior to the hearing, some had

6    been asked for -- I believe with that information returned.

7    And so as the government's receiving this information, it's

8    reporting.

9            But at no time was the government under any legal

10   obligation to disclose those records to the Aziz brothers

11   when they're making their report to pretrial services.  That

12   was a test, and it wasn't open book.  The Aziz brothers don't

13   get the opportunity to look at the government's files when

14   it's determined whether it was going to have candor with the

15   Court.

16           And so if opposing counsels' upset about being

17   ambushed, well, then they have no one further to look to than

18   their own clients, who know what their business records are,

19   who know what information is in their financial data.  There

20   is no ambush or surprise for the Aziz brothers.

21           If they decided not to communicate that to their

22   counsel, just like they decided not to communicate it to

23   pretrial services, Judge Nowak, or this Court, then that was

24   what they were entitled to do, but it in no way prevents the

25   government from fact-checking their disclosures.

1          THE COURT:  All right.  I'll hear from Mr. Wohlford

2     and Mr. Meyer.

3          MR. WOHLFORD:  Yeah.  If I may, Your Honor, I would

4     just make a couple of points.

5          THE COURTROOM DEPUTY:  Can you hold that just a

6     little farther from your mouth.

7          MR. WOHLFORD:  Sorry.  That is my recurring

8     problem, apparently.  Just a couple of quick points.  You

9     know, there was, you know, a passionate statement that, well,

10    only the Aziz brothers know what's, you know, what's in their

11    financial documents; some suggestion that -- and there has

12    been in briefs, too -- that the Aziz brothers had some

13    obligation to essentially just waive their Fifth Amendment

14    rights and come in and testify about it -- all sorts of

15    things -- and provide the government all sorts of documents,

16    notwithstanding that they are subject to a money laundering

17    charge in this case.

18          So look, the -- you know, I understand the argument

19    that they're making.  The fact of the matter is, with respect

20    to these documents here, the objection that we have to

21    Exhibits 9 through 14 are that Your Honor entered an order

22    and the order said they needed to submit this stuff by

23    Wednesday.

24          They didn't ask for leave -- if this was in

25    evidence that they obtained after Wednesday, they didn't

1  request leave from Your Honor to submit something after Your

2  Honor's order.  They just went ahead and filed it.  And they

3  filed it and they didn't serve it on us, and they didn't

4  provide it to us until yesterday, the day before the hearing.

5  And I wasn't even able to access it until after 5:00.

6         So, yes, this is an ambush and an attempt to try

7  this detention by ambush.  And, you know, not to mention that

8  we're, you know, I presume, about to see documents that we

9  were provided this morning right before the hearing.

10         So I think, Your Honor, I made the record of our

11  objection previously -- I won't do it again other than to

12  just reiterate, when an exhibit comes up, and just say, I

13  reiterate my previous objection.  But that's our position,

14  Your Honor.

15         THE COURT:  All right.  I understand your argument,

16  Mr. Wohlford.

17         Mr. Meyer, did you want to add anything?

18         MR. MEYER:  A desperate need for the microphone to

19  work for me, Your Honor.

20         Apart from that, I just wanted to join in

21  Mr. Wohlford's objection and point out that the indication

22  that what the government believes is a lack of disclosure to

23  pretrial services, the document is being used -- and we'll

24  get into this more later -- the document is being used as

25  financial status as of 12/31/19, which has no bearing on the

1    financial status as of 8/23/2021.

2            THE COURT:  All right.  Thank you, Mr. Meyer.

3            So I'm going to overrule the objections and deny

4    the motion to strike.  I'm going to allow the exhibits to be

5    used.

6            My thought on this for defendants' counsel is going

7    to be that you'll have the opportunity to cross-examine

8    Ms. Keene.  But one of the things I'll do before we close out

9    today is we'll probably make some provision for if the

10   defendants' counsel think they need more time, and this is

11   going to be up to you to ask that we continue the hearing and

12   bring back a witness because you need time to consult with

13   your clients or look at the records, and we need to bring the

14   witness back so that you have time before you have completed

15   any additional cross-examination you may want to do.  That's

16   what I'm inclined to do here.

17           I think the Court needs to be able to consider the

18   records.  At the same time, if there is an issue with the

19   defendants' counsel needing more time to review them and

20   consult their clients to complete the cross-examination you

21   need to do, I want to provide you time to do that.  So we

22   will cover that today.

23           But, Ms. Bloss, you can proceed.  And the Court's

24   going to consider this evidence.

25   ***

1   BY MS. BLOSS:

2   Q.   All right.  So backing up here, we're looking at what

3   Saad Aziz disclosed to pretrial services as his estimated net

4   worth, which is a little over $403,000; right?

5   A.   Correct.

6   Q.   Okay.  Let's take a look at the document that he

7   provided disclosing his net worth when he was looking to make

8   money.

9        MS. BLOSS:  Can we please have -- and, Your Honor,

10  we'll offer this as Government's Exhibit 8.

11       THE COURT:  Is this Government's Exhibit 8?

12       All right.  Defendants' counsel, I assume you have

13  the same objections.  You can just say that we have the same

14  objections that have been made, if you would like.

15       MR. WOHLFORD:  Was that the -- it looked like there

16  was an 11 up at the top corner.  Was that what was produced

17  to us as Exhibit 11?

18       MS. BLOSS:  Yes.  So it's attached -- the

19  attachments, as to the exhibits with respect to the motions,

20  are a bit different than what's been presented in court; it's

21  out of order.  So I'm trying to keep it --

22       THE COURT:  Well, do they have a paper copy in

23  front of them, you know, that's marked as Government's

24  Exhibit 8?  Because we'll need that for our record for this

25  hearing anyway.

1          MS. BLOSS:  They should have a copy of it because

2    it was filed, but I don't know that it's marked Exhibit 8.

3          THE COURT:  I don't know that I have a copy marked

4    Exhibit 8.

5          MR. WOHLFORD:  Yeah.  I think what we have here

6    Your Honor, is again, you know, we don't have a copy because

7    it was filed, we have a copy because they provided it to us

8    yesterday.  And what they provided to us was a PDF labeled

9    "Exhibit 11," and I believe that's the document that she's

10   now wanting to offer as Exhibit 8.  We have the same

11   objection, Your Honor.

12          THE COURT:  Mr. Meyer?

13          MR. MEYER:  Join in that objection as well, Your

14   Honor.  And if opposing counsel can just reference whatever

15   exhibit it was attached to the second supplemental briefing,

16   I think that ought to speed it up and help us recognize it.

17          THE COURT:  All right.  Ms. Bloss, you'll probably

18   only have to do this once, but what you may want to do is

19   say, This is Government's Exhibit 8 for this hearing, it was

20   also Government's Exhibit, I hear, 11, with regard to the

21   government's second supplemental filing.  You may just want

22   to reference it that way the first time.

23          If you want to give me a paper copy, I'll take it.

24          MS. BLOSS:  I have paper copies, Your Honor.  I'm

25   happy -- may I approach?

1          THE COURT:  Yes.

2          (Provided to the Court.)

3                (Government's Exhibit 8 was admitted.)

4          THE COURT:  All right.  So you can proceed with

5    what's been marked as Government's Exhibit 8 for this

6    hearing.

7          MS. BLOSS:  Could we publish?

8          THE COURT:  Yes.

9          MS. BLOSS:  All right.  Let's zoom in on the lower

10   portion of this document.

11   BY MR. BLOSS:

12   Q.    So we're looking at a statement date of -- what is that

13   date here on the second column?

14   A.    12/31/2019.

15   Q.    And it's the same assessment for the same time a year

16   prior; right?

17   A.    Correct.

18   Q.    Okay.  So in 20- -- well, let's go back.

19          What is personal net worth?

20   A.    So personal net worth would be all of the assets that

21   an individual owns, less any sort of liens or liabilities

22   against those assets.

23   Q.    So then what does less of half of jointly held assets

24   mean?

25   A.    So in this case, they were evaluating Duua Aziz and so

1    they subtracted out the commonly held property in the

2    marriage situation.

3    Q.    Okay.  So this is excluding Saad Aziz's wife's portion

4    of the assets.

5    A.    Correct.

6    Q.    So then total net worth, that represents just Saad

7    Aziz's net worth?

8    A.    Correct.

9    Q.    What is the next line down?

10   A.    The total liabilities --

11   Q.    Correct.

12   A.    -- net worth?  Do you want the number?

13   Q.    Well, what does that mean?  What does that stand for?

14   A.    So that is a summation of the assets and the

15   liabilities -- oh, excuse me, the net worth and the

16   liabilities, so kind of your basic accounting equation where

17   assets equal liabilities plus stockholders equity, and so

18   just showing that this balance sheet does balance.

19   Q.    Okay.  So Saad Aziz's total net worth, according to

20   this document, in 2018 is a little over 1.2 million; right?

21   A.    Correct.

22   Q.    And then the total liabilities net worth is 1.7 or is

23   1.7 million.

24   A.    Correct.

25   Q.    Okay.  Then what is the adjusted gross income value?

1    A.    The adjusted gross income is the amount that would show

2    up on your tax returns, that would be your taxable income.

3    And so that, in the year of 2019, was $749,799.

4    Q.    In 2018, it was what?

5    A.    571,232.

6    Q.    Okay.  So we're seeing significant growth here; right?

7    A.    Correct.

8    Q.    And adjusted gross income, that's essentially pure

9    profit for an individual; right?

10   A.    Yes.

11   Q.    Pure profit for Saad Aziz; right?

12   A.    Yes.

13   Q.    Doesn't even include his wife.

14   A.    Correct.

15   Q.    What are the personal net worth numbers for 2019?

16   A.    The -- I'm sorry, can you repeat that?

17   Q.    What was his personal net worth reported in 2019?

18   A.    1,548,694.

19   Q.    Okay.  And his total net worth for that year?

20   A.    1,246,694.

21   Q.    Total liabilities - net worth?

22   A.    1,765,000.

23   Q.    Okay.  And then his adjusted gross income, his pure

24   profit, for 2019 is what?

25   A.    749,799.

1    Q.    Okay.  So that's -- doing the math, that's roughly a

2    $178,000 growth in one year?

3    A.    Correct.

4    Q.    Is that substantial, in your experience?

5    A.    Yes.

6    Q.    In your expert opinion, do you think that this number

7    is lower for 2020 or 2021?

8    A.    No.

9    Q.    Why?

10   A.    Because the growth that is sustained between year over

11   year, you would expect to see that growth continue or at

12   least stay the same.

13   Q.    And had you seen any documents where Saad Aziz was

14   trying to secure money where he recorded an increase in

15   revenue?

16   A.    Yes.

17   Q.    What were those documents?

18   A.    Also part of the credit application with Regions Bank.

19   Q.    Okay.  So there is a credit application with Regions

20   Bank, you just said.

21   A.    Yes.

22   Q.    What is that?

23   A.    That is where they applied to get money from Regions.

24   Q.    "They" being who?

25   A.    Saad or SCS Supply Chain.

1   Q.    For Saad Aziz and Maaz Aziz?

2   A.    Yes, correct.

3   Q.    And is Regions a federally insured bank?

4   A.    Yes.

5   Q.    Did you subpoena Regions for this information?

6   A.    Yes.

7   Q.    And did they respond?

8   A.    Yes.

9   Q.    Was that on October 21st, 2021?

10  A.    Yes.

11  Q.    All right.  And did those subpoena terms include a

12  credit analysis performed by Regions Bank?

13  A.    Yes.

14         MS. BLOSS:  All right.  So if we could look at that

15  document, the 8/31/2020 Credit Regions Administration Form,

16  which I believe is Exhibit 9 to the supplemental filing and

17  will be offered here as Exhibit 9.

18         MR. WOHLFORD:  Same objection, Your Honor.

19         MR. MEYER:  Same, Your Honor.

20         THE COURT:  All right.  Those objections will be

21  overruled and we will admit -- are you offering it as Exhibit

22  9 for this hearing?

23         MS. BLOSS:  Correct, Your Honor.

24         THE COURT:  All right.  So we'll have that admitted

25  as the Government's Exhibit 9 for this detention hearing.

```
 1                    (Government's Exhibit 9 was admitted.)
 2             MS. BLOSS:  And does Your Honor want a hard copy of
 3   that?
 4             THE COURT:  I'm pulling it up.  I think I can pull
 5   it -- I mean, we'll wind up needing a copy ultimately for the
 6   record.
 7             MS. BLOSS:  Okay.
 8             All right.  Mr. Madrigal, can we pull up Exhibit 9?
 9   BY MS. BLOSS:
10   Q.    Okay.  So this is a Credit Administration Form.  Have
11   you seen these before?
12   A.    Yes.
13   Q.    And based on your experience, are these credit
14   performances or reports generated based on statements made by
15   the person trying to secure the line of credit?
16   A.    Yes.
17   Q.    So the bank is relying on that person's honest
18   representation of their financial assets in the situation.
19   A.    Yes.
20   Q.    Okay.  Well, let's look at what Saad and Maaz Aziz told
21   the bank when they wanted to secure money.  Can we look at
22   page 3 of Exhibit 9?
23             Okay.  So here it says requested amount.  What is
24   that?
25   A.    That is the amount of the loan that they are trying to
```

1    secure from --

2    Q.    And what is that amount?

3    A.    2.4 million.

4    Q.    Okay.  So they're making these statements to secure

5    that amount of money.

6    A.    Correct.

7    Q.    If we can go and look down where it talks about

8    COVID-19 impact.

9          All right.  It says here, Due to the nature of the

10   business supporting products for people to work from home,

11   the company is designated by the City of Dallas as an

12   essential business and is allowed to operate during the

13   COVID-19 pandemic.

14         Do you see that?

15   A.    Yes.

16   Q.    So during a national pandemic, they represented their

17   business was legitimate to the City of Dallas.

18   A.    Correct.

19   Q.    Then what does that second bullet point state?

20   A.    It says, Budget for 2020 submitted by the borrower

21   indicate stable operations with 42 million revenues,

22   estimated EBITDA of 185,000.

23   Q.    Okay.  So here, this is going back to what you had said

24   earlier about what you would expect his financials to look

25   like.  Here, what are they saying about their revenues?

1    A.    That it's stable.

2    Q.    If we can go down to page 5, look at the conditions of

3    approval.

4              THE COURT:  I have a quick question, looking at

5    that document.  Is that the EBITDA number?  Did you say

6    185,000 was the EBITDA?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Thank you.  Go ahead.

9    BY MR. BLOSS:

10   Q.    Okay.  Let's look at the conditions of approvals on

11   page 5.  And let's look at number 1.  Okay.

12             You were here when Mr. Agent Doering was

13   testifying?

14   A.    Yes.

15   Q.    You were here when he was cross-examined; right?

16   A.    Yes.

17   Q.    And you recall a lot of questioning around whether or

18   not there was foreign money, foreign accounts, foreign

19   assets.

20   A.    Yes.

21   Q.    And they kept on saying that Mr. -- Agent Doering had

22   no proof of those sorts of things; right?

23   A.    Correct.

24   Q.    What does bullet point 1 say here?

25   A.    Foreign AR, so accounts receivable, required to have

1   acceptable credit insurance to be included as available in

2   the BB, which is borrowing base.  Regions Global Trade to

3   review Euhler policy and regular BB submissions.

4   Q.    What does that mean to you?

5   A.    That there is substantial foreign accounts receivables,

6   so money that they are owed, held overseas that Regions wants

7   insurance on, to be able to feel confident in issuing this

8   loan.

9   Q.    So this was money they had yet to collect in 2020.

10   A.    Correct.

11   Q.    And it was so substantial that a bank required it to be

12   insured in order to grant a loan.

13   A.    Correct.

14   Q.    All right.  Let's look at number 4.  Can you tell the

15   Court what that says?

16   A.    The borrower sells inventory to related companies that

17   are owned by the guarantor's wife for its online and retail

18   businesses.  The results of these entities are not included

19   in the operating results of SCS; however, due to the

20   intercompany transaction, the owner's guarantee will be

21   required to be joint with his wife, Duua Aziz, and update

22   joint PFS, or personal financial statement, will be reviewed

23   prior to closing.

24   Q.    Who is Saad Aziz's wife?

25   A.    Duua Aziz.

1    Q.    And are you aware that Ms. Duua Aziz was offered as a

2    third-party custodian in front of Judge Nowak?

3    A.    Yes.

4    Q.    All right.  And you're aware that she was

5    cross-examined by Mr. Gonzalez as to her knowledge of this

6    company; right?

7    A.    Yes.

8            MS. BLOSS:  Can we take a look at that,

9    Mr. Madrigal?  Can we pull up the September 27th transcript

10   at page 2 of 7, line 20.  Let's look at what she had to say.

11   BY MR. BLOSS:

12   Q.    Starting with line 20, Mr. Gonzalez asks:  *Okay.  Is it*

13   *safe to say that you're not aware of your husband's*

14   *activities; correct?  What he's doing at the warehouse?*

15           What does she respond?

16   A.    *I mean, I do.  I mean --*

17   Q.    He asks, *Do you work at the warehouse?  Do you work in*

18   *the business?*

19           If we could go to the next page.

20           Okay.  Line 1, what does she say?

21   A.    She says, *No, but I know what kind of business he does.*

22   Q.    Okay.

23           MR. MEYER:  Your Honor, we would object to her

24   reading another witness's testimony into the record.  This

25   transcript is already before the Court as a docketed number.

1    The document stands for itself.

2            THE COURT:  All right.  I'll overrule that

3    objection.

4            You can continue.

5    BY MS. BLOSS:

6    Q.    Okay.  Then she says *It's an electronics business*.

7            Mr. Gonzalez asks, *So he sells consumer goods;*

8    *right?*

9            She says *Yes*.

10           MS. BLOSS:  All right.  Let's look at page 209,

11   starting with line 9.  Well, actually, let's back up to line

12   6 -- no, 9, 9.

13   BY MR. BLOSS:

14   Q.    Ernest Gonzalez asks, *Okay.  Now do you know of any of*

15   *the individuals that he does business transactions with?*

16           What is her response?

17   A.    *No*.

18   Q.    Who was he transacting business with in 2000 -- in

19   2020, according to the loan documents he submitted to a bank

20   to secure $2.4 million?

21   A.    Her businesses.

22   Q.    Let's go back to page 5 of Exhibit 9 and look back at

23   those conditions of approval.  Let's look at condition number

24   5.  It says, Key man life insurance on Saad Aziz, minimum of

25   $1 million.

1          What is key man life insurance?

2    A.    A key man life insurance is a policy that is often put

3    in place for loan situations where if a individual is taken

4    out of the business, it could be detrimental to the business.

5    Q.    Okay.  So Saad Aziz was so critical to the operations

6    that Regions required life insurance on him; right?

7    A.    Correct.

8    Q.    Okay.  Let's stick a pin in that.  Let's go to page 12.

9    And let's look at this summary of top customers based on

10   revenue.

11         Have you taken a look at some of these customers?

12   A.    Yes.

13   Q.    All right.  Let's start with Super Nova Phones Trading.

14   Do you see that it had 1.8 million, almost 2 million, in

15   sales there; right?

16   A.    Yes.

17   Q.    Where is that company?

18   A.    That is located in Dubai.

19   Q.    All right.  What about Ontel Trading FZE, 617,000 in

20   sales?  Where is that company?

21   A.    Also located in Dubai.

22   Q.    And Imperial Electronics LTD, $446,117, where is that

23   company?

24   A.    I believe also in Dubai.

25   Q.    Okay.  Now, this isn't the first iteration of Regions'

1    evaluation.  This isn't the only iteration of Regions'

2    evaluations of the Azizes and SCS; right?

3    A.    Correct.

4    Q.    Is there a second document that does the same thing

5    with respect to this loan?

6    A.    Yes.

7            MS. BLOSS:  Okay.  Your Honor, we offer what has

8    been -- what was attached as Exhibit 10 to the supplemental

9    briefing, and we are offering, for purposes of this

10   exhibit -- hearing, as Exhibit 10, the November 17th, 2020,

11   evaluation into evidence.

12           MR. WOHLFORD:  Same objection, Your Honor.

13           THE COURT:  Thank you, Mr. Wohlford.

14           Mr. Meyer.

15           MR. MEYER:  Same objection, Your Honor.

16           THE COURT:  All right.  Thank you, counsel.  The

17   objections are overruled.  The Exhibit 10 for this hearing is

18   admitted.

19               (Government's Exhibit 10 was admitted.)

20           MS. BLOSS:  Okay.  Can I --

21           THE COURT:  You may proceed.

22           MS. BLOSS:  Can we publish?

23           THE COURT:  Yes.

24   BY MS. BLOSS:

25   Q.    Okay.  So this is in November 17th, 2020; right?

1   A.    Correct.

2   Q.    Or about three months out from the first evaluation?

3         Okay.  Let's look at page 3.  Let's look at what's

4   been updated.  If you would look at Executive Summary, and

5   right there it says, This memo documents approval to increase

6   the RLOC approved.

7         What does that mean to you?

8   A.    That they have applied for and been approved for an

9   increase in that revolving line of credit.

10  Q.    So three months later, they're getting even more money?

11  A.    Correct.

12  Q.    All right.  And number 1, what does that say?

13  A.    Increase RLOC, or revolving line of credit, from 2

14  million to 3.5 million and increase the p-card to 500,000.

15  Q.    What does that mean?

16  A.    That they were able to secure almost 2 million more --

17  or 2 million more in funding from Regions.

18  Q.    And would, in your training and experience, a bank

19  increase a line of credit to a business believed to be

20  failing?

21  A.    No.

22  Q.    Would it increase a line of credit to a business that

23  was performing more poorly in 2020 than it was in 2019 or

24  2018?

25  A.    No.

1    Q.    All right.  Let's look at number 2.  *Remove requirement*
2    *for owner to provide the bank with key man life insurance of*
3    *1 million.*
4            What does that mean?
5    A.    The bank, for whatever reason, was not able to I guess
6    be satisfied with the key man life insurance, and so they
7    removed that requirement.
8    Q.    Okay.  Well, let's look at what it says about that
9    requirement in the conclusion section, if we could -- first
10   off, let's look at the first line.  It says, *Continued strong*
11   *performance and working capital position supports the*
12   *requested increase.*  Right?
13   A.    Yes.
14   Q.    So you're not just blowing smoke.  This is what the
15   bank actually thought:  This is a good business.
16   A.    Correct.
17   Q.    Okay.  Let's look at the third paragraph regarding the
18   inability to provide key man life insurance.  Can you finish
19   reading that please?
20   A.    *Regions has visited further with the borrower regarding*
21   *key management and succession planning.  While SCS is*
22   *relatively small, they have management structure in place and*
23   *plans in place to ensure continued operations.*
24   Q.    Okay.  So Saad Aziz was not able to secure key man life
25   insurance; right?

1    A.    Correct.

2    Q.    Have you looked at his PSR?

3    A.    Yes.

4    Q.    Is he a relatively young man?

5    A.    Yes.

6    Q.    Is he in good health?

7    A.    Yes.

8    Q.    Can't get life insurance.

9    A.    No.

10   Q.    So who does SCS propose as an alternative should he

11   die?

12   A.    Maaz Aziz.

13   Q.    And where is that on this document?

14   A.    In the paragraph right below that.

15   Q.    So if you could read that to the Court.

16   A.    *Maaz Aziz is the brother of Saad and has been with the*

17   *company since founding.  He heads the sales department and is*

18   *key to the rising volumes.*

19   Q.    All right.  So Maaz Aziz, and then later the chief

20   operations manager, is also suggested as having a heavy role

21   within the business; right?

22   A.    Correct.

23   Q.    So this isn't Saad Aziz leading SCS by himself; right?

24   A.    Right.

25   Q.    When they're asking for money, millions of dollars, to

1   a bank, Maaz Aziz is right there with Saad Aziz running SCS.

2   A.    Correct.

3         MS. BLOSS:  Let's go to page 5.  If you could zoom

4   in on financial performance.  I want to focus on a very

5   specific line called "Net Operating Profit."  If you could

6   highlight that, Mr. Madrigal.

7   BY MR. BLOSS:

8   Q.    What is net operating profit?

9   A.    So that is your revenue less operating expenses.

10  Q.    Okay.  So this is pure profit; right?

11  A.    Yes.

12  Q.    And this is the money that's being generated on the

13  items that you're selling; right?

14  A.    Correct.

15  Q.    This doesn't include an evaluation of the assets, the

16  hard assets, sitting in a warehouse; right?

17  A.    Correct.

18  Q.    It doesn't include an evaluation of all those machines

19  that we located, that fixed phones or counterfeited phones;

20  right?

21  A.    Right.

22  Q.    This is just money in and money out.

23  A.    Correct.

24  Q.    What -- for 9/30/2020, Actual 9-months, what was the

25  reported net operating profit?

1    A.    1,742,000.

2    Q.    And what does it mean for "Actual 9-months"?  What does

3    that mean?

4    A.    That means the nine months preceding 9/30/2020.  So

5    from January 1, 2020 through 9/30/2020.

6    Q.    So this isn't even a year.

7    A.    Correct.

8    Q.    Let's look at page 25.

9          Business overview.  How is SCS's business described

10   in that first sentence?

11   A.    SCS supply -- excuse me -- *SCS is a supply chain*

12   *solutions provider of consumer electronics.*

13   Q.    What's the next sentence say?

14   A.    *They recover, process and remarket a broad range of*

15   *devices with customers in the U.S. and 5 other countries.*

16   Q.    So it has customers in five other countries?

17   A.    Yes.

18   Q.    And we just went through a list of some of the

19   businesses that it worked with; right?

20   A.    Correct.

21   Q.    So then let's look at page 31 of the same document.

22         What is an account receiving aging schedule -- a

23   receivable aging schedule?

24   A.    So this details outstanding balances from customers,

25   and categorizes it based off of how far past due they've

1    been.  So the balance column shows the total.  1 to 30 days

2    is 1 to 30 days past due; 30 to 60; and then 60 to 90 days

3    past due.

4    Q.    So this is money that SCS is owed in March 2020?

5    A.    Correct.

6    Q.    Okay.  Cellntell Distribution, Inc., do you know where

7    that company is?

8    A.    I believe Canada.

9    Q.    And then that last one, Euromedia Investment Group, do

10   you know where that company is?

11   A.    I believe Spain.

12          MS. BLOSS:  All right.  If you could take that

13   down, Mr. Madrigal.

14   BY MR. BLOSS:

15   Q.    Now, credit agreements, millions of dollars, those

16   exchanges, they don't usually happen without contracts;

17   right?

18   A.    Correct.

19   Q.    You have detailed accounts of when you can draw upon a

20   line of credit.

21   A.    Yes.

22   Q.    And did you get that contract in the subpoena returns

23   from Regions?

24   A.    Yes.

25   Q.    Was this, in fact, governed by terms and conditions

1   with respect to credit draws?

2   A.   Yes.

3           MS. BLOSS:  Okay.  Can we --

4           Well, Your Honor, at this time, I offer into

5   evidence what was Exhibit 12 of the supplemental briefing,

6   what I'm offering as Exhibit 11 here, which is the credit

7   agreement between Regions and SCS.

8           MR. WOHLFORD:  Same objection, Your Honor.

9           MR. MEYER:  Same objection, Your Honor.

10          THE COURT:  All right.  The objections are

11  overruled, and the exhibit that will be Exhibit 11 for this

12  hearing is admitted.

13                  (Government's Exhibit 11 was admitted.)

14          MS. BLOSS:  May I publish?

15          THE COURT:  Yes.

16  BY MS. BLOSS:

17  Q.   When you secured this credit agreement, did you talk to

18  the general counsel of Regions Bank?

19  A.   Yes.

20  Q.   What did he tell you about the conditions around this

21  loan?

22  A.   That the loan would only have been offered to a company

23  that was in viable and working condition.

24  Q.   Okay.  And he said that this document outlined the

25  conditions on which SCS was allowed to withdraw on that loan;

1    right?

2    A.    Correct.

3            MS. BLOSS:  Okay.  So let's look at page 22.

4    That's 18.  Or, actually, you're right, I'm wrong.  Let's

5    back up.

6            Let's go to page 15, Mr. Madrigal.  If we could go

7    to 5.2 down at the bottom.

8    BY MR. BLOSS:

9    Q.    Where it says extensions of credit, *The obligation of*

10   *Lender to make any Advance, including the initial Advance, is*

11   *subject to the following additional conditions precedent*:

12           Do you see that?

13   A.    Yes.

14   Q.    And do you see where it says -- well, let's go to the

15   next page.  Let's go to (c).  One of those conditions is no

16   material adverse event has occurred; right?

17   A.    Yes.

18           MS. BLOSS:  Can we go to page 7 where that term is

19   defined?  Page 7 of the document, Material Adverse Event at

20   the bottom ...

21   BY MR. BLOSS.

22   Q.    ... *means any act, event, condition, or circumstance*

23   *which could materially and adversely affect:  (a) the*

24   *operations, business, properties, liabilities, actual or*

25   *contingent, or condition, financial or otherwise, or*

1    *prospects of Borrower or Borrower and its Subsidiaries.*

2            Do you see that?

3    A.    Yes.

4    Q.    So would the FBI shutting down your operation, would

5    that be a material adverse event?

6    A.    Yes.

7            MS. BLOSS:  All right.  If we could go to page 21,

8    Section 6.1.

9    BY MR. BLOSS:

10   Q.    All right.  These are the representations and

11   warranties, right, that the parties entered into?

12   A.    Yes.

13   Q.    It says, *To induce Lender to enter into this Agreement*

14   *... the Borrower represents and warrants to Lender ...*

15           Do you see that?

16   A.    Yes.

17   Q.    Okay.  And at 6.1(b) it says that it represents that it

18   has all requisite power and authority to own its assets and

19   carry on its business as now being proposed or to be

20   conducted.

21           Do you see that?

22   A.    Yes.

23           MS. BLOSS:  All right.  And then if we could go to

24   6.5.

25   BY MR. BLOSS:

1    Q.    Here, it's warranting that there is no proceeding

2    before or by any governmental authority or arbitrary pending

3    or to the knowledge of borrower after reasonable

4    investigation, threatened against or affecting borrower, or

5    any of its subsidiaries.

6              And that's an investigation by government

7    authority.  Do you see that?

8    A.    Yes.

9    Q.    And based on your review of this document, based on

10   your conversation with Regions' general counsel, every time

11   that SCS draws down upon that line of credit, is it

12   representing that this is true, that there's no adverse

13   event?

14   A.    Yes.

15              MS. BLOSS:  Okay.  If we could go to page 22 and

16   look at J.

17   BY MR. BLOSS:

18   Q.    Here, it says, *Notice of Material Adverse Event.  As*

19   *soon as possible and in any event within five days after the*

20   *occurrence thereof, written notice of any event or*

21   *circumstance that could result in a Material Adverse Event.*

22              That's what's expected; right?

23   A.    Yes.

24   Q.    When you spoke to Regions, had they received any

25   written notice, any notice whatsoever, from SCS that its

1    operation was shut down?

2    A.    No.

3              MS. BLOSS:  If we go to page 29, 29 of the

4    document.  So you're on 25.

5    BY MR. BLOSS:

6    Q.    Okay.  If we can look at 10.1, it says, *Each of the*

7    *following shall be deemed an "Event of Default."*

8              If we could look at (b), Borrower fails to provide

9    lender timely any notice of default as required by Section

10   7.1(g) of this agreement or breach to any provision of

11   Section 8 or Section 9 of this Agreement.

12             And if you look at (l), it says, *Borrower, any of*

13   *its Subsidiaries, or any other Obligated Party, or any of*

14   *their Properties, revenues, or assets, shall become subject*

15   *to an order of forfeiture, seizure, or divestiture, whether*

16   *under RICO or otherwise ...*

17             Do you see that?

18   A.    Yes.

19   Q.    Okay.  So those are all default events; right?

20   A.    Correct.

21   Q.    Of which SCS is supposed to report to Regions?

22   A.    Yes.

23   Q.    Let's look at what Saad Aziz told pretrial services

24   about his business.

25             MS. BLOSS:  Can we please have Saad Aziz's PSR on

1   page 3?  Let's look at that first paragraph.  No, sorry.

2   Under Employed/Unemployed History; all right?  My mistake.

3   BY MR. BLOSS:

4   Q.   Do you see where it says he closed the business on

5   August 24th, 2021, the date of the law enforcement raid?

6   A.   Yes.

7   Q.   Based on your review of the financial records, do you

8   believe that to be a true assertion?

9   A.   No.

10  Q.   Did you actually subpoena results and get returns for

11  transactions made out of SCS accounts that post date that

12  raid?

13  A.   Yes.

14          MS. BLOSS:  Your Honor, we have already enclosed

15  that in Exhibit 5, but we have a demonstrable that we think

16  it would be beneficial to walk the Court through with respect

17  to those filings.

18          THE COURT:  This demonstrative is premised on

19  what's already in Government Exhibit 5?  Is that what you're

20  saying?

21          MS. BLOSS:  So, yes.  The exhibit is a color-coded

22  version of the post 8/24 withdrawals.  And then in addition

23  to that, we've created a timeline of what was stated to the

24  Court with respect to the withdrawals that were being made.

25          THE COURT:  Go ahead, Mr. Wohlford.

```
 1              MR. WOHLFORD:  Yes, Your Honor.  I would object to
 2    the use of the demonstrative.  I don't think it's complete or
 3    accurate.  I think they're talking about statements, first of
 4    all, to pretrial services, not the Court.
 5              But this was also the demonstrative and the exhibit
 6    that was provided to us when we arrived at the courthouse
 7    today.  So for all those reasons, we would object, Your
 8    Honor.
 9              MR. MEYER:  Join in that objection as well, Your
10    Honor.
11              THE COURT:  Can I see a copy of the demonstrative?
12              MS. BLOSS:  Yes.  May I approach?
13              THE COURT:  Yes.
14              MS. BLOSS:  May Mr. Madrigal approach?
15              (Provided to the Court.)
16              THE COURT:  And as you've said, Ms. Bloss, this is
17    information you're saying was presented in -- it is presented
18    in Government's Exhibit 5.
19              MS. BLOSS:  Correct, yes.  It was also attached to
20    the government's briefing, but we have color-coded it to aid
21    the Court, and added statements with respect to like
22    surrenders, raids, et cetera.
23              THE COURT:  All right.  I'll overrule the
24    objections and allow its use as a demonstrative.
25              MS. BLOSS:  Your Honor, may we --
```

 1              THE COURT:  You can proceed.

 2              MS. BLOSS:  -- set up the courtroom?

 3              THE COURT:  Yes.

 4              MS. BLOSS:  And, Your Honor, I think it would be

 5    helpful if Ms. Keene could step down and walk us through this

 6    demonstrative.  Is that all right?

 7              THE COURT:  That's fine.

 8              MS. BLOSS:  All right, Ms. Keene.

 9              THE COURT:  Counsel, if one of you needs to move

10    around, or both of you want to move around, so you can see.

11              MR. MEYER:  Thank you, Your Honor.

12              THE COURT:  And, Ms. Bloss, let defense counsel get

13    set up so they can see what you're doing here.

14              All right.  Ms. Bloss, I think you can proceed when

15    you're ready and have a working microphone.

16    BY MR. BLOSS:

17    Q.    All right.  Let's walk through what we're looking at

18    right here.  Okay.  These documents, this spreadsheet that's

19    on the screen and the spreadsheet that's published before the

20    Court, what is this?

21    A.    So this details transactions that occurred from August

22    24th, 2021, the date of the search warrant, through September

23    17th, 2021.

24    Q.    And where are these transactions -- where are you

25    getting this data from?

1    A.     Regions Bank.

2    Q.     Okay.  So these are the Regions Bank accounts that SCS

3    has.

4    A.     Correct.

5    Q.     And where does SCS house all of its corporate accounts?

6    A.     At Regions.

7    Q.     Okay.  Did you color code this?

8    A.     Yes.

9    Q.     Can you explain your color-coding detail to us?

10   A.     Yes.  So there's transfers within Regions Bank accounts

11   to other business bank accounts -- excuse me, other SCS

12   business bank accounts, as well as transfers to outside bank

13   business accounts.  These are color-coded in kind of a light

14   yellow and a darker yellow.

15   Q.     Okay.  So when we're looking at light yellow and dark

16   yellow transfers, those are transfers between Regions SCS

17   accounts and out to SCS accounts held by other banking

18   entities; right?

19   A.     So the light yellow is Regions -- SCS accounts within

20   Regions, so just transferring between corporate accounts at

21   Regions.

22   Q.     And this dark yellow?

23   A.     Is transferring from Regions to outside business

24   accounts.

25   Q.     Okay.  So were you here when Agent Doering was

1    cross-examined about whether we had any evidence that

2    accounts were opened post 8/24?

3    A.    Yes.

4    Q.    All right.  Do we have evidence that SCS accounts were

5    opened post 8/24?

6    A.    Yes.

7    Q.    Why don't you explain that to the Court.

8    A.    So from 8/24 on, there were transfers of 104,000 within

9    their own bank accounts; and then 50 -- 154,000 was brought

10   in; 134,000 of that from a Texas Brand Bank account in the

11   name of "Aziz Holdings," as well as $20,000 in a Texas Brand

12   Bank account in the name of "Gizmobile."

13         They sent out 105,000 to that same Aziz Holdings

14   account, and also another 2,000 to the Gizmobile account.

15   Q.    And so we're just looking at post 8/24 transactions;

16   right?

17   A.    Correct.

18   Q.    Post transactions when Saad Aziz said that the business

19   was shut down; right?

20   A.    Correct.

21   Q.    And this, this first one, this account ending in 2268,

22   is that the SCS expense account?

23   A.    It is.

24   Q.    How do you know that?

25   A.    Because of the account numbers and the account

1    application documents that were provided by Regions.

2    Q.    Okay.  And that's all in Exhibit 5 that the government

3    has provided.

4    A.    I believe so, yes.

5    Q.    Okay.  So you're seeing transfers intercompany after

6    8/24; correct?  I see one on 8/24, 8/24, 8/25, 8/26, 8/27,

7    8/30; right?

8    A.    Correct.

9    Q.    Are you seeing them after that infamous 8/31 meeting

10   where the government told the Aziz brothers they were going

11   to be indicted?

12   A.    Yes.

13   Q.    Okay.  What dates are you seeing those transfers on?

14   A.    Um, there is one on 8/31, as well as 9/1, as well as

15   9/7, 9/8, 9/9, 9/14, and 9/15.

16   Q.    So safe to say several accounts and transfers between

17   SCS Regions accounts, SCS outside accounts, postdating all

18   the notice that the Aziz brothers are getting --

19   A.    Correct.

20   Q.    -- right?  I want to skip ahead a little bit since

21   we've talked heavily about the Regions line of credit.

22          In looking at this, after the Aziz brothers

23   represent their business as closed, do you see instances in

24   which they are drawing down on the Regions Bank credit?

25   A.    Yes.

1    Q.    Where are those?

2    A.    They're highlighted in this light green color,

3    beginning on 8/24.

4    Q.    All right.  So every time the Court sees a light green

5    color, that's a drawdown on the Regions credit account.

6    A.    Correct.

7    Q.    Okay.  And over here we've kind of presented this in a

8    different fashion; right?

9    A.    Yes.

10   Q.    At the bottom of this timeline, those are the drawdowns

11   starting with number 6; right?

12   A.    Yes.

13   Q.    And then at the top of this timeline, these are the

14   representations being made to the Court and pretrial

15   services; right?

16   A.    Yes.

17   Q.    So on August 24th, SCS's warehouse, that's a search

18   warrant; right?

19   A.    Yes.

20   Q.    That's the day that Saad Aziz says the warehouse is

21   closed.

22   A.    Correct.

23   Q.    That same day, how much money did they draw against the

24   Regions credit line?

25   A.    $49,471.

1    Q.    And the next day, how much money?

2    A.    72,500.

3    Q.    And the next day, how much money did they draw against

4    the Regions credit line?

5    A.    $120,891.

6    Q.    Did they stop drawing against the Regions credit line?

7    A.    No.

8    Q.    How long does your data go to?

9    A.    September 17th.

10   Q.    Okay.  So we're seeing multiple draws down on that?

11   A.    Yes.

12   Q.    Despite the fact that the business is not an operating

13   entity, apparently.

14   A.    Correct.

15   Q.    Did they pay any of that back?

16   A.    Yes.

17   Q.    And how do you denote that on your spreadsheet?

18   A.    These red highlights.

19   Q.    Did you total the amount taken between the time period

20   of August 24th and September 17th respective to the amount

21   paid back on that loan?

22   A.    Yes.

23   Q.    How much have they not paid back in that time period?

24   A.    $300,573.

25   Q.    When you asked Regions what they thought about this,

1    what did they tell you?

2    A.    They said it is fraudulent.

3    Q.    All right.  Let's go on and talk little bit more about

4    how they're using these accounts.

5              You note some personal withdrawals.  Could you

6    explain those?

7    A.    Yes.  So there were 196,300 that were sent from Saad

8    Aziz's account at Regions to the SCS Supply Chain account.

9    Q.    Okay.  So Saad Aziz is transferring his own personal

10   finances into a corporate account?

11   A.    Correct.

12   Q.    You said that you worked in private practice.

13   A.    Yes.

14   Q.    How big were the companies that you worked for?

15   A.    Substantial.

16   Q.    And in your time there, is that a typical business

17   practice?

18   A.    No.

19   Q.    Do owners of a company transport their assets into

20   company bank accounts?

21   A.    No.

22   Q.    All right.  What other instances did you see on these

23   spreadsheets that demonstrated they were using this account

24   as a personal piggy bank?

25   A.    There were payments made to Katten and Muchin and Duane

1    Morris from the SCS Supply Chain bank account on 9/9/2021.

2    Q.    All right.  So these are their personal criminal

3    lawyers; right?

4    A.    Correct.

5    Q.    The company has not been indicted.

6    A.    Correct.

7    Q.    The company has not been listed in the asset forfeiture

8    section of our indictment; right?

9    A.    Correct.

10   Q.    So the company -- this is a payment for their personal

11   criminal lawyers.

12   A.    Yes.

13   Q.    Out of the company account.

14   A.    Correct.

15   Q.    All right.  Did you see any other transfers that gave

16   you pause with respect to SCS?

17   A.    There was a transfer to SCS Canada in the amount of

18   $165,000 on September 2nd, 2021.

19   Q.    Okay.  So they're transferring money to SCS Canada

20   after the 8/24 search warrant and after the 8/31 meeting

21   where we tell them they are going to be indicted.

22   A.    Correct.

23   Q.    All right.  You've also got color-coding here for

24   credit card payments, two different colors.  Can you explain

25   that to the Court?

1    A.    Yes.  So it may be kind of hard to tell, but the darker

2    orange is personal credit card payments, so made in I believe

3    it was Saad Aziz's name, totaling $33,607.19, and then credit

4    card payments for SCS credit cards in the amount of

5    $40,055.19.

6    Q.    So despite the fact that this corporation has

7    represented to pretrial services that it is not operating,

8    they're paying down corporate expenses of $40,000.

9    A.    Correct.

10   Q.    And they're paying down Saad Aziz's credit card in the

11   tune of $33,000.

12   A.    Correct.

13   Q.    Do you see any money transfers that occurred during

14   this time period?

15   A.    Yes.

16   Q.    Explain those to the Court.

17   A.    So there was monies sent to a company by the name of "S

18   Noorani" -- I'm not sure if it's on -- in this gold color, on

19   9/8, there's $3,815 sent to S Noorani International.

20   Q.    What is S Noorani, based on your research?

21   A.    It is a money transfer service that specializes in

22   sending money to Pakistan.

23   Q.    Okay.  So this is again after the search warrant, this

24   is after the meeting with prosecutors, and it's after Saad

25   Aziz writes his letter saying he wants to self-surrender;

1    right?

2    A.    Correct.

3    Q.    Do you see any other money transfers that occurred

4    after the warrant?

5    A.    Yes.  The $20,000 checks on 9/10 and on 9/3.

6    Q.    Tell us about those.

7    A.    Those are checks made payable to Gohar, Inc.

8    Q.    And what is Gohar, Inc.?

9    A.    It is also a money service business.

10   Q.    Okay.  So when a substantial amount of money is

11   transferred through a money service business, is it easy to

12   track?

13   A.    No.

14   Q.    Do we know where that money went?

15   A.    No.

16   Q.    Do you see any other checks that were cashed or made

17   during -- since the shutdown of the operation?

18   A.    Yes.  There were two cash withdrawals, both on 9/7, one

19   in the amount of $19,450 and one in the amount of 13,000.

20   Q.    Tell us about those.

21   A.    So these are where they went into the bank and cashed

22   checks and received a cash withdrawal from their bank

23   account.

24   Q.    So these certainly aren't automated payments; right?

25   A.    No.

1    Q.    These are manually drawn checks against the account.

2    A.    Correct.

3    Q.    All right.  I want to talk about one more -- well,

4    before I move on to that, is there anything else listed in

5    your timeline color-coded?

6    A.    I don't believe so.

7    Q.    Okay.  Let's talk about one specific transaction that

8    was made on 9/2/2021, after the search warrant, after the

9    meeting with the U.S. Attorney's office.  I want to talk

10   about U.S. Global Products.  How much money did they transfer

11   to that company?

12   A.    $101,085.30.

13   Q.    Did the FBI look into U.S. Global Products?

14   A.    Yes.

15   Q.    And what did the FBI determine about this account?

16   A.    That they used proxy accounts for SCS Global --

17   Q.    Okay.

18   A.    -- what we call proxy accounts for SCS Global.

19   Q.    So U.S. Global houses proxy accounts for SCS?

20   A.    Correct.

21   Q.    What is a proxy account?

22   A.    It's an account that is held in name by someone else

23   but on -- for benefit of another company.

24   Q.    Is it difficult to --

25              THE COURT:  Well -- go ahead.

1    MR. WOHLFORD:  If I may just briefly, Your Honor, I

2 don't know if they plan to -- sorry.  I don't know if they

3 plan to offer this exhibit, but I believe the witness is

4 testifying about a document that was provided to us at 11:24

5 this morning, and so we would object to any testimony about

6 that late-disclosed document, Your Honor.

7    THE COURT:  Is that accurate, Ms. Bloss?

8    MS. BLOSS:  I'm happy to offer it.  Yes.  Yes, it

9 was received about 15 minutes before we provided it.

10    THE COURT:  And is she testifying about that

11 document?

12    MS. BLOSS:  That is correct.  That's the

13 information from that document.

14    THE COURT:  And that document hasn't been offered

15 yet.

16    MS. BLOSS:  Not yet, but I'm happy to offer it if

17 the Court would like.

18    THE COURT:  All right.  Mr. Meyer.

19    MR. MEYER:  Join in the objection, Your Honor.

20    THE COURT:  All right.  Why don't you offer --

21    MS. BLOSS:  Okay.

22    THE COURT:  -- the document.

23    MS. BLOSS:  All right.  Let me go grab it, then.

24    And, Your Honor I believe we're on Exhibit 12 or

25 purposes of this hearing.  Your Honor, we offer Exhibit 12

 1    into evidence.

 2              THE COURT:  All right.  And you were giving your

 3    response on the objections, Ms. Bloss?

 4              Ms. Bloss, do you have anything to add?  I think I

 5    have the objection from both of defendants' counsel.

 6              MS. BLOSS:  As to this?

 7              THE COURT:  Yes, as to this Exhibit 12.

 8              MS. BLOSS:  So this was provided to the FBI

 9    pursuant to a subpoena request.  It was provided about 15

10    minutes before we turned it over to opposing counsel, and it

11    was -- it demonstrates this relationship with U.S. Global.

12              THE COURT:  So this was received by your office --

13              MS. BLOSS:  Today.

14              THE COURT:  -- shortly before it was produced to

15    defense counsel today.

16              MS. BLOSS:  Correct.  Roughly 15 to 30 minutes

17    before.

18              THE COURT:  Well, I'm going to overrule the

19    objections.  As I mentioned to defense counsel, we -- you

20    know, as we get through this hearing, if you-all are going to

21    need more time to come back, if we need to come back for more

22    cross-examination on this, we'll do that.

23              But you can proceed, Ms. Bloss.

24                       (Government's Exhibit 12 was admitted.)

25              MS. BLOSS:  All right.

```
 1   BY MR. BLOSS:

 2   Q.    What is Exhibit -- what is it, 11?  12?

 3            THE COURT:  It's 12.

 4   BY MR. BLOSS:

 5   Q.    What is Exhibit 12?

 6   A.    This is an investigation from Prosperity Bank.

 7   Q.    So Prosperity noticed a red flag in this transaction

 8   and conducted its own investigation.

 9   A.    Correct.

10   Q.    And then you subpoenaed that investigation.

11   A.    Correct.

12   Q.    So what we're holding here is the report detailing what

13   Prosperity uncovered.

14   A.    Yes.

15   Q.    Who is the owner of U.S. Global Products?

16   A.    Malik Muradally.

17   Q.    And was he contacted by Prosperity?

18   A.    Yes.

19   Q.    What did he have to say to them about this account?

20            Did he state that this was a proxy account?

21   A.    Yes.

22   Q.    And did he state that in paragraph 3 of the account

23   review section?

24   A.    Can you point it out to me?

25   Q.    Where it says, *Additionally, Mr. Muradally admitted*
```

1   *that SCS is indeed recruiting individuals and businesses to*

2   *open proxy accounts for them so that they can continue to*

3   *send their transactions through the various accounts to keep*

4   *their operations afloat.*

5   A.   Yes.

6   Q.   So this is a means -- SCS had numerous bank accounts;

7   right?

8   A.   Correct.

9   Q.   And they were getting shut down, according to this

10  report; right?

11  A.   Correct.

12  Q.   So these proxy accounts, they're a way to avoid the

13  reporting obligations that they had.

14  A.   Yes.

15  Q.   They're going to be a way to avoid having your account

16  shut down because it's getting flagged for illegal activity.

17  A.   Correct.

18  Q.   And given the history that this is a proxy account for

19  SCS, did SCS then transfer money into the account post

20  becoming aware of our investigation?

21  A.   Yes.

22  Q.   To what amount?

23  A.   $101,085.30.

24  Q.   Now, there has been a lot of talk about who does and

25  does not have signatory authority over these accounts.

A.    Correct.

Q.    But based on your view of this evidence, is Maaz Aziz getting money out of the SCS accounts irrespective of whether he has signatory authority?

A.    Yes.

Q.    How do you know that?

A.    On 8/24, and I believe on -- there is another date, but on 8/24 for sure, there was $1,686 sent to a JP Morgan Chase account in the name of "Maaz Aziz."

Q.    And this flips over.  So if you're missing it, it might be on this side.

            What about on 9/14?

A.    Oh, yes.  There are transfers to Gizmo Galaxy -- or, excuse me, Gizmobile, Inc., which is a company that Maaz Aziz has signatory authority on.

Q.    Okay.  You've been with the FBI for some time now; right?

A.    Yes.

Q.    In your opinion, does it take time to transfer money to various accounts without the FBI knowing?

A.    Yes.

Q.    So as the defendants are stating to the Court they want to turn themselves in and they have no intention to flee, as they're writing Judge Nowak that they don't want to be arrested and they want to turn themselves in, as they're

1    being interviewed by pretrial services, do you see them

2    transferring money through these accounts?

3    A.    Yes.

4    Q.    And was that disclosed to pretrial services?

5    A.    No.

6            MS. BLOSS:  If you could have your seat.  I have a

7    few more questions for you.

8    BY MR. BLOSS:

9    Q.    Ms. Keene, how many business accounts or accounts

10   associated with the Aziz brothers is the FBI currently

11   investigating?

12   A.    Approximately 80.

13   Q.    Have you gotten the returns on all of those?

14   A.    No.

15   Q.    Are you aware of how many proxy accounts might be out

16   there?

17   A.    No.

18   Q.    Are you aware that there are proxy accounts out there?

19   A.    Yes.

20   Q.    And did your conclusion or your investigation just

21   focus on a few of those accounts?

22   A.    Yes.

23   Q.    Who are the signators (ph) of those accounts?

24   A.    Saad Aziz and Maaz Aziz.

25   Q.    And that's in Exhibit 5; correct?  I won't belabor that

1    point.

2    A.    Yes.

3    Q.    Based on your review of the documents, based on the

4    proxy accounts, based on the money movements, do you have any

5    confidence that the Aziz brothers would correctly and

6    accurately and fully identify the accounts that are located

7    within their possession?

8    A.    No.

9    Q.    So is there any assurance that opposing counsel gave in

10   its briefing that the government could open an account and

11   hold the Aziz money, does that give you any assurances that

12   the Aziz brothers are not a flight risk?

13   A.    No.

14           THE COURT:  Mr. Meyer, did you have something you

15   wanted to say before ...

16           MR. MEYER:  Your Honor, just to clarify the record.

17   The demonstratives that counsel was just walking through, are

18   the three spreadsheet demonstratives and the timeline all

19   part of the same exhibit, or are they several exhibits?

20           MS. BLOSS:  So the --

21           THE COURT:  My understanding is that wasn't marked

22   as an exhibit yet.

23           MS. BLOSS:  Correct.

24           THE COURT:  They're demonstrative.

25           MS. BLOSS:  It's just a demonstrative.  If the

1    Court wants it in the record, we can mark it as Exhibit 13.

2              THE COURT:  Yeah.  I think it would be helpful,

3    actually, to mark it as Exhibit 13.

4              MS. BLOSS:  Okay.  Then we'll mark that as

5    Government's Exhibit 13 and offer it into evidence.

6              THE COURT:  I'm going to assume the same objections

7    on behalf of defendants' counsel --

8              MR. WOHLFORD:  Yes, Your Honor.

9              THE COURT:  -- am I correct?

10             MR. MEYER:  That's correct, your Honor.

11             THE COURT:  All right.  I'm going to overrule those

12   objections, and Government's Exhibit 13, as a demonstrative,

13   is admitted.

14                       (Government's Exhibit 13 was admitted.)

15             MS. BLOSS:  My co-counsel notes that I have omitted

16   some things, and I just want to touch on those briefly.

17             If we could turn to Exhibit 9, and if we could go

18   to page 29 of 59.

19             You know what?  I'm just going to do it on the doc

20   cam.

21   BY MR. BLOSS:

22   Q.    Can you see that, Ms. Keene?

23   A.    It's blurry.

24   Q.    A little blurry.

25                       (Pause in the proceedings.)

1    BY MR. BLOSS:

2    Q.    Okay.  Down here, you see that the borrower sells

3    inventory to related companies that are owned by the

4    guarantor's wife, Duua Aziz?  Do you see that?

5    A.    Yes.

6    Q.    We touched on that briefly.  But does it list the

7    companies that she owns?

8    A.    Yes.

9    Q.    What are those companies?

10   A.    Gizmo Galaxy, LLC; Gizmo Parts; Gizmobile, Inc.; and

11   Gizmobile Retail and Online.

12   Q.    Okay.  And that's why on page 59 of that same document

13   they include this requirement right there.

14   A.    Correct.

15   Q.    What is that requirement?

16   A.    That -- do you want me to read that?

17   Q.    Well, is it that the wife has to join in guaranteeing

18   this loan?

19   A.    Yes.

20   Q.    Did she say anything about that when she was asked

21   about her relationship with the business?

22   A.    No.

23   Q.    It also includes this additional requirement right

24   here, or at least it discusses the collateral that was

25   pledged for this loan.  Do you see that?  It says, The

1    prospective borrower's present inventory system --

2              MS. BLOSS:  Well, okay, that's better.  Thank you,

3    Patrick.

4    BY MR. BLOSS:

5    Q.    *The prospective borrower's present inventory system*

6    *does not allow for the generation of sales/usage reports to*

7    *determine the level of slow-moving or excess inventory.*

8    A.    Yes.

9    Q.    The examiner, in performing tests of inventory costing,

10   identified one item valued at 189 million, the Yeti Ramblers;

11   right?

12   A.    Yes.  I do believe that's 189,000.

13   Q.    Oh.  What does the 189M mean?

14   A.    So if it's millions, there's two Ms.

15   Q.    Oh, you're right.  You're right.  Thank you for

16   correcting my mathematical errors.

17             Did they pledge this as collateral for the loan?

18   A.    Yes.

19   Q.    And were you here when Agent Doering testified that

20   Yeti Ramblers were stolen?

21   A.    Yes.

22   Q.    And that was the SCS product?

23   A.    Yes.

24             MS. BLOSS:  Pass the witness.

25             THE COURT:  All right.  Why don't we take about a

1    ten-minute break before we have defense counsel do their

2    cross-examination.

3                (Recess taken.)

4                THE COURT:  You may be seated.

5                All right.  I think when we left off, we were going

6    to have Mr. Wohlford do his cross-examination of Ms. Keene.

7    So you can proceed when you're ready, Mr. Wohlford.

8                MR. WOHLFORD:  Thank you, Your Honor.  I'll try and

9    stay back from the microphone as much as I can.

10                                CROSS-EXAMINATION

11   BY MR. WOHLFORD:

12   Q.    Ms. Keene, good afternoon.

13   A.    Good afternoon.

14   Q.    I'm going to try and get through this as quickly as I

15   can.  So I'm going to try and hit the topics and, hopefully,

16   we can get this done as quickly as possible.

17                First, Ms. Bloss was asking you -- the first thing

18   you testified about was that there was no disclosure of

19   Frisco properties to pretrial services.

20                Do you remember that testimony?

21   A.    Yes.

22   Q.    Fact of the matter is you were not present at the

23   interview with Maaz Aziz with pretrial services; correct?

24   A.    Correct.

25   Q.    So you don't actually know what was or was not

1   disclosed to pretrial services; correct?

2   A.    What was documented, that's what I know.

3   Q.    Sure.  You know what was on the report, but you don't

4   know what was or was not actually disclosed to pretrial

5   services, do you?

6   A.    No.

7   Q.    Okay.  And were you present at the hearing before Judge

8   Nowak?

9   A.    No.

10  Q.    You were not.  I remember you reading some testimony

11  earlier from that hearing.  You don't know whether I

12  proffered to Judge Nowak that, in fact, there was disclosure

13  regarding the Frisco properties, do you?

14  A.    No.

15  Q.    Okay.

16            (Pause in the proceedings.)

17            THE COURTROOM DEPUTY:  Can I help you?

18            MR. WOHLFORD:  I'm trying to do the doc cam.  Oh, I

19  got it.  Okay.

20  BY MR. WOHLFORD:

21  Q.    Ms. Keene, can you see what's on the screen there?

22  A.    Yes.

23  Q.    Okay.  I turn your attention to line 12.  Do you see

24  that?

25  A.    Yes.

1    Q.    This is the transcript of the detention hearing before

2    Judge Nowak.   Could you read starting at line 12 for us?

3    A.    *One thing, Your Honor, that's been mentioned over and*

4    *over about, well, there weren't disclosures of properties in*

5    *Plano.   In fact, Your Honor, because Mr. Aziz is facing a*

6    *money laundering charge, I brought the list of assets.   I*

7    *spoke to pretrial services.*

8    Q.    Go on.

9    A.    *I did specifically mention a -- he owns a property in*

10   *Runaway Bay, Texas, and he's also listed as a co-owner of*

11   *real property in Frisco, Texas, which was in the process of*

12   *being transferred prior to the indictment.*

13   Q.    Okay.

14   A.    *Now, why that didn't make it into the pretrial services*

15   *report I don't know, but it was not because of any attempt to*

16   *conceal any evidence from this Court.*

17   Q.    Okay.   Ms. Keene, I represent to you that that was a

18   proffer that I made to Judge Nowak during the detention

19   hearing before her.   Do you have any evidence that I was

20   lying to the Court when I made that proffer?

21   A.    No.

22   Q.    Okay.   I'm going to ask you to look at -- if you look

23   down here at the bottom of the page where the Court's

24   talking -- that's Judge Nowak -- do you see that?

25   A.    Is this line 21?

```
 1    Q.    Yes, ma'am.

 2    A.    Yes.

 3    Q.    Read that for us, please.

 4    A.    Before you're seated, sir, can you tell me -- you

 5    referenced during your argument here today that you provided

 6    the list of properties to pretrial, and so to the extent that

 7    it's incomplete, that's -- that that's on you.

 8    Q.    Continue at the top of the page, please.

 9    A.    Can you help me understand why you waited until now to

10    bring that up?

11         MS. BLOSS:  Objection, Your Honor.  At this time, I

12    think we should invoke the best evidence rule and have him

13    actually provide the list of properties that were provided to

14    pretrial services.

15         THE COURT:  Well, I think he can read his testimony

16    or what he offered -- not his testimony, I'm sorry.  It's the

17    proffer from the attorney or what the attorney stated at the

18    hearing.

19         And I am -- Mr. Wohlford, we may want to see if you

20    can produce what you actually gave to Pretrial.

21         MR. WOHLFORD:  Sure.  And I can say right now I

22    read from a list of documents -- of assets to pretrial

23    services.  I'm -- I've got it.  I've got a copy of that with

24    me.

25         THE COURT:  Right.  It might be helpful to see
```

1    that.  But you can go through what you proffered to the

2    Court --

3                MR. WOHLFORD:  Sure.

4                THE COURT:  -- the magistrate judge.

5    BY MR. WOHLFORD:

6    Q.    And so can you read my response to Judge Nowak, please?

7    A.    *I honestly did not realize, Your Honor, that those were*

8    *omitted from that.  I have the sheet here that I had that I*

9    *was using to provide the information to pretrial.  The last*

10   *two bullet points are Mr. Aziz owns undeveloped real property*

11   *in Runaway Bay, Texas, and Mr. Aziz may be listed as a*

12   *co-owner of real property in Frisco, Texas, which was in the*

13   *process of being transferred prior to his indictment.*

14              *Your Honor, until it came up late in the day that*

15   *that -- that that wasn't disclosed and the suggestion that it*

16   *wasn't disclosed, that totally escaped my mind.  That is on*

17   *me.  That's absolutely my fault.  I fall on the sword on*

18   *that.*

19   Q.    Okay.  Thank you.

20   A.    Um-hum.

21   Q.    So again, you don't actually have personal knowledge of

22   what was or was not disclosed to pretrial services on behalf

23   of Maaz Aziz, do you?

24   A.    Not beyond the report, no.

25   Q.    Okay.  So to the extent that you testified that Frisco

1   properties definitely were not disclosed to pretrial

2   services, you actually don't know that, do you?

3   A.    No.

4   Q.    Okay.  Now, was the Frisco properties subject to

5   forfeiture?  Do you know?

6   A.    We were in the process of that, yes.

7   Q.    Did you file a lis pendens on it?

8   A.    That was in the process, but the transfer of the

9   property made that difficult.

10   Q.    Okay.  So when did that process start?

11   A.    The valuation date began on September 10th, but I do

12   know that we requested the forfeiture procedure reports prior

13   to that --

14   Q.    Okay.

15   A.    -- just a backlog.

16   Q.    Okay.  But prior to the property being sold, it was not

17   subject to forfeiture, was it?

18   A.    It was in the process.

19   Q.    My question is was it subject to forfeiture at the time

20   it was sold?

21   A.    It was in the process.

22   Q.    I'm not asking if it was in the process.  At the time,

23   was it listed as a property subject to forfeiture in the

24   indictment?

25   A.    Not in the indictment, no.

1    Q.    Okay.  Was it anywhere else subject to forfeiture?

2    A.    Yes.  We had the pretrial or the marshals preseizure

3    packets being put together during that time.

4    Q.    So they were being put together.  They weren't

5    completed.

6    A.    Correct.

7    Q.    So it was not subject to forfeiture at the time it was

8    sold.

9    A.    It was in the process.

10   Q.    Okay.  And also you didn't file a lis pendens?

11   A.    No.

12   Q.    Okay.  So there was no indication to Maaz or Saad

13   Aziz -- you know, certainly no formal indication that they

14   were not free to sell that property, was there?

15   A.    No.

16   Q.    Okay.  I ask you now about the demonstrative exhibit

17   that, you know, we talked about up here.  That deals with SCS

18   accounts, right, not Maaz Aziz's personal accounts.

19   A.    There was one co-owned personal account with Saad and

20   Maaz.

21   Q.    Okay.  Out of how many accounts?

22   A.    Six.

23   Q.    Okay.  So when you were talking about those accounts, I

24   believe Ms. Bloss said that -- asked you about Agent Doering

25   being asked about accounts that were opened after August

 1    24th.

 2              Do you remember that?

 3    A.    Yes.

 4    Q.    Who asked Agent Doering about accounts being opened

 5    after August 24th?

 6    A.    I don't know.

 7    Q.    But you said you remembered that testimony.  So who

 8    asked?

 9    A.    Well, I don't remember specifically, but I remember

10    that question being asked.

11    Q.    Oh, okay.  Were you testifying -- were those accounts

12    that were opened, on that demonstrative that you talked

13    about, those were accounts that were opened after August

14    24th?  Or were you just talking about transfers from existing

15    accounts after August 24th?

16    A.    These accounts remained opened after August 24th, is

17    what she was asking about.

18    Q.    Okay.  They remained open.  I think you were asked --

19    and I just wanted to make sure we have a clear record.  You

20    didn't testify about a single account that was actually

21    opened after August 24th, did you?

22    A.    Not that was physically opened after, but accounts that

23    remained open post August 24th.

24    Q.    Okay.  Remained open --

25    A.    Yes.

1    Q.    -- correct?  So the transfers.  I know you looked at

2    one transfer on the demonstrative.  I don't remember which

3    one it was, and you said, well, that's not an auto transfer

4    because that was a check.

5              Do you remember that?

6    A.    I would have to see the number that you're referring

7    to.

8    Q.    Yeah.  I'm just saying do you generally remember that,

9    that there was one at least that you thought was -- that was

10   not -- you know, couldn't have been an auto transfer because

11   it was a physical check.

12   A.    Oh, the cash withdrawals?

13   Q.    Yeah.

14   A.    Yes.

15   Q.    Okay.  Other transfers that weren't those cash

16   withdrawals, those could have been auto transfers; right?

17   A.    The checks written to Gohar were not; those were

18   handwritten checks.

19   Q.    There are transfers listed on that exhibit that could

20   be automatic transfers, aren't there?

21   A.    Generally, the description of the transaction would

22   include some sort of auto pay or something to that effect,

23   and these did not.

24   Q.    Okay.  You have no opinion or knowledge about whether

25   or not these were -- any transfers that were made out of

327

1    these accounts were made to pay preexisting obligations, do

2    you?

3    A.    Can you repeat that question?

4    Q.    Is it your testimony that all of these transfers dealt

5    with new business that was ongoing, or is it that these

6    transfers could have been -- could have paid for preexisting

7    obligations that SCS had?

8    A.    New business.

9    Q.    New business?

10   A.    Yes.

11   Q.    So your testimony is you're aware of actual

12   transactions of goods between SCS and somebody else after

13   August 24th?

14   A.    I can't speak to the goods.  I can only speak to the

15   transactions that occurred.

16   Q.    And all you've got is financial transactions; right?

17   A.    Correct.

18   Q.    Do you know what the underlying obligation for those

19   transactions is?

20   A.    No.

21   Q.    You don't.  So the fact of the matter is you don't know

22   whether or not those transactions, any monies paid out of

23   SCS's accounts, were to satisfy preexisting obligations.  You

24   don't know that, do you?

25   A.    No.

1  Q.    Okay.  Now, I got the impression -- and maybe I

2  misunderstood what you-all were trying to say.  I got the

3  impression that you-all were trying to equate financial

4  transfers in a bank account with operating a business.  Is

5  that what you were -- were you trying to say that those

6  financial transfers show that SCS was operating as a business

7  after August 24th?

8  A.    Yes.

9  Q.    You were.

10 A.    Yes.

11 Q.    So any financial transfers that we just talked about,

12 you don't know whether all those transfers and payments that

13 were made were to pay off preexisting obligations; right?

14 A.    Well, regardless of that, the advances from the credit

15 line were fraudulent draws.  So the fact that it continued

16 after the business was shut down on August 24th speaks for

17 itself.

18 Q.    Okay.  We'll talk about advances from the credit line.

19 I'm talking -- I'm asking you, you already testified you

20 don't know whether the transfers and payments made from SCS

21 bank accounts were for preexisting obligations; right?  You

22 testified to that.

23 A.    Correct.

24 Q.    You don't know what the ongoing obligations were for

25 those payments; right?

1    A.    Correct.

2    Q.    So you actually don't know whether that reflects actual

3    operations of SCS after August 24th.  You have no idea.  It

4    could have been for all stuff that was owed prior to August

5    24th.

6    A.    The fact that in the pretrial services report it stated

7    that the business was closed on August 24th and did not begin

8    winding down, leads me to believe that it is continuing

9    operations.

10   Q.    Okay.  Do you know that the FBI has been in possession

11   of their warehouse since August 24th?

12   A.    Yes.

13   Q.    What business are you saying that SCS was doing?

14   A.    I can only speak to these transactions that I see here.

15   Q.    Yeah.  You can only speculate that there were

16   transactions going on, you know, that there was actually

17   operating the business.  That's all you're doing; right?

18   You're just speculating that because you have transfers from

19   accounts that you don't know what those transfers are for.

20   Fair?

21   A.    Can you repeat that?

22   Q.    Yeah.  You're just speculating that SCS was operating

23   as a business based on bank transfers for which you have no

24   idea what those transfers were for; right?  That's fair to

25   say; right?

1    A.    Well, I'll refer back to the credit line, which I know

2    you mentioned before.  Part of that, when they draw on that

3    credit line, they are saying that they are an existing

4    entity, that they are continuing operations.  So by the fact

5    they continue to draw on those, leads me to believe that they

6    are continuing their operations.

7    Q.    Or the draw on the credit line could have been to pay

8    preexisting obligations, too; right?

9    A.    Either way, continuing operations.

10   Q.    Okay.  So paying preexisting obligations is continuing

11   operations.  That's your testimony.

12   A.    Yes.

13   Q.    Okay.  But again, you have no idea and no knowledge

14   whatsoever whether or not SCS was actually selling any

15   products after August 24th, do you?

16   A.    No.

17   Q.    No idea about that; right?

18   A.    No.

19   Q.    You have no idea whether SCS was actually engaged in

20   any other type of business, other than you know that there

21   are financial transactions to pay for obligations about which

22   you know nothing.  Is that fair?

23   A.    Can you repeat that?

24   Q.    You have no idea whether SCS was doing anything other

25   than making -- than engaging in the financial transactions,

331

1  the underlying obligations for which you know nothing about;

2  is that right?

3  A.    Yes.

4  Q.    Okay.  Another bit of your testimony about that caught

5  my attention.  You said, pretty unequivocally, owners don't

6  transfer money into a company's bank account.

7            Do you remember that?

8  A.    Yes.

9  Q.    Have you ever heard of a capital contribution?

10  A.    Yes.

11  Q.    So isn't that an owner transferring money into a bank

12  account?

13  A.    It's not as frequent as you would see here.

14  Q.    I didn't ask that.  I'm asking, isn't that an owner

15  transferring money into a company's bank account?

16  A.    Yes.

17  Q.    Okay.  Did you ever hear about owners taking a loan

18  from a company?

19  A.    Yes.

20  Q.    Owners pay that money back.

21  A.    Yes.

22  Q.    And when an owner does that, they might transfer money

23  into the company's bank account; right?

24  A.    Correct.

25  Q.    So your testimony, your unequivocal testimony and just

1    blanket testimony that owners don't transfer money into a
2    bank account, that's not true.  Owners transfer money into
3    company bank accounts; don't they?
4    A.    Yes.
5    Q.    Okay.  Now I would like to ask you about the CTR
6    report.  This I believe was admitted as Exhibit 12.  This is
7    the report that was sent to us at 11:24 this morning.
8            What time did you get this Exhibit 12?
9    A.    It was also sometime this morning.
10   Q.    Yeah, okay.  I'm going to put this up on the screen.
11           So just, first off, this is a CTR report, Currency
12   Transaction Report; right?
13   A.    Correct.
14   Q.    This is just a document that's filled out by a bank
15   employee; right?
16   A.    Well, this is their internal investigation into filing
17   the CTR, yes.
18   Q.    Okay.  My question was this is a document that's filled
19   out by a bank employee; right?
20   A.    Correct.
21   Q.    Correct.  So this isn't like some FBI investigation;
22   right?
23   A.    No.
24   Q.    This isn't the results of any other government
25   investigator.  This is what a bank employee wrote on this;

1    right?

2    A.    Correct.

3    Q.    And what's the date of this document?

4          (Pause in the proceedings.)

5          THE WITNESS:  I don't see it listed on here.

6    BY MR. WOHLFORD:

7    Q.    It doesn't have a date, does it?

8    A.    No, sir.

9    Q.    No.  But we're talking about what date the analysis was

10   because that is in there.  But so I want to ask you about

11   this full paragraph here at the bottom of the first page of

12   Exhibit 12, which is again what's being filled out by a bank

13   employee.  And it says *Within the last two months, U.S.*

14   *Global Product, Inc. has received multiple wires from SCS*

15   *SUP, which I believe is SCS Supply Chain.*

16          Do you see that?

17   A.    Yes.

18   Q.    So not only is this just a bank employee, this is just

19   what a bank employee believes; right?

20   A.    Yes.

21   Q.    Okay.  Did you ever talk -- you mentioned, and I

22   believe your testimony was, again unequivocally, that SCS has

23   proxy accounts.  You testified to that; right?

24   A.    Yes.

25   Q.    And is that just based off this document?

1   A.     Yes.

2   Q.     Which you received this morning?

3   A.     Yes.

4   Q.     Which you've done no further investigation into?

5   A.     Correct.

6   Q.     Correct.  So, okay, let's peel the onion back on that a

7   little bit.  The -- I believe the basis for you saying that

8   SCS has proxy accounts is some statements in this document

9   that are written by a bank employee about what this person

10  Malik Muradally told the bank employee; is that right?

11  A.     Yes.

12  Q.     Did you ever talk to Muradally?

13  A.     No.

14  Q.     No, because you haven't done any investigation into

15  this document, have you?

16  A.     Well, my role is not interviewing individuals.

17  Q.     Right, I understand.  But you haven't done any

18  investigation beyond this document; right?

19  A.     Correct.

20  Q.     So you have no idea whether Muradally was being

21  truthful to the -- this bank employee.

22  A.     Correct.

23  Q.     You have no idea whether the bank employee accurately

24  and faithfully transcribed what he had been told by

25  Muradally, do you?

A.     No.

Q.     This is just a statement by a bank employee about what someone else told that bank employee; isn't that right?

A.     Yes.

Q.     And then you come in here with that -- with that and that only, and that is the sole basis for your testimony that SCS has proxy accounts?

A.     Yes.

Q.     Look at the top here.  You see where it says, Scope of Review?

A.     Yes.

Q.     January 2019 to January 2020; right?

A.     Yes.

Q.     So that tells you this is stale information anyway; right?

A.     Not necessarily.

Q.     Well, the Scope of Review is approximately 22-months old, isn't it?

A.     Yes.

Q.     Yeah, okay.  Down at the bottom, *The customer sent and received 29 wires totaling $1,587,313 to the suspicious entity.  The transactions were conducted online between January 16, 2019 to January 8, 202*0; right?

A.     Yes.

Q.     Again, we're talking about information that's 22-months

1    old.

2    A.    Yeah.

3    Q.    And based on that information and that information

4    alone, you are willing to testify to this Honorable Court

5    that you know SCS has proxy bank accounts presently, as we

6    sit here today.

7    A.    This is an ongoing financial investigation.  So as

8    information becomes available, we look into it and go, go

9    from there.

10   Q.    I'm not asking about the investigation.  I'm asking

11   about the unequivocal testimony you gave today based on

12   nothing other than this document that's based on information

13   that's no less than 22-months old.  You're willing to testify

14   unequivocally to this Honorable Court that based on nothing

15   other than this document, SCS has proxy bank accounts, as we

16   sit here today.  Yes or no?

17   A.    Yes.

18   Q.    You have no evidence whatsoever that Maaz Aziz has any

19   access to any U.S. Global bank account, do you?

20   A.    No.

21   Q.    Okay.  I'm going to ask you now about Exhibit 5.  Just

22   so you know what document I'm talking about, are you familiar

23   with that?

24   A.    Yes.

25   Q.    Is this document, just for mine and the Court's

1   edification, is this a summary of your analysis or is this a

2   document that you found somewhere?

3   A.    A summary of my analysis.

4   Q.    Okay.  This analysis covers nine bank accounts; is that

5   correct?

6   A.    Correct.

7   Q.    Okay.  Are they all business accounts?

8   A.    No.

9   Q.    How many are not business accounts?  It's just one,

10  isn't it?

11  A.    It's two, actually.

12  Q.    Okay.  Which ones are not business accounts?

13  A.    The Regions account ending in 2276, not the savings,

14  and then also the Regions account ending in 3414.

15  Q.    Okay.  The 2276 account, whose account is that?

16  A.    Saad Aziz.

17  Q.    Okay.  And then the other account you mentioned that

18  was not a business account, whose account is that?

19  A.    That is a joint-owned account between Saad and Maaz

20  Aziz.

21  Q.    Okay.  So Maaz Aziz is a co-signatory on the account

22  for Maaz and Saad Aziz; correct?

23  A.    Correct.

24  Q.    And as of June 15 of 2021, that account had $13,043.60

25  in it; is that right?

1  A.    Can you show me?

2  Q.    Sure.  Does that help reflect your recollection?

3  A.    Yes.

4  Q.    Okay.  So that's as of June 15th of 2021.  You don't

5  have any -- do you have any information about the current

6  balance in that account or --

7  A.    Not at this time.  It was not included in this

8  consolidation the balance information was on.

9  Q.    Okay.  So you would agree with me that this document

10 that you proffered to the Court says nothing about the

11 current account balance or status of this account.

12 A.    Sure.

13 Q.    Yeah.  Maaz Aziz is also a signatory on the account

14 that's named "Gizmobile"; is that right?

15 A.    Yes.

16 Q.    And that account, going from my notes, as of May 28th,

17 there was $26,608.62 in that account.  Does that sound

18 accurate?

19 A.    What was the amount you said?

20 Q.    Here, I'll show it to you in just a sec.

21        So that account is 26 or $28,608.62, right, as of

22 May 28th, 2021?

23 A.    Correct.

24 Q.    And you would agree this is not a personal account, is

25 it?

1    A.    No.

2    Q.    And you would also agree that this says nothing about

3    the current balance or status of that account either, does

4    it?

5    A.    No.

6    Q.    This is going on close to five-months old.

7    A.    Correct.

8    Q.    Okay.  And the other seven accounts, Maaz Aziz isn't

9    the signatory on any of those; right?

10   A.    Correct.

11   Q.    Okay.  Your analysis regarding these accounts again,

12   all nine accounts, it ranges from January of 2020 to June

13   2021; is that right?

14   A.    Yes.

15   Q.    Some accounts, the information is in May.  Some

16   accounts, the information ends in June.  Right?

17   A.    Correct.

18   Q.    So again, I mean, a lot of work went into this, but at

19   the end of the day, it doesn't say anything about the current

20   status of any of those accounts, does it?

21   A.    No.

22   Q.    Okay.  So looking at this document again, which is sort

23   of a consolidated summary of your analysis of those nine

24   accounts; right?

25   A.    Yes.

```
 1   Q.    And I just want to go to the bottom line.  It says, you

 2   know, "Sources:" there.

 3   A.    Yes.

 4   Q.    It's 36 million 175 -- or $36,175,029.76; right?

 5   A.    Correct.

 6   Q.    And the "Uses:" is $36,065,908.97; is that right?

 7   A.    Yes.

 8   Q.    So the bottom line analysis of this spreadsheet,

 9   setting aside that it's stale information, is that over these

10   nine accounts as of May or June 2021, there was around

11   109,000 in liquid assets; is that right?

12   A.    In these accounts, yes.

13   Q.    Okay.  It's not -- that's not tens of millions of

14   dollars in liquid assets, is it?

15   A.    No.

16   Q.    Certainly not hundreds of millions of dollars.

17   A.    No.

18   Q.    And this doesn't even paint the current picture, does

19   it?

20   A.    No.

21   Q.    Okay.  You have no opinion, and you are offering no

22   opinion here today, as to whether any of the transactions

23   reflected in all your analysis were legal or illegal, are

24   you?

25   A.    No.
```

1    Q.    Okay.  Analysis says nothing whatsoever about the

2    legality of any of the transactions you've analyzed, does it?

3    A.    No.

4    Q.    Flip to the -- do you see there where it says, Income,

5    and you've got just shy of 12 million there?

6    A.    Yes.

7    Q.    I just want to clarify.  Is that gross revenue or is

8    that net income that we're talking about?

9    A.    So that would be gross revenue.

10   Q.    Why do you use Income?

11   A.    Just what I use in my analysis when I schedule the

12   accounts.

13   Q.    Okay.  So that's -- the Court shouldn't read that and

14   think, my gosh, they made $11 million or close to $12 million

15   in net profit.

16   A.    No.  This is not a financial statement.

17   Q.    Yeah.  That's just gross revenue that came into these

18   accounts; right?

19   A.    Yes.

20   Q.    Okay.  Let's see.  You're familiar with this, this part

21   of the document, too, that's the second page there of Exhibit

22   5?

23   A.    Yes.

24   Q.    You have a breakdown in where these revenues come from;

25   don't you?

1    A.    Yes.

2    Q.    It looks like 23.3 percent comes from Dubai; is that

3    right?

4    A.    Yes.

5    Q.    Again, you have no idea or opinion as to whether any of

6    that, those funds, are illicit; right?

7    A.    Based off of the totality of the investigation,

8    including the -- what I've done so far with the other

9    accounts, it is believed that the foreign income from Dubai,

10   specifically Action Logistics, is illegal income.

11   Q.    Is believed by you or by people within the FBI?

12   A.    The totality of the investigation, looking at this

13   whole conspiracy from a broader picture.

14   Q.    The whole alleged conspiracy from the broader picture

15   has led the FBI to believe that the income from one person in

16   Dubai or one company in Dubai is illicit?

17   A.    Not just one company.  But, yes.

18   Q.    You only mentioned the one.  What else?

19   A.    That was just the first one that I saw.  Also, Super

20   Nova, which was mentioned in the credit application.  Those

21   are the ones I can think of off the top of my head.

22   Q.    Okay.  So when I asked you before whether you have any

23   opinion as to whether or not any of these transfers were

24   illicit and you said no, you don't have an opinion, now you

25   do have an opinion.

1    A.     Yes.

2    Q.     Okay.  So that, I believe it looks like 23.3 percent,

3    based on your analysis, comes from Dubai.  Then the next one

4    down is, it looks like England, 9.85 percent.

5    A.     Yes.

6    Q.     When you were talking to Ms. Bloss about, oh, you know,

7    there's this money coming in from Dubai, I think you

8    mentioned -- I don't remember the other country you

9    mentioned, but I don't remember you mentioning England;

10   right?  You didn't mention that, did you?

11   A.     No.

12   Q.     And, yet, that's the second biggest source of SCS's

13   foreign income -- correct myself -- foreign gross revenue,

14   not income; right?

15   A.     For this time period and in these accounts, yes.

16   Q.     Yeah, okay.  Now, England -- do you know whether

17   England uses the Global Standard Mobilization Association

18   device registry for blocking stolen devices?

19   A.     I cannot speak to that.  I can only speak to the

20   financials.

21   Q.     Yeah, can't speak to that.

22   A.     The financials.

23   Q.     Okay.  So England may not be a place where you can even

24   sell a stolen phone; right?

25   A.     Maybe.

1    Q.    Yeah.  So all of that 9.8 percent there, or was it 9.85

2    percent of the income, you know, 1.1 million, as far as you

3    know, that's a hundred percent legitimate.

4    A.    It could be.

5    Q.    Next one down I see is 2.56 percent, the Netherlands;

6    right?

7    A.    Yes.

8    Q.    Do you know whether the Netherlands uses the Global

9    Standard Mobilization Association device registry for

10    blocking stolen devices?

11            THE COURT:  Stand by, Ms. Keene.

12            MS. BLOSS:  Objection, Your Honor.  This is outside

13    the scope of direct examination, and this witness has clearly

14    stated that she was only asked to perform a financial

15    investigation.

16            THE COURT:  All right.  Well, as you know, our

17    rules are relaxed for a detention hearing, so I'm going to

18    overrule the objection and allow the question.

19            MR. WOHLFORD:  Thanks, Your Honor.

20    BY MR. WOHLFORD:

21    Q.    Do you have any idea whether the Netherlands uses the

22    global registry for blocking stolen devices?

23    A.    No.

24    Q.    Okay.  So again, all this revenue from the Netherlands,

25    the 306,000 and change, that could all be completely

1    legitimate revenue; right?

2    A.    Could be.

3    Q.    Yeah.  Other countries you list, New Zealand, the

4    revenue coming in about .98 percent in the revenue.  Canada,

5    that one stuck out to me.  Only .69 percent of all of the SCS

6    revenue in these accounts came from Canada, huh?

7    A.    Yes.

8    Q.    Again, this is old information, so it doesn't paint the

9    current picture.  But at least in this little snapshot in

10   time that you analyzed, it was only .69 percent; right?

11   A.    Correct.

12   Q.    Okay.  You've got Hong Kong at .56 percent.  You've got

13   Prague at .5 percent.  Switzerland at .4.  Israel at .34.

14   And Uruguay at .23; is that right?

15   A.    Yes.

16   Q.    Okay.  So other than Dubai or UAE, or England and the

17   Netherlands, no other foreign country even represented 1

18   percent of SCS's revenue during this snapshot in time that

19   you analyzed; right?

20   A.    Correct.

21   Q.    So and then if you look at the bottom line here, it's

22   less than 40 percent of SCS's total revenue came from foreign

23   countries; is that right?

24   A.    Yes.

25   Q.    And, again, just in this snapshot shot in time.

1    A.    Correct.

2    Q.    So it's not accurate to say or to suggest that, at

3    least based on your analysis, that SCS is solely in the

4    business of selling products overseas; right?  That wouldn't

5    be accurate.

6    A.    No.

7    Q.    In fact, that's less than half of its business.

8    A.    For this time frame and in these accounts, yes.

9    Q.    Yeah.  And so for this time frame and in these

10   accounts, less than 40 percent of SCS's revenue came from

11   overseas.

12   A.    Correct.

13   Q.    Okay.  And just again, you don't have any analysis,

14   you're offering no evidence, about what SCS's revenue is

15   after the time frame captured in this analysis; right?

16   A.    Correct.

17   Q.    Okay.  I will move now to Exhibit 9.

18         So you remember Exhibit 9 was the document related

19   to approval of a line of credit for SCS in 2020; right?

20   A.    Yes.

21   Q.    And that was in August 31st of 2020; right?

22   A.    I believe so.

23   Q.    I can put it up if that would help.

24   A.    Yes.

25   Q.    Yeah, okay.  So again, not actually talking about

1   current information and it's over a year old; right?

2   A.    Correct.

3   Q.    Okay.  And in this document, Maaz Aziz is not listed as

4   an owner of SCS, is he?  Page 8.

5              (Pause in the proceedings.)

6              THE WITNESS:  Okay.  I apologize.  I'm with you

7   now.

8   BY MR. WOHLFORD:

9   Q.    No problem.  So my question was in this document, Maaz

10  Aziz is not listed as an owner of SCS, is he?

11  A.    No.

12  Q.    Did Agent Doering have this document?

13  A.    I believe -- I'm not sure.

14  Q.    Okay.  You don't know whether Agent Doering ever viewed

15  this document?

16  A.    I believe he did.

17  Q.    Okay.  So Agent Doering, when he testified earlier, you

18  know, that Maaz Aziz is an owner of SCS, he certainly had

19  some evidence that suggested Maaz Aziz isn't an owner of SCS;

20  right?

21  A.    Can you repeat that?

22  Q.    Yeah.  When Agent Doering testified earlier that Maaz

23  Aziz is an owner of SCS, it's your understanding Agent

24  Doering had evidence that showed that Maaz Aziz was not an

25  owner; right?

1    A.     Well, I will say there are bank accounts that had --

2    that were in SCS's name that Saad and Maaz were both

3    signators (ph) on that have since been closed, but...

4    Q.     That's not at all the question that I asked.

5           The question that I asked was when Agent Doering

6    testified earlier that Maaz Aziz was an owner of SCS, it's

7    your understanding that he actually had information that

8    showed that Maaz Aziz was not an owner of SCS; is that

9    correct?

10   A.     Based off this one document where it does not split the

11   ownership percentage, yes.

12   Q.     Okay.  You have -- there's no indication in this

13   document that Maaz Aziz has any ability to access this

14   Regions line of credit; right?

15   A.     No.

16   Q.     In fact, I think you testified earlier that -- is this

17   line of credit even open anymore?  Did Regions close this

18   down?

19   A.     I believe it's currently still open.

20   Q.     You talked to him, and Regions said, oh, yeah -- did

21   you testify earlier that Regions told you there were

22   fraudulent draws on the --

23   A.     Yes.

24   Q.     And then they just said, you know what, we'll keep it

25   open, though.

1   A.    I believe they're in the process, but I cannot speak

2   for Regions right now.

3   Q.    Okay.  So again, no evidence in this document or

4   elsewhere that Maaz Aziz personally can't access this line of

5   credit; right?

6   A.    No.

7   Q.    He's not a guarantor for this line of credit, is he?

8   A.    No.

9   Q.    Now, Ms. Bloss talked about foreign accounts in this

10  document, and I think what she was talking about was AR,

11  right, accounts receivable?

12  A.    Yes.

13  Q.    So just so we're clear, all of that kind of back and

14  forth about the foreign accounts related to this document,

15  that didn't have anything to do with foreign bank accounts,

16  that had to do with insurance for foreign accounts

17  receivable.

18  A.    Correct.

19  Q.    And as we saw just a little bit ago, the accounts

20  receivable for SCS, at least during the time period and

21  snapshot that you analyzed, were actually less than 40

22  percent of their entire revenue; right?

23  A.    Correct.

24  Q.    Okay.  Is Regions Bank a reputable bank?

25  A.    Yes.

350

1   Q.    Okay.  And so they -- you know, they probably did some

2   due diligence before they offered this line of credit?

3   A.    Yes.

4   Q.    Okay.  Do you remember seeing in this document their

5   analysis that in 2020, electronic parts and equipment

6   wholesaling in the U.S. was a $412.4 billion industry?

7   A.    Can you point to that?

8   Q.    Yeah, sure.  Do you see that?

9   A.    Yes.

10  Q.    Any reason to dispute that's the case?

11  A.    No.

12  Q.    And there's two publicly traded companies in this

13  industry as competitors of SCS, don't they?

14  A.    Yes.

15  Q.    And then they listed a non-public company owned by

16  Berkshire Hathaway as another competitor; right?

17  A.    Yes.

18  Q.    So just so we're clear and there's no, you know, no

19  mistake about this, it's not the government's position that

20  the industry and the business that Maaz and Saad Aziz are

21  involved in is just a purely illegal industry, is it?

22  A.    No.

23          MR. WOHLFORD:  Okay.  I'm going to move to Exhibit

24  10.  And I'm sorry if I'm misidentifying the exhibit as it

25  was admitted today.  This was Exhibit 10 as it was identified

351

1    in the supplemental -- second supplemental brief, just so I'm

2    clear for the record.

3    BY MR. WOHLFORD:

4    Q.    So this document again, right, has been a subsequent

5    Regions credit approval for some changes to the line of

6    credit for SCS; right?

7    A.    For an increase, yes.

8    Q.    Okay.  And again, if we look at the bottom, that

9    document's dated November 17th of 2020.

10   A.    Correct.

11   Q.    Almost a year old.

12   A.    Yes.

13   Q.    Yeah.  Let's go to page 25 of this document.  And Maaz

14   Aziz is not an owner of SCS, is he?

15   A.    No.

16   Q.    No.

17   A.    Not listed here.

18   Q.    No, he's not.  Doesn't even say he owns 1 percent of

19   it, does it?

20   A.    No.

21   Q.    No indication he has the ability to access funds under

22   this line of credit; right?

23   A.    No.

24   Q.    Not a guarantor for it.

25   A.    No.

1    Q.    Okay.  I'm going to go back to page 3 of Exhibit 10.

2    And I want to make sure I understood what your testimony was.

3    I believe you testified this document says that Maaz Aziz was

4    offered as an alternative for the key man insurance that

5    Regions wanted for Saad Aziz.

6    A.    Yes.

7    Q.    Where does it say that on there?

8    A.    Beginning of the paragraph 3 where it states, *Regarding*

9    *the inability to provide Key man life insurance, Regions has*

10   *visited further with the borrower regarding key management*

11   *and succession planning.  While SCS is relatively small, they*

12   *have a management structure in place and plans in place to*

13   *ensure continued operations*.  Next paragraph.

14        *Maaz Aziz is the brother of Saad and has been with*

15   *the company since founding.  He heads the sales department*

16   *and is key to rising volumes.  Mr. Amr Makki is chief of*

17   *operations and has been with the company for about two years.*

18   *He has a deep understanding of the business and is a key*

19   *contributor to decision making for the firm*.

20   Q.    And I must have missed it.  Where did it say that Maaz

21   Aziz was an alternative option for key man insurance?

22   Because the way I'm reading that, it says maybe we don't need

23   key man insurance because they've got people in the pipeline,

24   they've got people lower in the ranks; they're going to take

25   over the business if someone were to happen to the key man.

1    A.    Precisely.

2    Q.    Yeah.  So it's not that he is an alternative, not that

3    Maaz Aziz provided -- you know, that Regions had Maaz -- took

4    out a key man insurance policy on Maaz Aziz; right?

5    A.    No.  They did not provide key man life insurance.

6    Q.    Okay.  That -- I was trying to clear that up.  Because

7    that was my understanding of your testimony earlier was that

8    SCS offered Maaz Aziz as an alternative, you know, insurer or

9    you know, kind of collateral -- whatever you want to call

10   it -- you know, the key man insurance, but that's not what

11   you were testifying; right?

12   A.    Well, they have the management structure in place, so

13   that Maaz Aziz and his brother -- because his brother has

14   been with the company since founding.  And then they have the

15   chief operating officer as well.

16   Q.    Yeah.  And my question I guess is only, it's not your

17   testimony that Regions Bank or SCS took a key man insurance

18   policy out on Maaz Aziz in order to satisfy any requirement

19   that Regions Bank had for this line of credit; right?

20   A.    No.

21   Q.    Okay.  I don't think I need to show Exhibit 11 on the

22   screen, but fair to say that's a balance sheet for Saad and

23   Duua Aziz; right?

24   A.    Can you show it, just to make sure?

25   Q.    Sure.  Do you not have the exhibits in front of you?

1   A.    I don't have them numbered, so I just want to make sure

2   I'm looking at the right thing.

3   Q.    I'm kind of worried we are going to have a messy record

4   with exhibit numbers here, but we'll figure it out.

5         That document, that was labeled as Exhibit 11 to

6   the government's second supplemental brief?

7   A.    Yes.

8   Q.    That document has zero to do with Maaz Aziz; right?

9   A.    Correct.

10  Q.    Okay.  And then go to the credit agreement between SCS

11  Supply Chain and Regions Bank.  This was labeled as Exhibit

12  12 to the government's second supplemental exhibit -- I

13  apologize, I don't recall what we admitted this exhibit as

14  today.  But I think if I identify it as the credit agreement,

15  you know what I'm talking about; correct?

16  A.    Yes.

17  Q.    Okay.  And again, this is dated December 3rd of 2020;

18  right?

19  A.    Correct.

20  Q.    Is this agreement still in place?

21  A.    I believe it would go the length of, as long as the

22  line of credit was outstanding, then the agreement would be

23  in place, yes.

24  Q.    Okay.  I want to go to the last page of this document.

25  This is the Schedules page; right?

1    A.    Yes.

2    Q.    Okay.  There has been a lot of testimony that, you

3    know, SCS Canada is a subsidiary of SCS.  Have you heard

4    that?

5    A.    Yes.

6    Q.    Now, this document at least was a document the

7    government's offering to support its position here.  If you

8    look at 6.13 in the Schedules page, subsidiaries, ventures,

9    et cetera, and what does it say?

10   A.    None.

11   Q.    Okay.  Let's look at Exhibit 13.  Can you tell what

12   that document is?

13   A.    Yes.

14   Q.    Okay.  And just to be clear as to what this is, this

15   was just a list of transfers from SCS bank accounts from

16   August 24th of 2021 to September 17th, 2021; right?

17   A.    The transactions, yes.

18   Q.    Okay.  Doesn't list the balance of any accounts; right?

19   A.    No.

20   Q.    Doesn't actually indicate the current financial status

21   of any of these accounts, does it?

22   A.    No.

23   Q.    Okay.  Um, okay.  And then Exhibit 14 was a PPP loan

24   application form.  I'm not even sure if that was admitted,

25   but do you know what I'm talking about?

1    A.    I -- can you show it to me?

2    Q.    I'm not offering it.  I want to be clear about that,

3    but...

4              Have you seen that before?

5    A.    Yes.

6    Q.    Just to be clear, Maaz Aziz didn't sign that form, did

7    he?

8    A.    No.

9    Q.    And real quick again, that form indicates that Maaz

10   Aziz is not an owner or investor in SCS Canada.

11   A.    Correct.

12   Q.    So to be clear, you've offered no evidence regarding

13   the current status of any SCS accounts today, have you?

14   A.    Correct, beyond the September -- or the August 24th to

15   September 17th transactions that have occurred.

16   Q.    Those are just transactions.  That doesn't have -- say

17   anything about the current status or balance of those

18   accounts, does it?

19   A.    Beyond the fact that they're open to have transactions,

20   no.

21   Q.    Okay.  So it says that the accounts are open, but it

22   doesn't say anything about the balance, anything else; right?

23   A.    Correct.

24   Q.    Okay.  And you've offered no evidence regarding Maaz

25   Aziz's current ability to access funds from those SCS

1    accounts, have you?

2    A.    Correct.

3              MR. WOHLFORD:  Okay.  Pass the witness, Your Honor.

4              THE COURT:  All right.  Do you have any

5    examination, Mr. Meyer?

6              MR. MEYER:  Yes, Your Honor.  My apologies.

7    Double-checking before I make the exhibit situation any worse

8    than it already is.

9                        CROSS-EXAMINATION

10   BY MR. MEYER:

11   Q.    Ms. Keene, there's been a lot of testimony about what

12   was told or not told to pretrial services.  And as to my

13   client, Saad Aziz, were you present during his pretrial

14   services interview?

15   A.    No.

16   Q.    Okay.  And so you don't know who was in the room at

17   that time?

18   A.    No.

19   Q.    Okay.  You don't know who was asked what?

20   A.    Just whatever was reported in the report.

21   Q.    Okay.  And to clarify, my colleague, Ms. Riley, you

22   were not aware that she was there for that interview;

23   correct?

24   A.    Correct.

25   Q.    You're not aware of the answers she provided to

1    pretrial --

2              (Court reporter clarification.)

3              MR. MEYER:  Yes, ma'am.  I apologize.

4    BY MR. MEYER:

5    Q.    Last question is you are not aware of the answers she

6    provided pretrial services; is that correct?

7    A.    Correct.

8    Q.    You're also not aware of the length of that meeting,

9    are you?

10   A.    No.

11   Q.    And just to clarify, on each of the two Frisco lots,

12   lots I believe 6 and 7 that you discussed during your direct

13   examination, those are not subject to lis pendens, are they?

14   A.    Not at this moment, no.

15   Q.    There's not a preliminary order of forfeiture that's

16   been filed in the Eastern District or the Northern District

17   of Texas; is that right?

18   A.    Correct.

19   Q.    And going to what I believe is Exhibit 12, I know you

20   covered this at length, so I just want to make sure this is

21   clear for the record.  The transfers that you identified in

22   the Regions accounts after August 24th, you have no idea

23   whether those are for new or past obligations; is that

24   correct?

25   A.    It is my assumption, based off of the warranties that

1    are made by drawing on the credit line, that the business was

2    continuing.

3    Q.    I'm sorry.  I'm sorry.  Could we --

4            MR. MEYER:  Objection as nonresponsive, Your Honor.

5            THE COURT:  Well, let her finish her answer --

6            MR. MEYER:  Yes, Your Honor.

7            THE COURT:  -- then you can make your objection.

8            THE WITNESS:  So it's my understanding that it is

9    continuing business.  However, the specifics of the

10   transactions, I do not know about.

11   BY MR. MEYER:

12   Q.    Okay.  So to clarify the record, you do not know

13   whether these financial transfers are for current, past, or

14   future obligations.

15   A.    Correct.

16   Q.    And with respect to the U.S. Global bank account and

17   the report from Prosperity, I'm going to ask the same

18   question Mr. Wohlford asked about his client:  You have no

19   indication that Saad Aziz has signatory authority on any of

20   those accounts; is that correct?

21   A.    Not at this time.

22   Q.    And you have no indication he has the ability to access

23   those accounts; is that correct?

24   A.    Not at this time, no.

25   Q.    This is Exhibit 5 that you were discussing earlier,

1    Government Exhibit 5.  And this is a report that you

2    prepared?

3    A.    Correct.

4    Q.    And just for the take-away number at the bottom, I know

5    you've discussed this at length, but there is approximately a

6    hundred thousand dollars that is liquid in those accounts for

7    this time period -- the analyzed accounts; is that correct?

8    A.    Correct.

9    Q.    And that time period ended on June 30, 2021; is that

10    correct?

11    A.    Correct.

12    Q.    So five months ago.

13    A.    Yes.

14    Q.    Are you're not aware of the current balance of those

15    accounts, are you?

16    A.    No.

17    Q.    Going back to these post transfer or post -- sorry --

18    warrant transfers, a number of them are coded as sweeps --

19    A.    Yes.

20    Q.    -- in the transaction type.

21    A.    Yes.

22    Q.    For instance, there are transfers here on 9/16 that are

23    coded as sweeps, the SCS expense account; is that right?

24    A.    Yes.

25    Q.    And there's a number of earlier ones, including I think

1    all of the transactions regarding a line of credit are coded

2    as sweeps.

3    A.    Yes.

4    Q.    Do you have an understanding of what that means?

5    A.    I do not.  Those are internal designations provided by

6    Regions.

7    Q.    And how long -- you said you've been a CPA for ten

8    months with the FBI; is that correct?

9    A.    With the FBI, yes.

10   Q.    And how long were you in public accounting before that?

11   A.    Over two years.

12   Q.    Okay.  And that was after you got your master's in

13   accounting?

14   A.    Yes.

15   Q.    And so you audited public companies; is that correct?

16   A.    I -- no, sir.

17   Q.    You did not do public company work as a CPA.

18   A.    I worked as a CPA, but the companies that I audited

19   were privately held.

20   Q.    Okay.  So they were private companies.  Were they

21   closely held or did they have a large number of shareholders?

22   A.    Closely held.

23   Q.    So less than 50 shareholders; is that right?

24   A.    Yes.

25   Q.    Any single-member or two-member entities that you

1    audited?

2    A.    Yes.

3    Q.    And it's still your testimony today that it's

4    completely unusual for you that the owners of an entity would

5    make transactions in and out from their personal accounts?

6    A.    To this degree, yes.

7    Q.    To this degree.  I understand.

8    A.    Yes.

9    Q.    So it's not your testimony that it's unusual for an

10   owner of a single or two-member LLC to move money in and out

11   from personal accounts to business accounts.

12   A.    Correct.

13   Q.    Would you have any reason to disagree with me if I

14   represented to you that these sweeps were an automated

15   process whereby funds were deposited into the account from

16   the line of credit based on the borrowing base of the

17   company?

18   A.    Can you repeat that?  Sorry.

19   Q.    Yes.  So do you have the spreadsheet in front of you?

20   A.    I do.

21   Q.    Okay.  So if you look at, for instance, I believe

22   8/24 -- my apologies, that's a bad example.

23             There we go.  If we look at 8/25, there is a line

24   here that's coded as cash management credit?

25   A.    Yes.

1   Q.     72,500.  And your timeline identifies that that

2   transfer was a transfer from the Regions line of credit; is

3   that correct?

4   A.     Correct.

5   Q.     So my question to you is -- this is coded as a sweep.

6   You mentioned earlier that there are, you know, individual

7   checks being cashed, that sort of thing.  It looks like right

8   here is one, $20,000, that would have been a check that was

9   cashed at the desk.

10          So my question to you is, where it says this is a

11  sweep, if I represent to you that this is an automated

12  process whereby Regions is doing a daily analysis and they

13  are depositing into the account the amount justified by the

14  borrowing base submitted on a biweekly basis, do you have any

15  reason to disagree with that?

16  A.     In the credit agreement, in order to get an advance

17  from the credit line, you have to submit a written agreement

18  or a written statement to Regions to get that money.

19  Q.     And have you reviewed all of those?

20  A.     All of what?

21  Q.     The transfer -- the credit requests, the loan advances.

22  A.     No.

23  Q.     Have you reviewed any of the loan advances?

24  A.     No.

25  Q.     Are you aware of whether or not loan advances exists

1    for each one of these transactions?

2    A.    No.

3    Q.    Are you aware that this is a contract that can

4    be amended by the parties?

5    A.    No.

6    Q.    So setting aside what's in the credit agreement, if I

7    represent to you that this is an automated process, it became

8    automated at some point, do you have any reason to disagree

9    with that?

10   A.    Not at this time.

11   Q.    And moving on to the -- well, first of all, just a

12   matter of clarification.  During your direct examination with

13   Ms. Bloss, you mentioned on a number -- you described a

14   number of times that the financing arrangement with Regions

15   is a loan.  That's not exactly correct.  It's a line of

16   credit; right?

17   A.    Correct.  Yes.

18   Q.    So when we looked at the $2 million authorization and a

19   $3 and a half million authorization, it's not your testimony

20   that on those dates Regions just cut a check to SCS for $2

21   million.

22   A.    Correct.

23   Q.    SCS had to provide a borrowing base; is that right?

24   A.    Yes.

25   Q.    And that borrowing basis comprised of various

1  categories, including accounts receivable; is that right?

2  A.    Yes.

3  Q.    And those were valued-based amounts by a credit-based

4  amounts by Regions; is that correct?

5  A.    Yes.

6  Q.    And Regions will only loan a certain amount against

7  those various categories of borrowing base, and there was a

8  maximum that could be less than or up to $2 million, and then

9  eventually $3.5 million.

10  A.    Correct.

11  Q.    So going to what has been marked Exhibit 8 for the

12  hearing, this is a balance sheet that Ms. Bloss covered with

13  you.  And this was received from Regions Bank; is that

14  correct?

15  A.    Correct.

16  Q.    And this is not a balance sheet prepared by Saad Aziz

17  individually, is it?

18  A.    No.

19  Q.    This is prepared by the bank.

20  A.    It lists tax return.  I can't -- I am to assume that it

21  came from their tax return.

22  Q.    My assumption was that it was prepared by the bank

23  based on tax returns.  Does that seem fair to you?

24  A.    Yes.

25  Q.    And a couple of questions, I think the first one of

1    which is the most recent date on here is December 31st, 2019;

2    is that right?

3    A.    Yes.

4    Q.    So this is a financial statement, a balance sheet from

5    Saad Aziz as of 12/31/19.

6    A.    Yes.

7    Q.    And today is October 25th, 2021.

8    A.    Yes.

9    Q.    So this information is almost two-years old; is that

10   right?

11   A.    Yes.

12   Q.    And here, where it's listing his assets, it identifies

13   the value of the business owned.  And for these purposes, the

14   business owned is SCS Supply Chain here in Texas; is that

15   right?

16   A.    I would assume so, yes.

17   Q.    And that's $800,000.

18   A.    Yes.

19   Q.    So that's fully half of his total assets identified by

20   the bank.

21   A.    Yes.

22   Q.    In 2019.

23   A.    Um-hum.

24   Q.    And as you testified earlier, are you aware that the

25   warehouse is currently held by the FBI?

```
 1    A.    Yes.

 2    Q.    Is that right?  And it has been held by the FBI for the

 3    last month?

 4    A.    Yes.

 5    Q.    Two months.

 6    A.    Two months.

 7    Q.    I apologize.

 8    A.    Yes.

 9    Q.    And then finally, you discussed with Ms. Bloss these

10    adjusted gross income numbers down here at the bottom,

11    571,000 and then 749,000; is that right?

12    A.    Yes.

13    Q.    So that's cash that Mr. Aziz received in each of '18

14    and '19.

15    A.    Correct.

16    Q.    It's your testimony today that these are cash

17    distributions he received in full in 2018 and 2019.

18    A.    Well, it's his income for that year.

19    Q.    Okay.  So I understand it's his taxable income.  My

20    question is did he receive $749,799 in cash in 2019?

21    A.    I can't say whether it was in cash or...

22    Q.    Are you aware of what kind of entity SCS is?

23    A.    I believe it's an LLC.

24    Q.    And LLC's are pass-through entities; is that correct?

25    A.    Correct.
```

1    Q.    Are you aware of what tax election SCS has made?

2    A.    Um, I believe it was an S Corp, but I can't remember.

3    Q.    So if it's an S Corp, the income is going to be passed

4    through and deemed for the owners; is that correct?

5    A.    Yes.

6    Q.    So if this is deemed income, then 749,000 could just be

7    income from the business but not actual cash distributions;

8    is that right?

9    A.    Can you repeat that?

10   Q.    Yes.  My point is this is $749,799 in taxable income in

11   2019, but you have no idea, sitting here today, whether that

12   amount was actually distributed in cash to Mr. Aziz or

13   whether it was held at the company, because it's a

14   pass-through entity, so this income would just be deemed to

15   him.

16   A.    Correct.

17   Q.    And speaking of deemed income, are you aware of the

18   ownership structure, at least as Regions understands it, for

19   SCS?

20   A.    Um, I believe in the credit application it was listed

21   as Saad Aziz with a hundred percent ownership.

22   Q.    So for federal tax purposes, he would have had to pay

23   taxes on the total income of SCS in 2018 and 2019, whether or

24   not he actually received those funds in cash.

25   A.    Correct.

1    Q.    And you discussed earlier with Ms. Bloss that there

2    were -- there were entities that Regions identified as

3    affiliated or related entities because they were owned by

4    Duua Aziz.

5    A.    Correct.

6    Q.    I'm going to direct you to page 15 of Exhibit 9.

7          Please just let me know if I read the second

8    sentence correctly.  *While not active in the daily*

9    *operations, she* -- referring back to Duua Aziz -- *is the*

10   *beneficial owner of multiple related entities.*  Is that

11   correct?

12   A.    Yes.

13   Q.    And beneficial owner, again, is someone who owns

14   legally on paper but, as the bank said, she is not involved.

15   A.    In SCS, correct.

16   Q.    So just to clarify, it says *While not active in the*

17   *daily operations, she is the beneficial owner of multiple*

18   *related entities.*  I read that correctly.

19   A.    Yes.

20   Q.    So do you have any reason to dispute Regions'

21   understanding as of August 2020 that Ms. Aziz was not

22   involved in the daily operations of the business?

23   A.    No.

24   Q.    And you also covered with Ms. Bloss that there was an

25   update to this application in November of 2020; is that

370

1    right?

2    A.    Yes.

3    Q.    And at that time, they increased -- Regions authorized

4    an increase in the line of credit from two million to three

5    and a half million; is that right?

6    A.    That is correct.

7    Q.    This was after Regions had done an onsite examination?

8    A.    I believe so, yes.

9    Q.    I direct you to page 27 of Exhibit 10, please.  As we

10   were talking earlier about whether or not Mr. Aziz had

11   reached -- or received cash distributions, this first bullet

12   point in the bank's analysis -- make sure I read this

13   accurately -- *MRA estimates tax payments of 25% of NI --*

14   assume that's net income -- *while covenant includes actual*

15   *distributions, which have been materially less in recent*

16   *years as owners have retained earnings.*

17              Did I read that right?

18   A.    Yes.

19   Q.    Now, as you identified earlier, the owner of SCS is

20   Saad Aziz; is that correct?

21   A.    Yes.

22   Q.    And retained earnings means that he did not make cash

23   distributions; is that accurate?

24   A.    Yes.

25   Q.    So he would have reinvested those income -- he would

1    have reinvested distributions into the business.

2    A.    Yes.

3    Q.    So earlier, in the same document on page 5, when the

4    bank is identifying margins of 1.6 to 1.7 percent for the

5    business as a whole, the bank's saying Saad Aziz isn't

6    pocketing that money, he's plowing it back into the business

7    to expand it; is that correct?

8    A.    Yes.

9    Q.    Do you have any reason to believe that Saad Aziz

10   stepped up distributions in 2021?

11   A.    Not at this time, no.

12   Q.    One more question on Exhibit 10 and then we'll move on.

13          I direct you to page 32 of Exhibit 10.  Again, this

14   is the November 2020 update; is that correct?

15   A.    I believe so, yes.

16   Q.    Okay.  And again the bank notes, quote, *While not*

17   *active in the daily operations, she* -- referring to Duua

18   Aziz -- *is the beneficial owner of multiple related*

19   *entities...*

20          Did I read that correctly?

21   A.    Yes.

22   Q.    So again, as of November 2020, after a field exam, the

23   bank is still saying Duua Aziz was merely a beneficial owner

24   with no involvement in the daily operations; is that correct?

25   A.    Yes.

1   Q.    Do you have any reason to dispute that today?

2   A.    Not at this time.

3   Q.    Ms. Keene, how many -- or Agent Keene?  I apologize.

4   A.    Ms. Keene.

5   Q.    Ms. Keene, how many detention hearings have you

6   testified in?

7   A.    This is my first one.

8   Q.    So when Ms. Bloss asked you earlier if you were -- if

9   you had made a determination as to any conditions of release

10  that could be imposed on Saad Aziz to reasonably compel

11  his -- reasonably compel his appearance at trial, this is the

12  first time you've had to do this.

13  A.    Correct.

14  Q.    And you were present in the courtroom earlier -- well,

15  were you present in the courtroom on October 15th during the

16  bulk of Agent Doering's presentation?

17  A.    I was.

18  Q.    And you heard him discuss that there was a bank account

19  in Pakistan.

20  A.    Yes.

21  Q.    A Silk Bank account; is that correct?

22  A.    Correct.

23  Q.    Do you know when that account was opened?

24  A.    Not at this time.  I was not asked to look into that

25  for the purposes of this hearing.

1  Q.    So you don't know when that account was opened; is that

2  correct?

3  A.    No.

4  Q.    You don't know the status of that account?

5  A.    No.

6  Q.    You don't know the volume of transfers into that

7  account?

8  A.    Not at this time, no.

9  Q.    Out of -- transfers out of that account?

10  A.    Not at this time.

11  Q.    Current balance of that account?

12  A.    Not at this time.

13  Q.    So if the current balance was $21.74 as of October

14  20th, 2021, you would not have any dispute with that?

15  A.    Not at this time, no.

16  Q.    Were you solely -- going back to what you were asked to

17  review for purposes of this hearing, were you solely asked to

18  review the Regions accounts?

19  A.    The Regions and the Texas Brand Bank, yes.

20  Q.    All right.  Just one more question about the Pakistani

21  account.  Do you have any reason to dispute that the account

22  was opened on December 25th of 2018?

23  A.    Not at this time, no.

24  Q.    And that was before this case was indicted; is that

25  correct?

```
1    A.    Correct.

2    Q.    Or investigated?

3    A.    Correct.

4          THE COURT:  Mr. Meyer, just a question.  How much

5    more do you have for this witness?

6          MR. MEYER:  Ten to fifteen minutes, Your Honor,

7    tops.  I can get it done in ten, probably.

8          THE COURT:  All right.  Why don't you get it done

9    in ten.

10         MR. MEYER:  Yes, Your Honor.

11   BY MR. MEYER:

12   Q.    Ms. Keene, I know you said you were not aware of the

13   current balance of the Regions accounts.  Are you aware that

14   the government received another subpoena return from Regions

15   on last Thursday?

16   A.    Yes.

17   Q.    But you haven't looked at those yet?

18   A.    Not yet, no.

19   Q.    This is a SCS Supply Chain account; is that correct?

20   A.    Yes.

21   Q.    And that statement's through September 30th; is that

22   right?

23   A.    That's correct.

24   Q.    And am I reading that correctly, the ending balance is

25   36 cents?
```

1    A.    That is correct.

2    Q.    And that's account ending in 1235; is that right?

3    A.    Yes.

4    Q.    This is another Regions Bank account for SCS ending in

5    1243; is that right?

6    A.    That's correct.

7    Q.    And that ending balance on September 30th is $1,001.58;

8    is that right?

9    A.    Yes.

10   Q.    So now we're up to $1,002; is that about right?

11   A.    Thereabouts.

12   Q.    This is SCS account ending in 2268; is that right?

13   A.    Yes.

14   Q.    Sorry, I'm going to skip ahead.  That one ends in

15   August.  And its ending balance, as of September 24th, is

16   zero dollars; is that right?

17   A.    Yes.

18   Q.    So three accounts worth a thousand and two dollars.

19         And this is another SCS account ending in 2276; is

20   that right?

21   A.    Yes.

22   Q.    And its balance, as of September 24th, is zero dollars;

23   is that right?

24   A.    Correct.

25   Q.    This is an SCS account ending in 2276; is that right?

1    A.    No, sir.  That is an account for Saad Aziz.

2    Q.    Oh, my apologies.  Saad Aziz account at Regions ending

3    in 2276.

4    A.    Correct.

5    Q.    And the balance on that account on October 14th

6    is $1.25.

7    A.    Correct.

8    Q.    And it looks like this is a joint CD for Saad and Maaz

9    Aziz; is that right?

10   A.    Yes.

11   Q.    And that's ending in 3414?

12   A.    Yes.

13   Q.    And its ending balance on October 14th of this year is

14   $45.93; is that right?

15   A.    That's correct.

16   Q.    So we're at about a thousand fifty dollars?

17   A.    Thereabouts.

18   Q.    And this is an SCS Supply Chain account at Regions

19   for -- ending in 4317, and its ending balance on September

20   22nd is one cent; is that right?

21   A.    Yes.

22         MR. MEYER:  Your Honor, might I make use of the

23   government's demonstrative momentarily?

24         THE COURT:  Yes.

25   BY MR. MEYER:

1    Q.    Can you see this far?

2    A.    We'll see once you get it set up.

3    Q.    Is the microphone working?  First time in two hearings.

4    All right.

5            So I know you covered this a lot, and I just want

6    to make this very simple for you.  So we've got a search

7    warrant here on August 24th.

8    A.    Correct.

9    Q.    You were here earlier when I was talking to Agent

10   Doering, and you were aware that there was also search

11   warrants executed on Saad's house.

12   A.    Correct.

13   Q.    Okay.  And on this same date, you drew attention to the

14   fact that there were inflows from the line of credit within

15   two days totaling over a hundred thousand dollars.

16   A.    Correct.

17   Q.    And it looks like down here on August 30th you've got a

18   transfer to Aziz Holdings for a hundred thousand dollars.

19   A.    That's correct.

20   Q.    Okay.  So when did Mr. Saad Aziz flee between August

21   24th and August 30th?

22   A.    He did not.

23   Q.    Okay, he didn't.  On August 31st, Mr. Aziz is told by

24   Mr. Gonzalez and Agent Doering that he's going to be

25   indicted; is that right?

1    A.    Correct.

2    Q.    And it looks like here on September 2nd there is a wire

3    to Canada for $165,000 on here.

4    A.    Correct.

5    Q.    Okay.  And so when did Mr. Aziz flee to Canada to take

6    advantage of those funds there?

7    A.    He did not.

8    Q.    Did Mr. Aziz's children flee to Canada?

9    A.    Not that I know of.

10   Q.    His wife didn't go ahead of time to prepare the way?

11   A.    Not that I know of.

12   Q.    Here, on September 3rd, there is a note that

13   Mr. McCarthy wrote -- and Mr. Gonzalez and I was on that --

14   that Mr. Aziz wanted to self-surrender.  On the same day,

15   you've got $134,000 transferred to Aziz Holdings.

16             When did Mr. Aziz flee to Canada on that day?

17   A.    He did not.

18   Q.    What about Pakistan?

19   A.    He did not.

20   Q.    So you're telling me that somehow he's got hundreds of

21   thousands of dollars out of the country, he's apparently a

22   serious risk of flight, he's been told he's going to be

23   indicted, and he hasn't fled yet.

24   A.    Yes.

25   Q.    In fact, when -- so, again, on September 13th he writes

 1    Judge Nowak saying he -- and Judge Johnson and the U.S.

 2    Attorney's office and U.S. Probation saying, I want to

 3    self-surrender.  Let me know where I need to go.

 4              The day before -- or two days before, you've got

 5    11,000 drawn down on the line of credit.  Here, you've got

 6    another -- a couple of additional outflows of cash.

 7              When does Mr. Aziz flee at that point?

 8    A.    He does not.

 9    Q.    In fact, between August 24th and September 23rd, which

10    is a month where you identify what you say are large outflows

11    of cash, Mr. Aziz does not flee.

12    A.    Correct.

13    Q.    His kids don't leave the country.

14    A.    Not that I know of.

15    Q.    His wife doesn't leave the country.

16    A.    Not that I know of.

17    Q.    His mother doesn't heave the country.

18    A.    Not that I know of.

19    Q.    He stays here and waits to get indicted.

20    A.    Yes.

21    Q.    And he does that despite the fact that you've

22    identified what you claim is hundreds of thousands of dollars

23    of funds available to fund that escape.

24    A.    Correct.

25    Q.    He stays here the entire time.

1    A.    Yes.

2    Q.    And the funds that you've identified here, those are

3    not seized by the government at that time.  There weren't

4    seizure warrants run on those accounts.

5    A.    No.

6    Q.    Those funds were available from August 24th to

7    September 23rd; is that right?

8    A.    Correct.

9              MR. MEYER:  No more questions at this time, Your

10   Honor.

11             THE COURT:  All right.  Thank you, Mr. Meyer.

12             Ms. Bloss, can this witness step down?

13             MS. BLOSS:  Well, Your Honor, I had a few questions

14   on redirect, but I understand we're getting pretty close to

15   the...

16             THE COURT:  Yeah, I think if you -- you're going to

17   have to keep it to about five minutes, I think.

18             MS. BLOSS:  All right.  Then I will make it real

19   quick.

20                      REDIRECT EXAMINATION

21   BY MS. BLOSS:

22   Q.    Ms. Keene, on the SCS accounts that opposing counsel

23   just showed you, had low balances.  Do you remember that?

24   A.    Yes.

25   Q.    Now, those accounts, based on what you're seeing,

```
 1    they're passing money through to other accounts; right?
 2    A.    Correct.
 3    Q.    Passing money to credit card payments.
 4    A.    Correct.
 5    Q.    Passing money to money transmitters.
 6    A.    Correct.
 7    Q.    Passing money to Pakistan.
 8    A.    Yes.
 9    Q.    Passing money to U.S. Global, to the tune of over a
10    hundred thousand dollars; right?
11    A.    Correct.
12    Q.    So SCS accounts, those are pass-throughs.
13    A.    Correct.
14    Q.    And U.S. Global, you didn't just see them making
15    transactions with SCS based on the reports from the bank,
16    right, in that investigation?
17    A.    Can you repeat that?  Sorry.
18    Q.    So Prosperity Bank does an investigation of U.S.
19    Global's interactions with SCS; right?
20    A.    Yes.
21    Q.    That's where they say we're a proxy account; right?
22    A.    Yes.
23    Q.    But that's not the only transaction that you saw;
24    right?
25    A.    Correct.
```

1   Q.    Because on September 2nd, U.S. Global is receiving

2   $101,000 from SCS as well.

3   A.    Correct.

4   Q.    And that helps support your analysis; right?

5   A.    Yes.

6   Q.    And I've really got to touch base on this because

7   opposing counsel has just said that Agent Doering

8   misrepresented evidence, and I just want to be clear and make

9   sure we understand where Agent Doering is getting his facts.

10          This is from Saad -- excuse me, Maaz Aziz's own

11  mouth; right?  What he reported to pretrial services.

12  A.    Correct.

13  Q.    The defendant advised that he owned and operated along

14  with his brother, co-defendant Saad Aziz, SCS Supply Chain in

15  Farmersville, Texas; right?

16  A.    Yes.

17  Q.    Agent Doering's opinion based on the defendant's own

18  words; right?

19  A.    Correct.

20  Q.    And one last point.  Opposing counsel noted that there

21  were potentially properties that were identified and given to

22  pretrial services.  Judge Nowak asked them about that

23  pretrial services report; right?

24  A.    Yes.

25  Q.    And here, the Court asks if there's any other

1    information that y'all want to bring out during the course of

2    this hearing; any errors, omissions in that report that you

3    want to bring to our attention.  Do you see that?

4    A.    Yes.

5    Q.    She asked Maaz Aziz's lawyer that question; right?

6    A.    Yes.

7    Q.    She asked Saad Aziz's question -- lawyer that question;

8    right?

9    A.    Yes.

10   Q.    And based on this transcript, do any of those

11   individuals indicate that the report's inaccurate in any way

12   or there needs to be any additional information?

13   A.    No.

14              MS. BLOSS:  Pass the witness.

15              THE COURT:  All right.  I think you can step down,

16   Ms. Keene.

17              So I think that's everything the government's going

18   to present; correct?

19              MR. GONZALEZ:  Yes, Your Honor.  No more witnesses.

20              THE COURT:  So for the defendants, is there any

21   witness you were going to present, or not?

22              MR. WOHLFORD:  Your Honor, so actually, I would

23   appreciate, to the extent that you're willing to, to give us

24   a little bit of guidance.  We do have -- we proffered a

25   third-party custodian at the hearing before Judge Nowak.  He

1  was there.  He was cross-examined by Mr. Gonzalez.  Pretrial

2  services filed an addendum to their report after he was

3  proffered, stating that he would be a suitable custodian.

4        He, unfortunately, could not be at the hearing

5  today.  And I understand that some courts say you've got to

6  hear from your own ears from a potential third-party

7  custodian.  So I have brought a potential backup if that's

8  Your Honor's, you know, policy that you need to be able to

9  hear from any potential third-party custodian.

10        If not, you know, we would -- we think it's

11  sufficient that the previous custodian that we offered,

12  appeared before Judge Nowak, was cross-examined, and vetted

13  by pretrial services.

14        THE COURT:  All right.  So, essentially, what

15  you're saying is defendants would stand on the testimony of

16  the person offered as a third-party custodian at the hearing

17  before Judge Nowak; correct?

18        MR. WOHLFORD:  Yes, Your Honor.  Just to clarify,

19  Maaz Aziz would take that position.  We will stand on the

20  third-party custodian offered for Maaz Aziz.  I can't speak

21  to Saad Aziz.

22        THE COURT:  Mr. Meyer, what about you?

23        MR. MEYER:  Yes, Your Honor.  We had offered Duua

24  Aziz as a third-party custodian at that hearing.  We would

25  stand on her testimony.  She obviously had the opportunity to

1    be cross-examined by Mr. Gonzalez.  We have not received an

2    addendum.  I know that pretrial services ran her and agreed

3    that she had no background hits, but we have not received an

4    addendum.  We followed up with them and just aren't sure of

5    the status of that.

6              THE COURT:  All right.  So needless to stay, I have

7    the transcript.  I have you-all's position that you would

8    stand on that testimony as to both of those proffered

9    third-party custodians.

10             What's the government's position?  Is the

11   government willing to stand on that testimony with

12   cross-examination?

13             MR. GONZALEZ:  Yes, Your Honor.  Obviously, we

14   would -- as we argued then, that we believe that the

15   third-party custodians were woefully inadequate based on the

16   information that was elicited there at that time, and we

17   would obviously add whatever information was added today,

18   specifically as to Duua Aziz, now that the Court has more

19   information that Judge Nowak didn't have about her

20   involvement with businesses that are closely related.  So we

21   would add that testimony to the cross-examination that I had

22   of her at the time on the original detention hearing.

23             THE COURT:  Right.  I understand what you're

24   saying.  You want the Court to account for evidence of this

25   hearing as it bears on that issue.  And I assume the

1    defendants are aware of that.

2            It's no problem for me.  As you may know in many of

3    these instances, we don't have a third-party custodian that

4    ever testifies in front of a magistrate.  And that, you know,

5    from my perspective, is more when we need to hear from one if

6    there hasn't been any evidence presented concerning the

7    potential third-party custodian.  So with that, since the

8    parties are content, I'll just review the record as to both

9    of those custodians.

10           I do want to ask the defendants' counsel -- I want

11   to return to this issue -- you have had the opportunity to do

12   cross-examination on these documents that a number of which

13   were only recently provided to you.  So there's two ways we

14   can approach this in terms of whether or not the defendants

15   believe we need a continuation of this hearing for you to

16   have another opportunity at cross-examination.

17           One is if you can tell me here today we don't need

18   that, we've been able to do sufficient cross-examination,

19   we've been able to do sufficient review, and I can close out

20   the record and close out the hearing.

21           The second alternative is if you tell me you need

22   time, you need a day or two, to figure that out, I can afford

23   that to you and say the Court's not going to make any

24   decision pending a notice from one or both defendants that

25   you don't believe -- whether or not you believe you need more

1    time for further cross-examination based on further review of

2    those documents.

3              Does that all make sense to you?

4         MR. WOHLFORD:  It does, Your Honor.  And on behalf

5    of Maaz Aziz, we will go with the former option and say that

6    we've done our cross-examination -- you know, without

7    withdrawing our prior objection, we've done our

8    cross-examination and would not object to the Court closing

9    the record, Your Honor.

10             THE COURT:  All right.  Mr. Meyer, does Mr. Saad

11   Aziz take the same position, or --

12             MR. MEYER:  Your Honor, he does.  The only other

13   issue I want to raise -- and I can do it now or give

14   Mr. Gonzalez an opportunity, whichever you would prefer, Your

15   Honor.

16             THE COURT:  I'm sorry, you take the same position

17   as Mr. Wohlford?

18             MR. MEYER:  I do.  I just wanted to raise one more

19   issue, Your Honor, which is my colleague, Ms. Riley, is here.

20   We would appreciate the opportunity for her to make a brief

21   proffer to the Court.  She was at the pretrial services

22   interview.  And just because it's been such an issue of

23   discussion, we would appreciate the opportunity for her to

24   make that to the Court this afternoon.

25             THE COURT:  Is there any objection from the

1   government?

2            MR. GONZALEZ:  No, Your Honor.

3            THE COURT:  All right.  She can do that.

4            MR. MEYER:  Thank you, Your Honor.

5            THE COURT:  Ms. Riley, you can go ahead.

6            MS. RILEY:  Thank you, Your Honor.  My name is

7   Rachel Riley, and I'm an associate working at the same firm

8   with Ryan Meyer and with Brandon McCarthy.

9            On September --

10           THE COURT:  You may want to make sure you speak

11  slowly.

12           MS. RILEY:  Okay.  I represented our client, Saad

13  Aziz, at his initial arraignment hearing on September 23rd.

14  I arrived with my client that morning, and he was taken back

15  for processing.  I was actually not physically present when

16  he was being interviewed; however, I had asked to be present

17  for that portion of the interview.

18           And after he had been taken back for processing, I

19  was approached by the pretrial services officer, Ms. Tiffany

20  Routh, who asked if I was Ms. Riley, and said that she had

21  been interviewing my client and that when she had asked him

22  about financials, he had directed her to speak to me as I had

23  a short sheet listing the figures.  So I went over those

24  figures with her, which are the figures that are reflected in

25  the pretrial services report.

1               At no time was I asked about business, financial

2        accounts, which also makes sense to me as I represent an

3        individual and not any entities.  I was not asked about any

4        property ownership other than about Mr. Aziz's home in

5        Euless, Texas.  I was not asked about the location of any

6        bank accounts, whether it was foreign or domestic; that was

7        never approached.

8               And, finally, I was never asked to make a

9        representation that the numbers that we went over represented

10       his complete net worth picture.  And I believe on Exhibit 13

11       it says that Saad Aziz made this representation.  And I want

12       to be clear for the Court that that was not a representation

13       that was made by myself or by my client.

14               THE COURT:  Let me ask you just two questions on

15       that.  So you're saying that when the pretrial services

16       officer interviewed Mr. Saad Aziz and asked him about

17       financials, he just referred her to you; is that correct?

18               MS. RILEY:  Yes.  Yes, that is what she told me.

19               THE COURT:  And then you had the information that

20       you gave to her, and I take it that information was derived

21       from what Mr. Aziz -- and the problem is I don't want to get

22       into any attorney/client communications.  Did you gather that

23       information from your client?

24               MS. RILEY:  Yes.

25               THE COURT:  Okay.  And entirely from your client, I

1    assume.

2              MS. RILEY:  Yes.

3              THE COURT:  All right.

4         Is there anything further you wanted to add?

5              MS. RILEY:  No.  I just wanted to provide that

6    background to the Court because much has been made about the

7    insinuation that our client has not provided this information

8    or it was concealed from pretrial.  But I was the one having

9    that conversation, and I was never asked for a lot of

10   information that they're saying was concealed here today.

11             THE COURT:  All right.  Thank you, Ms. Riley.

12             MS. RILEY:  Thank you.

13             THE COURT:  Both sides have already submitted a lot

14   of written argument on this motion.  If the parties are

15   content to rest on the written briefing, I think we can close

16   out this hearing.  I'm closing the record on the hearing,

17   other than if the parties feel the need to present oral

18   argument in addition to the written arguments that have

19   already been made.

20        Let me ask the government, first, your position on

21   that.

22             MR. GONZALEZ:  No, Your Honor.  We rest on what's

23   already been presented.

24             THE COURT:  All right.  Let me ask both defendants.

25             So Mr. Maaz Aziz, Mr. Wohlford, what's your

1    position on that?

2            MR. WOHLFORD:  Your Honor, we'll rest on the

3    written submission, written arguments as well.

4            THE COURT:  All right.

5            MR. WOHLFORD:  Thank you.

6            THE COURT:  Mr. Meyer.

7            MR. MEYER:  Already turned on, Your Honor, so it

8    will actually work for me.

9            I think we will largely do so as well.  The only

10   point we would make, Your Honor, and just to re-urge -- I

11   know it's in the written briefing -- is our client, Saad

12   Aziz, made multiple attempts over the course of a month to

13   surrender himself.  He's offered multiple times to provide

14   his passports, his children's passports, his wife's

15   passports, to the government to hold through the pendency of

16   the case.

17           He is -- this man is in no way a serious risk of

18   flight.  And we just want to make sure that for every -- all

19   the other testimony that's been provided over the last three

20   hearings about the weight of the evidence and the charges

21   he's facing, and the looming trial, to make sure that the

22   focus is on what is really before, in all of this briefing,

23   which is the serious risk of flight and the fact that he

24   doesn't pose one.

25           THE COURT:  All right.  Thank you, Mr. Meyer.

```
 1              MR. MEYER:  Thank you, Your Honor.

 2              THE COURT:  So I'll close out the record.  We've

 3    heard from counsel today, and I have your written

 4    submissions.  I'm going to take this under advisement and

 5    render a decision as soon as we can.  And we are working hard

 6    on it, and we will try to get the decision out as soon as we

 7    can.  And so as soon as possible, the Court will get a

 8    written decision out regarding detention.

 9              Is there anything further from the government at

10    this time?

11              MR. GONZALEZ:  No, Your Honor.  Thank you.

12              THE COURT:  Anything further from the defendants at

13    this time?

14              MR. WOHLFORD:  Nothing from Maaz Aziz, Your Honor.

15              MR. MEYER:  Nothing from Saad Aziz, Your Honor.

16              THE COURT:  All right.  Thank you, counsel.

17              We'll stand in recess.  You're excused.

18              THE COURT SECURITY OFFICER:  All rise.

19                        (Adjourned at 6:20 p.m.)

20                         *    *    *    *

21

22

23

24

25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4              I, Gayle Wear, Federal Official Court Reporter, in

 5    and for the United States District Court for the Eastern

 6    District of Texas, do hereby certify that pursuant to Section

 7    753, Title 28 United States Code, that the foregoing is a

 8    true and correct transcript of the stenographically reported

 9    proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the regulations

11    of the Judicial Conference of the United States.

12

13                        Dated 30th day of October 2021.

14

15

16                        /s/ Gayle Wear
                          GAYLE WEAR, RPR, CRR
17                        FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25
```